IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PAUL NICKLEN, et al.,

                Plaintiffs,

    v.

MASHABLE, INC., et al.,

                Defendants.

No. 1:20-cv-10300-JSR

**DEFENDANTS HEARST COMMUNICATIONS, INC., HEARST STATIONS INC., HEARST TELEVISION INC., JACKSON HEARST TELEVISION INC., OHIO/OKLAHOMA HEARST TELEVISION INC., WJCL HEARST TELEVISION LLC, WVTM HEARST TELEVISION INC., HEARST PROPERTIES INC. AND HEARST CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Matthew Greenfield
Ravi V. Sitwala
THE HEARST CORPORATION
Office of General Counsel
300 West 57th Street, 40th Floor
New York, New York 10019
Matthew.Greenfield@hearst.com
Tel.: (212) 649-2009

*Counsel for Defendants Hearst Communications, Inc., Hearst Stations Inc., Hearst Television Inc., Jackson Hearst Television Inc., Ohio/Oklahoma Hearst Television Inc., WJCL Hearst Television LLC, WVTM Hearst Television Inc., Hearst Properties Inc., and Hearst Corporation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

ARGUMENT ......................................................................................................................... 6

  I.   The SAC does not allege an infringing "display" as a matter of law, because the Hearst Article only embedded an Instagram post. ....................................................................... 6

  II.  The SAC does not allege that any Hearst Defendant's conduct was "unauthorized," as is required for an infringement claim. ............................................................................... 9

  III.  Even if the Hearst Article were an unauthorized display, it would be fair use. ............... 11

      A.   The purpose and character of the Hearst Defendants' alleged use was fair use. ... 12

          1.  The Hearst Defendants used the Polar Bear Video for news reporting and comment. ............................................................................................... 13

          2.  The Hearst Article embedded the Instagram post transformatively because it reports on the social media post itself. ....................................... 14

          3.  No commercial purpose is alleged; nor would it move the needle. ............... 15

      B.   The factual and published nature of Nicklen's work favors fair use. ................... 16

      C.   The third factor has little impact here, because embedding the full Instagram post served the Hearst Defendants' news reporting and commentary. ................. 17

      D.   The Hearst Defendants' reporting had no plausible effect on the market for Nicklen's video, which he had already posted for free public viewing. .............. 19

  IV.  The SAC does not allege any conduct by five of the Hearst Defendants, who should be dismissed from the litigation. ...................................................................................... 21

  V.  Nicklen asserts three causes of action based exclusively on corporate parenthood, and those three causes of action fail under Rules 8 and 12. ................................................... 22

      A.   Counts Two, Three, and Four do not specify which defendant is the target of each claim. ......................................................................................................... 23

      B.   Counts Two, Three, and Four rely on corporate parenthood as the entire reason for liability, without any basis to pierce the corporate veil. ................................. 23

  VI.  To the extent Mittermeier asserts a claim against the Hearst Defendants, it should be dismissed. ...................................................................................................................... 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Broad. Cos. v. Aereo, Inc.*,
   473 U.S. 431 (2014)..................................................................................8

*Am. Protein Corp. v. AB Volvo*,
   844 F.2d 56 (1988).................................................................................23

*Amsinck v. Columbia Pictures Indus., Inc.*,
   862 F. Supp. 1044 (S.D.N.Y. 1994)........................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................22, 24

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014)......................................................................12

*Authors Guild v. Google Inc.*,
   804 F.3d 202 (2d Cir. 2015)...............................................................14, 19

*Banff Ltd. v. Limited, Inc.*,
   869 F. Supp. 1103 (S.D.N.Y. 1994).........................................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................10, 22

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006)...............................................................11, 17

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)....................................................................16

*Boesen v. United Sports Publ'ns, Ltd.*,
   No. 20-CV-1552, 2020 WL 6393010 (E.D.N.Y. Nov. 2, 2020)............14, 15

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).............................................................11, 13, 16, 17

*Capitol Records, LLC v. ReDigi Inc.*,
   910 F.3d 649 (2d Cir. 2018)..................................................................8, 19

*Capitol Records, LLC v. ReDigi Inc.*,
   934 F. Supp. 2d 640 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018)..............................8

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013)..................................................................................................16, 17

*Cartoon Network, LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008)...............................................................................................8, 9, 22

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*,
    150 F.3d 132 (2d Cir. 1998)...........................................................................................................13

*Coakley v. Jaffe*,
    49 F. Supp. 2d 615 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000).................10, 22, 24

*Conley v. Gibson*,
    355 U.S. 41 (1957)........................................................................................................................22

*DeJesus v. HF Mgmt. Servs., LLC*,
    726 F.3d 85 (2d Cir. 2013)...........................................................................................................22

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010)...................................................................................................12, 13

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)................................................................................................................11, 21

*Flava Works, Inc. v. Gunter*,
    689 F.3d 754 (7th Cir. 2012) .........................................................................................................7

*Goldman v. Breitbart News Network, LLC*,
    302 F. Supp. 3d 585 (S.D.N.Y. 2018)............................................................................................8

*Katz v. Google Inc.*,
    802 F.3d 1178 (11th Cir. 2015) ...................................................................................................17

*Live Face on Web, LLC v. Biblio Holdings LLC*,
    No. 15-CV-4848, 2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016).................................................8

*Lombardo v. Dr. Seuss Enters., LP*,
    279 F. Supp. 3d 497 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir.).................................12

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006).........................................................................................................13

*Mathieson v. Associated Press*,
    No. 90-CV-6945, 1992 WL 164447 (S.D.N.Y. June 25, 1992) ..............................................17, 18

*McGucken v. Newsweek LLC*,
    464 F. Supp. 3d 594 (S.D.N.Y. 2020).........................................................................................15

*MyPlayCity, Inc. v. Conduit Ltd.*,
  No. 10-CV-1615, 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012) ............................................8

*North Jersey Media Group Inc. v. Pirro*,
  74 F. Supp. 3d 605 (S.D.N.Y. 2015) .......................................................................................17

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004) .........................................................................................11, 13

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) .................................................................................................13

*Pearson Educ., Inc. v. Ishayev*,
  963 F. Supp. 2d 239 (S.D.N.Y. 2013) ....................................................................................8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ......................................................................................7, 8, 9

*Satava v. Lowry*,
  323 F.3d 805 (9th Cir. 2003) ................................................................................................17

*Schwartzwald v. Oath Inc.*,
  No. 19-CV-9938, 2020 WL 5441291 (S.D.N.Y. Sept. 10, 2020) ........................................16

*Smith v. Barnesandnoble.com, LLC*,
  839 F.3d 163 (2d Cir. 2016) ..............................................................................................6, 9

*Sony Corp. of America v. University City Studios, Inc.*,
  464 U.S. 417 (1984) .......................................................................................................18, 19

*Swatch Group Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ................................................................................11, 12, 13, 17

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016) .................................................................................................12

*Walsh v. Townsquare Media, Inc.*,
  464 F. Supp. 3d 570 (S.D.N.Y. 2020) ...............................................................12, 14, 15, 20

*Wright v. Warner Books, Inc.*,
  953 F.2d 731 (2d Cir. 1991) .................................................................................................13

*Yang v. Mic Network, Inc.*,
  405 F. Supp. 3d 537 (S.D.N.Y. 2019) ..................................................................................16

**Constitutional Provisions**

First Amendment ....................................................................................................................11, 21

**Statutes**

17 U.S.C. § 101 ..................................................................................................................7, 9

17 U.S.C. § 106 ..................................................................................................................6, 7

17 U.S.C. § 106(4) ...............................................................................................................8

17 U.S.C. § 106(5) .............................................................................................................6, 8

17 U.S.C. § 107 ..........................................................................................................1, 11, 13

**Rules**

Fed. R. Civ. P. 8(a)(2) ...............................................................................................10, 22, 23

Fed. R. Civ. P. 12(b)(6) ..........................................................................................1, 12, 15, 25

**Other Authorities**

Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105 (1990) ...........................13

Defendants Hearst Communications, Inc., Hearst Stations Inc., Hearst Television Inc., Jackson Hearst Television Inc., Ohio/Oklahoma Hearst Television Inc., WJCL Hearst Television LLC, WVTM Hearst Television Inc., Hearst Properties Inc., and Hearst Corporation (collectively, the "Hearst Defendants") submit this memorandum of law in support of their motion under Fed. R. Civ. P. 12(b)(6) to dismiss the Second Amended Complaint ("SAC") of Plaintiffs Paul Nicklen and Cristina Mittermeier.

## PRELIMINARY STATEMENT

Paul Nicklen is a world-renowned conservationist who posted a video on Instagram depicting a starving polar bear.  He says he made the video freely available to the world—including his seven million Instagram followers—in his effort "to break down the walls of apathy" for environmental conservation.  (SAC ¶ 151.)  The video went viral.  Nicklen alleges that four of the Hearst Defendants published a news article covering the viral post, its million-plus views, and its hundreds of thousands of likes and comments (the "Hearst Article").  He claims the Hearst Article infringed his copyright because it embedded his own Instagram post—the very same viral post at the center of the Hearst Article's reporting.

That use, as alleged, is a fair use protected by the Copyright Act as a matter of law.  The Hearst Article fits neatly into the categories of "news reporting" and "commentary," which the Copyright Act sets out as examples of fair use.  17 U.S.C. § 107.  Even if the article were neither news nor commentary, it would still be transformative:  Whereas Nicklen alleges that he created his video to promote conservation, the Hearst Defendants' use was for an article about the Instagram post itself.  The other fair use factors similarly favor the Hearst Defendants:  Nicklen's video is a work of nonfiction; he had already published it before the Hearst Article was posted; and the Hearst Defendants could not have usurped the market for the Polar Bear Video by merely embedding the content that Nicklen had already posted for free viewing.  Copyright law should

not punish news reporting about a world-renowned conservationist's own Instagram post and the viral reaction to his video, which he posted for the express purpose of eliciting a public reaction to bring awareness to a cause.

Even without fair use, the SAC would not state a claim for relief.  Nicklen fails to allege two elements of copyright infringement: (1) that the Hearst Defendants displayed the video (instead, he alleges that Instagram's server displayed the video through embedding code), and (2) that that their conduct was unauthorized (he alleges that scores of other defendants lacked licenses, but omits this allegation for the Hearst Defendants).

And even if some part of the SAC survives this motion, the claims must be narrowed.  Of the nine Hearst Defendants, five must be dismissed because the SAC contains no nonconclusory allegations regarding their content or conduct whatsoever.  Three of the SAC's four counts are directed exclusively to corporate parents, based on nothing other than their ownership of other companies, which is legally insufficient to state a claim.  Finally, Plaintiff Cristina Mittermeier cannot assert a claim against the Hearst Defendants, whom she does not allege used her photograph; she appears to not be pressing her claim, and in any event, it should be dismissed.

## BACKGROUND[1]

Nicklen alleges that he is an "iconic," "renowned," "acclaimed," and "sought-after" photographer, filmmaker, and conservationist.  (SAC ¶¶ 2-3.)  He has approximately seven million Instagram followers.  (SAC ¶ 2.)  On December 5, 2017, he posted a video to Instagram "depicting a starving polar bear in the Canadian Arctic" (the "Polar Bear Video").  (SAC ¶ 5(a).) The video went "viral."  (SAC ¶ 5(c).)  Instagram users viewed Nicklen's video 1.8 million times (SAC ¶ 151), and Facebook users viewed it 1.4 million times (SAC Ex. 7).

---

[1] The allegations are drawn from the SAC and taken as true for purposes of this motion.

Reporting on the viral reaction and on Nicklen's own take, the Hearst Defendants published an article on December 9, 2017.  (SAC ¶¶ 272-275.)  The SAC alleges that the article appeared on fifteen web pages published by various Hearst Defendants.  (*Id.*)  Each of these web pages is incorporated by reference into the SAC, which provides a web address and hyperlink to each instance of the article.  (*Id.*)  Each web page features the exact same article (the "Hearst Article").  (Declaration of Matthew Greenfield, March 8, 2021 ("Greenfield Decl.") ¶ 21; *see* Greenfield Decl. Exs. A through O.)

The Hearst Article focuses on the popular response to the video.  The headline declares that it "goes viral," and the lede paragraph reports that "[m]ore than a million people have viewed" the video.  (Greenfield Decl. Ex. A (an example of each of Exs. A through O).)  The article goes on to describe Nicklen's hope that the viral popularity of the video would raise awareness about climate change.  (*Id.*)  Here is the entire text of the Hearst Article:

### Photographer's 'soul-crushing' video of
### starving polar bear goes viral:
"This is what starvation looks like"

More than a million people have viewed a photographer's video showing an emaciated, dying polar bear.

The "soul-crushing scene" captured by Paul Nicklen and conservation group Sea Legacy is being used as a moment to recognize the seriousness of climate change. A warming climate has decreased the habitat for polar bears.

"This is what starvation looks like," Nicklen wrote in an Instagram post with the video. "The muscles atrophy. No energy. It's a slow, painful death."

In an interview with National Geographic, Nicklen explained why he didn't intervene and try to help the bear.

"Of course, that crossed my mind," Nicklen said. "But it's not like I walk around with a tranquilizer gun or 400 pounds of seal meat."

By capturing the scene, he hoped he could at least preserve the bear's memory and push the conservation on climate change in a positive direction.

"When scientists say bears are going extinct, I want people to realize what it looks like. Bears are going to starve to death," Nicklen said. "This is what a starving bear looks like."

(*Id.*)

Approximately halfway through the article, an embedded Instagram post from user @paulnicklen is visible.  (*Id.*)  The embedded Instagram post includes all the visual trappings of Nicklen's Instagram post.  (*Compare id. with* SAC ¶ 151 (screen capture of Nicklen's Instagram post).)  Like the original Instagram post, the version embedded in the Hearst Article features a small portrait of Nicklen in a circle next to the account name "paulnicklen;" a link to view Nicklen's Instagram profile; the label "Baffin Island" above the video; the Polar Bear Video itself, in Instagram's player; the number of "likes" and "comments;" and Nicklen's caption.  (*Id.*)  Nicklen's caption includes three separate links to the Instagram account of his organization, SeaLegacy; a statement of Nicklen's desire to "share both the beautiful and the heartbreaking if we are going to break down the walls of apathy;" a plea to "join us at @sea_legacy;" an additional link to Mittermeier's Instagram account; and a statement that "[t]his video is exclusively managed by Caters News" with contact information "[t]o license or use in a commercial player."  (*Id.*)

On December 8, 2020, Nicklen and Mittermeier filed the Complaint in this action.  (ECF No. 7.)  Three days later, they filed the Amended Complaint (ECF No. 11) ("AC"), suing 45 defendants in addition to a putative defendants' class.  On February 24, 2021, they filed the SAC, dropping some named defendants from the AC and now suing more than 130 named defendants in addition to two putative defendants' classes.  The SAC refers to two categories of defendants: some that embedded the Polar Bear Video, and others that embedded Mittermeier's still photo of the same bear depicted in the Polar Bear Video.  (SAC ¶¶ 5(c), 155.)

In its few factual allegations regarding the Hearst Defendants, the SAC alleges that four of the Hearst Defendants "embedded Plaintiff Nicklen's Video from his Instagram account in a post titled, 'Photographer's "soul crushing" video of starving polar bear goes viral,' on or around

December 9, 2017."  (SAC ¶¶ 272-275.)  The SAC alleges that the Hearst Article is available at various web pages of the four Hearst Defendants identified in paragraphs 272 through 275.  (*Id.*)  Each of those paragraphs also alleges that the Hearst Article "does not warrant a 'fair use' defense" but says nothing else on that point.  (*Id.*)

In contrast to the four Hearst Defendants identified in paragraphs 272 through 275, the remaining five Hearst Defendants are not associated with any alleged conduct:

**(1.)**  Defendant Hearst Corporation is named in a jurisdictional allegation that does not allege any conduct at all.  (SAC ¶ 121.)  The Hearst Corporation is not mentioned again until the recitation of the causes of action.  Even there, it is unclear whether the Hearst Corporation is mentioned, because the SAC defines the same abbreviation—"Hearst"—as the shortened name of each of multiple parties.  (SAC ¶¶ 119, 121.)

**(2.)**  Defendant Hearst Communications, Inc. is named in two paragraphs.  The first is a jurisdictional allegation identifying its states of citizenship and alleging that it "owns and operates numerous television and print media entities."  (SAC ¶ 119.)  The second alleges that other defendants besides Hearst Communications, Inc.—those who are allegedly "owned by Defendants Hearst Communications, Inc. (which may own and control about 34 stations)"— infringed Nicklen's copyright.  (SAC ¶ 276.)  The SAC does not allege any conduct of Hearst Communications, Inc. besides that it "may" own other entities.

**(3, 4, and 5.)**  As to Defendants Ohio/Oklahoma Hearst Television Inc., Jackson Hearst Television Inc., and WVTM Hearst Television Inc., each is named in only one paragraph, a jurisdictional allegation that does not allege any conduct other than that it "submits itself to the jurisdiction of this court."  (SAC ¶¶ 125-127.)

The SAC asserts one cause of action for copyright infringement by "all Plaintiffs against all Defendants" (SAC p. 75), and three causes of action against only "Defendants Hearst and Sinclair" apparently on the theory that "parent corporations" are automatically liable wherever there is a claim against a corporate affiliate.  (*E.g.*, SAC ¶ 303 ("parent [sic] are liable as contributory copyright infringers for the infringing acts of their various named affiliates"); *id.* ¶ 312 (alleging vicarious liability "for the infringing acts of each of their respective affiliates").) Plaintiffs seek an injunction prohibiting further use of their work (without alleging whether any alleged use is ongoing); an accounting; statutory damages of "up to $30,000.00 per infringement or up to $150,000.00 for each instance of willful infringement" or other measures of damages; their costs and attorneys' fees; and other relief.  (SAC pp. 82-84.)

## ARGUMENT

**I.    The SAC does not allege an infringing "display" as a matter of law, because the Hearst Article only embedded an Instagram post.**

A copyright infringement plaintiff must allege that "the defendant infringed the copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder." *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016).  The thrust of Nicklen's allegations against the Hearst Defendants is that they violated his exclusive right to "display" the Polar Bear Video under 17 U.S.C. § 106(5), when they published online articles that "displayed the Video."  (SAC ¶ 5(c).)  But the SAC is self-defeating in this regard: it does not allege that the Hearst Defendants played the video or that users played the video from the Hearst Defendants' servers; rather, the Hearst Article used "computer code" to "embed" Nicklen's Instagram post, thereby allowing Instagram to play the video to readers of the Hearst Article.  (SAC ¶ 160.) Where, as here, a website merely directs a user's browser to content that is hosted by a third

party's server and transmitted by that third party to the user, that third party—and only that third party—is displaying the work.

The Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), is the key case distinguishing embedding from exclusive rights under § 106.  The plaintiff in *Perfect 10* alleged (as pertinent here) that Google Image Search infringed its copyright by embedding full-size images from other websites.  *Id.* at 1155-56.  Google Image Search users would view the embedded full-size images on Google's site, but the images were stored only on the servers of the third-party website publishers where the images had originally been published.  *Id.*  The Ninth Circuit held that Google could not have infringed the plaintiff's exclusive "display" right because Google's server had not stored and served the full-size image. *Id.* at 1159.  The court adopted the "server test," holding that "the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information."  *Id.*

The server test derives from "the language of the Copyright Act" itself.  *Id.* at 1160. Congress defined the term, "[t]o 'display' a work," as "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process . . . ."  17 U.S.C. § 101. The *Perfect 10* Court held that Google had not displayed the full-size images when it used computer code to call upon the servers of third-party websites:  "Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer [server] that stores the full-size photographic image."  508 F.3d at 1161. "Providing these HTML instructions is not equivalent to showing a copy."  *Id.*

No appellate court has rejected *Perfect 10*'s server test for copyright infringement claims based on embedding allegations.  *See Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)

(citing *Perfect 10*'s server test).  The majority of courts in this district that have considered the question have embraced the server test.  *See, e.g.*, *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10-CV-1615, 2012 WL 1107648, at *13 (S.D.N.Y. Mar. 30, 2012) (rejecting copyright infringement based on embeds, which "did not themselves contain copies of" the work); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 652 (S.D.N.Y. 2013) (Sullivan, J.) (citing *Perfect 10*'s server test), *aff'd*, 910 F.3d 649 (2d Cir. 2018); *Live Face on Web, LLC v. Biblio Holdings LLC*, No. 15-CV-4848, 2016 WL 4766344, at *4 (S.D.N.Y. Sept. 13, 2016) (citing *Perfect 10*'s server test and concluding that "the Complaint indicates that the third-party server stored and disseminated the infringing file directly to Website visitors").[2]  The only contrary decision in this district, *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018), relied on precedent that interpreted the "performance" right under 17 U.S.C. § 106(4) rather than the "display" right under § 106(5).  302 F. Supp. 3d at 594-95 (citing *Am. Broad. Cos. v. Aereo, Inc.*, 473 U.S. 431 (2014)).  The Second Circuit has given no indication that it would create a circuit split and decline to follow *Perfect 10*; indeed, it has recognized that in a copyright case, "the dispositive question was '*who* makes the copies?'"  *Cartoon Network, LP v. CSC Holdings, Inc.*, 536 F.3d 121, 126 (2d Cir. 2008).

The SAC alleges all the facts necessary to apply the server test.  The Hearst Article allegedly "embedded Plaintiff Nicklen's Video from his Instagram account."  (SAC ¶¶ 272-275.)  This means the article "insert[ed] the unique computer code attached to [Nicklen's Instagram post], . . . causing the Video or Photo to simultaneously be displayed within the body of [the

---

[2] Courts in this district have also extended *Perfect 10*'s reasoning to other exclusive rights besides display.  *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 251-52 (S.D.N.Y. 2013) (citing *Perfect 10* for the server test and concluding that hyperlinks did not constitute "distribution").  In any event, while the SAC conclusorily mentions "reproduction" and "distribution" (SAC ¶ 284), the factual allegations are limited to display (*id.* ¶¶ 155-160).

Hearst Article] without the need for a viewer of Defendants' web site to take additional action or navigate their web browser away from the web site to the Instagram account of Nicklen . . . ." (SAC ¶ 160.)  All the while, "the Video . . . displayed in the body of the web site was 'embedded' and the actual Video . . . file was stored on Instagram's server."  (*Id.*)  In this way, the embedded content was transmitted to users from Instagram's server.  (SAC ¶ 302 ("embedding infringing copies of Plaintiff's Video onto and from Facebook and Instagram's platform").)  By contrast, the SAC never alleges that the Polar Bear Video was ever stored on or transmitted from the Hearst Defendants' server.  Finally, the requested relief would be incoherent if the Polar Bear Video were stored on or transmitted from the Hearst Defendants' servers, because Nicklen asks that they "remove the 'embed code' pointing to the Copyrighted Video or Photos from the internet or Instagram . . . ."  (SAC ¶ 321(b).)

The SAC therefore alleges that Instagram—not the Hearst Defendants—"show[ed] a copy" of the Polar Bear Video.  17 U.S.C. § 101.  Accepting the allegations as true, the Hearst Defendants are "owner[s] of a computer that does not store and serve the electronic information" and they therefore were "not displaying that information."  *Perfect 10*, 508 F.3d at 1159.  Only Instagram—not the Hearst Article's embedding—meets the statutory definition of "display."

## II.   The SAC does not allege that any Hearst Defendant's conduct was "unauthorized," as is required for an infringement claim.

Even if the SAC sufficiently alleged that the Hearst Defendants had violated an exclusive right, it must also allege "that the copying was unauthorized."  *Smith*, 839 F.3d at 167.  The SAC alleges that scores of defendants engaged in unauthorized copying, but as to the Hearst Defendants it never even tries to allege that their conduct was unauthorized.

In its allegations against more than 90 defendants, the SAC alleges that they used the Polar Bear Video "without a license or permission."  (SAC ¶¶ 171-270.)  But the Hearst

Defendants are not among them.  The allegations against the Hearst Defendants make no mention of whether the alleged use was authorized by a license or other permission. (SAC ¶¶ 272-275.)  Notably, the Amended Complaint (before it was superseded by the SAC) included an allegation that no defendant had obtained a license (AC ¶ 85), but in the SAC, the parallel allegation was amended to merely allege that "[n]o Defendant will be able to provide proof of having obtained a license . . ." (SAC ¶ 165).  Alleging a defendant's inability to disprove an element does not satisfy the plaintiff's burden to plead "allegations plausibly suggesting (not merely consistent with)" the elements of the cause of action, such that the claim "possess[es] enough heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Even if Paragraph 165 were sufficiently addressed to the Hearst Defendants (which is doubtful), it would merely allege that the Hearst Defendants *cannot disprove* an element.  It is an allegation "consistent with" unauthorized use but does not show entitlement to relief, thereby flunking the *Twombly* standard.

Elsewhere, the SAC alleges as a general matter that none of the defendants "secured a license or permission *from Plaintiff Nicklen*" (SAC ¶ 168 (emphasis added); *see also id.* ¶ 158 ("without securing a valid license or permission *from each Plaintiff*" (emphasis added)) but this does not allege that the use was unauthorized, in light of Nicklen's other allegations that he contracted with a licensing agent from whom some licensees secured licenses (SAC ¶¶ 5(a), 158).  Moreover, this allegation is an example of the SAC's "shotgun pleading" in violation of Rule 8(a)(2), *see Coakley v. Jaffe*, 49 F. Supp. 2d 615, 625 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000), *abrogated on other grounds as recognized by Dorce v. City of New York*, 460 F. Supp. 3d 327 (S.D.N.Y. 2020), because Paragraph 168 applies only to "the following Defendants," followed by a list of defendants more than a hundred paragraphs long, with many

but not all of those paragraphs specifically alleging the absence of a license.  By failing to allege unauthorized copying by the Hearst Defendants, the SAC fails to state a claim.

### III.    Even if the Hearst Article were an unauthorized display, it would be fair use.

As a copyright owner, Nicklen enjoys certain exclusive rights—but not absolute rights. To the contrary, under the Copyright Act, "the fair use of a copyrighted work, including such use . . . for purposes such as criticism, comment, [or] news reporting . . . is not an infringement of copyright."  17 U.S.C. § 107.  By "guarantee[ing] . . . breathing space within the confines of copyright," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), the fair use doctrine ensures that copyright furthers its intended purpose.

Section 107 sets forth four factors to determine whether a use is fair: "(1) 'the purpose and character of the use;' (2) 'the nature of the copyrighted work;' (3) 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole;' and (4) 'the effect of the use upon the potential market for or value of the copyrighted work.'"  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (quoting 17 U.S.C. § 107). Those factors "are non-exclusive," *Swatch Group Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014), and a defendant "need not establish that each of the factors set forth in § 107 weighs in their favor."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476-77 (2d Cir. 2004).

Fair use also safeguards the First Amendment from infringement by overbroad enforcement of the copyright laws, protecting a speaker who uses another's expression for their own message or purpose.  *See Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003).  The fair use doctrine protects against attempts to use copyright to restrict news reporting and analogous activity at the core of the First Amendment.  *Swatch*, 756 F.3d at 84.  The copyright laws recognize that "the need to convey information to the public accurately may . . . make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work

without alteration." *Id.*  For example, "a book reviewer may . . . quote from an original work in order to illustrate a point and substantiate criticisms, and . . . [a] newspaper can publish a copyrighted photograph (taken for a modeling portfolio) in order to inform and entertain the newspaper's readership about a news story."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).

The Second Circuit "has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim" on a Rule 12(b)(6) motion.  *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). Accordingly, courts in this district have dismissed copyright claims based on fair use at the pleading stage, and the Second Circuit has affirmed.  *Lombardo v. Dr. Seuss Enters., LP*, 279 F. Supp. 3d 497, 504 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir.); *see also, e.g.*, *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 586 (S.D.N.Y. 2020).

Here, the SAC's allegations (including the incorporated Hearst Article) describe a fair use.  Most importantly, the alleged use was transformative as a news article about the Instagram post's viral popularity, and the Hearst Defendants did not affect the license market by embedding a social media post in which Nicklen had already made the Polar Bear Video freely available and in which he represented that licensing was available for use in a separate commercial player.

A.   **The purpose and character of the Hearst Defendants' alleged use was fair use.**

The "purpose and character" of the Hearst Defendants' use—at the center of a news story on the viral Instagram post[3]—strongly supports the conclusion that the Hearst Article constituted

---

[3] The SAC alleges web addresses and hyperlinks to fifteen web pages where the Hearst Article appeared.  (SAC ¶¶ 272-275; Greenfield Decl. ¶¶ 1-5.)  In deciding this motion, the Court should consider those web pages, which are "incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  In any event, the SAC "relies heavily"

fair use.  This first factor is the "heart of the fair use inquiry."  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001).  If the work is used by a copyright defendant for "the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).

The first factor hinges on three aspects of the defendant's use:  (1) whether it was for any of the favored purposes listed in § 107, (2) whether it was for a materially different purpose than the purpose for which the work was originally created, and (3) whether the defendant is a commercial entity, which gets little weight if either of the first two factors suggests transformative use.  *Campbell*, 510 U.S. at 578-79; *NXIVM Corp.*, 364 F.3d at 478.

### 1.     The Hearst Defendants used the Polar Bear Video for news reporting and comment.

The Hearst Defendants' news reporting, aided by the Polar Bear Video, is independently sufficient to demonstrate that the first factors weighs heavily on their side.  There is a "strong presumption that factor one favors the defendant" where the use is among the examples in § 107.  *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991).  In such a case, the first factor supports fair use even if the use is not deemed transformative.  *Swatch*, 756 F.3d at 85.

The Hearst Article is news reporting, plain and simple.  Under the headline, "Photographer's 'soul-crushing' video of starving polar bear goes viral," the Hearst Article provides recent, noteworthy information of public interest regarding Nicklen's social media post.  (Greenfield Decl. Ex. A.)  It begins by reporting, "More than a million people have viewed"

---

upon the web pages, "thereby rendering [them] 'integral' to the complaint."  *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

Nicklen's post.  (*Id.* at 2.)  The Hearst Article goes on to report on the effects of its viral

popularity (*id.* ("a moment to recognize the seriousness of climate change")), why Nicklen

created the video in the first place (*id.* at 4 ("he hoped he could at least preserve the bear's

memory")), and how Nicklen hoped the viral phenomenon would affect attitudes (*id.* ("'When

scientists say bears are going extinct, I want people to realize what it looks like.'")).

### 2.   The Hearst Article embedded the Instagram post transformatively because it reports on the social media post itself.

A use is transformative if it "communicates something new and different from the

original or expands its utility." *Authors Guild v. Google Inc.*, 804 F.3d 202, 214 (2d Cir. 2015).

"[E]mbedding an Instagram post featuring a copyrighted photo in an article reporting on the post

itself [i]s transformative." *Boesen v. United Sports Publ'ns, Ltd.*, No. 20-CV-1552, 2020 WL

6393010, at *3 (E.D.N.Y. Nov. 2, 2020).  After all, fair use applies "where the copyrighted work

is itself the subject of the story, transforming the function of the work in the new context."

*Walsh*, 464 F. Supp. 3d at 581 (citation and quotation marks omitted).

In *Walsh*, the court granted a motion for judgment on the pleadings, dismissing the

copyright infringement action that was based on an embedded Instagram post.  464 F. Supp. 3d

at 577 n.4.  The post featured a photo "taken to 'depict Cardi B at Tom Ford's fashion show.'"

*Id.* at 581.  The court held that the defendant's article had used the image transformatively

because "[i]t did not use the Photograph as a generic image of Cardi B to accompany an article

about Cardi B . . . or as an image of her at Tom Ford's fashion show alongside an article about

the fashion show."  *Id.* at 581-82.  Instead, "the [Instagram] Post . . . was the very thing the

Article was reporting on," constituting a transformative use.  *Id.* at 582.

Similarly, in *Boesen*, the defendant published an article about Caroline Wozniacki's

retirement from professional tennis, and the article embedded Wozniacki's Instagram post

discussing her retirement, which included the plaintiff's photograph of Wozniacki playing tennis years earlier.  2020 WL 6393010, at *1-2.  The court dismissed under Rule 12(b)(6), based on fair use:  "The article did not use plaintiff's photograph 'as a generic image' of Wozniacki, nor to depict her playing tennis at a young age.  Rather, it embedded the Instagram post . . . because the fact that Wozniacki had disseminated that post was the very thing the Article was reporting on." *Id.* at *4 (brackets and citation omitted).  Even where a court did not find fair use, it acknowledged the weight of authority that use is "transformative where the photograph itself is the subject of the story," and distinguished the facts before it.  *McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020) (photo was not "the subject of the story," but rather, was used "as an illustrative aid").

Here, the SAC alleges transformative use.  Nicklen created the Polar Bear Video as a "conservation-oriented documentary film[]," seeking to communicate "the fate that awaited the world's polar bear population given the toll that global warming is taking on their natural habitat."  (SAC ¶ 150.)  The Hearst Article did not communicate what Nicklen allegedly communicated:  It is unrelated to creating a conservation-oriented documentary film, predicting the future of polar bears, or warning the world of global warming.  *Walsh* and *Boesen*'s reasoning applies easily to these allegations.  The Hearst Defendants did not use the Polar Bear Video as a generic illustrative aid in an article about polar bears or as a video about conservation in an article about conservation.  Instead, the Hearst Article embedded the Polar Bear Video, because the social media post was the very thing the Hearst Article was reporting on.

### 3. No commercial purpose is alleged; nor would it move the needle.

The SAC does not allege that the Hearst Defendants acted with a commercial purpose, so this factor must either be neutral or weigh in favor of fair use.  Even if the SAC had alleged a commercial purpose, and even if those hypothetical allegations were credible, they would have

little bearing.  Any examination of commercial purpose in this context "must be applied with

caution because, as the Supreme Court has recognized, Congress 'could not have intended' a rule

that commercial uses are presumptively unfair." *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir.

2013) (quoting *Campbell*, 510 U.S. at 584).  Therefore, "if the new work is 'substantially

transformative,' the 'other factors, including commercialism, are of less significance.'" *Yang v.

Mic Network, Inc.*, 405 F. Supp. 3d 537, 542-43 (S.D.N.Y. 2019) (quoting *Blanch v. Koons*, 467

F.3d 244, 254 (2d Cir. 2006)).[4]

> **B.      The factual and published nature of Nicklen's work favors fair use.**

Two sub-factors determine the second fair use factor:  "(1) whether the work is

expressive or creative, such as a work of fiction, or more factual, with a greater leeway being

allowed to a claim of fair use where the work is factual or informational, and (2) whether the

work is published or unpublished, with the scope for fair use involving unpublished works being

considerably narrower." *Blanch*, 467 F.3d at 256 (citation omitted).  Both sub-factors favor the

Hearst Defendants, because the Polar Bear Video is a work of fact (not fiction) and published

(not unpublished) and therefore does not warrant additional protection.

First, the Polar Bear Video is factual and informational.  A factual work is eligible for

copyright protection, but it is more susceptible to fair use than a work of fiction.  For example,

the second factor favors fair use in the context of a photograph of the attacks on the World Trade

---

[4] Plaintiffs may contend that bad faith is relevant to a fair use analysis, but the SAC does not
contain any nonconclusory allegation of bad faith on the part of the Hearst Defendants.  Alleging
that a defendant used a work "without seeking . . . authorization does not lead to a finding of bad
faith, as the Second Circuit has noted that it is 'aware of no controlling authority to the effect that
the failure to seek permission for copying, in itself, constitutes bad faith.'" *Schwartzwald v.
Oath Inc.*, No. 19-CV-9938, 2020 WL 5441291, at *6 (S.D.N.Y. Sept. 10, 2020) (quoting
*Blanch*, 467 F.3d at 256).  The sorts of allegations that may suggest bad faith and militate against
fair use at the pleading stage—such as "intentional removal of a copyright mark," *Yang*, 405 F.
Supp. 3d at 546—are not present here.  And the allegation that hundreds of defendants engaged
in "a bad faith usurpation" (SAC ¶ 156) is conclusory.

Center, *North Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 619-20 (S.D.N.Y. 2015), or

any other "candid shot in a public setting," *Katz v. Google Inc.*, 802 F.3d 1178, 1183 (11th Cir.

2015).  The same concept explains why "realistic depictions of live animals" may be protectable

under the Copyright Act but "the scope of copyright protection in such works is narrow."  *Satava*

*v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003).  Here, the SAC acknowledges that the Polar Bear

Video is a factual work, realistically depicting a live animal.  (*See, e.g.*, SAC ¶¶ 1, 5(a).)

Second, the Polar Bear Video had already been published at the time of the Hearst

Defendants' alleged use.  Nicklen posted the Polar Bear Video to Instagram on December 5,

2017, and two days later in National Geographic.  (SAC ¶ 5(b)-(c).)  Two days after that, the

alleged uses by the Hearst Defendants took place.  (SAC ¶¶ 272-275.)

**C.    The third factor has little impact here, because embedding the full Instagram post served the Hearst Defendants' news reporting and commentary.**

The third factor—the amount and substantiality of the portion used—looks to whether

"the quantity and value of the materials used are reasonable in relation to the purpose of the

copying."  *Campbell*, 510 U.S. at 586 (citation and quotation marks omitted).  This analysis

"harken[s] back to the first of the statutory factors" and "varies with the purpose and character of

the use."  *Id.* at 586-87.  Accordingly, "copying [an entire work] does not necessarily weigh

against fair use because copying the entirety of a work is sometimes necessary to make a fair use

of the image."  *Bill Graham Archives*, 448 F.3d at 613.  Nor does the law strictly "require that

the secondary artist may take no more than is necessary."  *Cariou*, 714 F.3d at 710.

Instead, where copying the entirety of a work is "reasonable in light of [the defendant's]

purpose," the third factor is at worst neutral.  *Swatch*, 756 F.3d at 90.  That reasonableness

standard allows for more extensive use in connection with news reporting.  Accordingly, in

*Mathieson v. Associated Press*, No. 90-CV-6945, 1992 WL 164447 (S.D.N.Y. June 25, 1992),

17

the court held that even if the defendant had copied the entire work, "the outcome of the substantiality factor is made proportionately less significant" due to the determination that the first fair use factor had weighed in favor of the defendant. *Id.* at *8. After all, "courts have sanctioned even full reproduction of a copyrighted work in the context of news reporting." *Id.*

Here, the embedded post was reasonable considering the Hearst Article's purpose and character. *See supra* Part III.A. The Hearst Article reports on the viral reception of the social media post, and it embeds the entire social media post, including the comments and engagement figures. (Greenfield Decl. Ex. A.) Using computer code to prompt Instagram to show the entire post is the only manner in which the embedding feature operates (SAC ¶¶ 151, 160; *see supra* Part I); moreover, it is exactly proportional to the news report at issue. The third factor either tilts in favor of defendants or has no effect.

In any event, the amount of the original work used by the alleged infringer is not relevant where the plaintiff has already made the entire work freely viewable by the public. In *Sony Corp. of America v. University City Studios, Inc.*, 464 U.S. 417 (1984), the Supreme Court considered copyright infringement claims related to the practice of "timeshifting"—where freely available television content is recorded in its entirety and watched at a later time. *See id.* at 421. The Court explained that copying the entire work in this way was consistent with fair use: "when one considers . . . that timeshifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced . . . does not have its ordinary effect of militating against a finding of fair use." *Id.* at 449-50. Like the plaintiffs in *Sony*, Nicklen made the Polar Bear Video available in its entirety free of charge. Like the timeshifting at issue in *Sony*, the embedding at issue here merely enabled a viewer to see what the plaintiff had already made freely available, within the very

context in which he made it available.  Thus, like the Supreme Court held in *Sony*, the substantiality-and-amount factor here does not militate against fair use.

### D.   The Hearst Defendants' reporting had no plausible effect on the market for Nicklen's video, which he had already posted for free public viewing.

For the fourth fair use factor, courts consider "whether the copy brings to the marketplace a competing substitute . . . so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Authors Guild v. Google Inc.*, 804 F.3d at 223.  This factor addresses whether the allegedly infringing work "can be used as a substitute for the plaintiff's original work."  *Amsinck v. Columbia Pictures Indus., Inc.*, 862 F. Supp. 1044, 1049 (S.D.N.Y. 1994).  "Factor Four is necessarily intertwined with Factor One; the more the objective of secondary use differs from that of the original, the less likely it will supplant the commercial market for the original." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018).  Here, it supports a determination of fair use.

As the SAC explains, the alleged embedding allowed users to see Nicklen's Instagram post when they visited the Hearst Article, while "the actual Video . . . was stored on Instagram's server."  (SAC ¶ 160.)  The Hearst Article is consistent with that allegation: the Polar Bear Video does not appear as a standalone video, but rather, is framed by Nicklen's post, complete with hyperlinks to Nicklen's Instagram account; the Instagram account of Nicklen's organization, Sea Legacy; Nicklen's caption including licensing information; and other users' engagement with Nicklen's account—plus the text of the Hearst Article.  (Greenfield Decl. Ex. A at 3.)  Therefore, as the SAC makes clear, the Hearst Article included only what Nicklen made publicly available on Instagram.  Any effect on the market for a license was accomplished by Nicklen's Instagram

post; not by the Hearst Defendants' allegedly referring additional users to see Nicklen's Instagram post.

Put a different way, "because the [copyrighted work] did not appear on its own, but as part of the [Instagram] Post, alongside text . . . it is implausible that Defendant's use would compete with Plaintiff's business or affect the market or value of [his] work." *Walsh*, 464 F. Supp. 3d at 586. Nicklen alleges that he sought profit by licensing the Polar Bear Video itself—not the Instagram post—and it is implausible that a potential licensee of the Polar Bear Video would choose to use the Hearst Article instead of buying a license for the Polar Bear Video. The abundant text, borders, logos, icons, links, and other artifacts of the Instagram embedding, together with the surrounding text of the Hearst Article, render the Hearst Article an implausible substitute for licensing the Polar Bear Video. Indeed, Nicklen's post specifies that he was seeking licensing fees for use of the video "in a commercial player," as opposed to licensing fees for playing the video in the Instagram player he enabled. (SAC ¶ 151.)

More generally, it is implausible that any person who considered buying such a license for the Polar Bear Video on or after December 9, 2017—when it had already been freely available through Nicklen's social media posts and had been viewed millions of times on Instagram and Facebook—decided not to do so merely because the Hearst Article had referred additional viewers to see Nicklen's Instagram post. The SAC does not allow any plausible inference that any potential licensee could have received from the Hearst Article what they would have received by licensing the Polar Bear Video from Nicklen.

\* \* \* \*

Taken together, the statutory factors establish fair use, and the Court need not look further than the SAC and incorporated documents for this conclusion. The Hearst Article

reported on the Polar Bear Video's viral reception and showed the viral post itself—in which Nicklen had published the Polar Bear Video as a freely available work of non-fiction—as part of that news reporting.  If these allegations do not trigger fair use protection, then the Copyright Act will be stripped of the "built-in First Amendment accommodation" that the fair use doctrine represents, amounting to a constitutional deprivation.  *Eldred*, 537 U.S. at 219-20. Constitutional concerns aside, if these allegations are held not to constitute fair use, the Hearst Defendants will be forced to defend against a claim based on their transformative use of a social media post in their news reporting about that very post.  That result would contort the copyright laws to suppress public knowledge and news reporting without encouraging more creation.

**IV.    The SAC does not allege any conduct by five of the Hearst Defendants, who should be dismissed from the litigation.**

As to five of the Hearst Defendants, the SAC fails to allege any conduct whatsoever.  The SAC mentions Defendant Hearst Communications, Inc. in only two paragraphs of its factual allegations:  first, a jurisdictional allegation reciting its states of citizenship (SAC ¶ 119), and second, an information-and-belief allegation that other defendants "may" be "owned by Defendant Hearst Communications, Inc."  (SAC ¶ 276.)  The SAC alleges even less about Defendants Ohio/Oklahoma Hearst Television Inc., Jackson Hearst Television Inc., WVTM Hearst Television Inc., and Hearst Corporation, which are mentioned only in jurisdictional allegations.  (SAC ¶¶ 121, 125-127.)

As to these five defendants, the SAC includes no allegation of displaying, hosting, or embedding any content.  The SAC identifies the web addresses of 200 allegedly infringing web pages (SAC ¶¶ 179-275, 278), but it does not associate an allegedly infringing URL with any of these five defendants.  None of these five defendants is listed in the SAC section that alleges

infringements of Nicklen's video (SAC ¶¶ 168-276); nor are they mentioned in the section on Mittermeier's photo (SAC ¶¶ 277-278).

The SAC does not even provide notice of the conduct these five defendants allegedly undertook.  If they allegedly infringed a copyright, the SAC does not even say which plaintiff's copyright they infringed.  The SAC certainly does not allege "volitional conduct," which "is an important element" of copyright infringement.  *Cartoon Network*, 536 F.3d at 131.  These allegations fall far short of Rule 8(a)(2)'s pleading standard and, "like the allegations in *Iqbal*, . . . [a]re too meager, vague, or conclusory to survive a motion to dismiss."  *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013) (citation and quotation marks omitted).

## V.   Nicklen asserts three causes of action based exclusively on corporate parenthood, and those three causes of action fail under Rules 8 and 12.

The SAC adds three new counts, asserted against only "Defendants Hearst and Sinclair": inducement of copyright infringement (Count 2) (SAC ¶¶ 290-300), contributory copyright infringement (Count 3) (SAC ¶¶ 301-309), and vicarious copyright infringement (Count 4) (SAC ¶¶ 310-318).  These counts fail to state a claim against any Hearst Defendant for two principal reasons:  (1) they fail to specify which (if any) of the Hearst Defendants is the subject of the allegations and (2) they are based only on corporate parenthood, rather than on any conduct.

In short, these counts fail even Rule 8(a)(2)'s minimum requirement "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  And the counts certainly fail under the modern pleading standard, which requires that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  "Shotgun pleading," such as the SAC, "mak[es] it extremely difficult to discern the precise nature of the claim" and therefore warrants dismissal even under the lower, pre-*Twombly* standard.  *Coakley*, 49 F. Supp. 2d at 625.

The entire SAC is an exercise in shotgun pleading, with 278 paragraphs of factual allegations incorporated into Count One (*see* SAC ¶ 279) and each subsequent count incorporating all the counts before it (*see* SAC ¶¶ 290, 301, 310).  The shotgun strategy is at its apex in Counts Two, Three, and Four, which specify neither the defendant nor the conduct at issue.

> **A.**      **Counts Two, Three, and Four do not specify which defendant is the target of each claim.**

It is unclear whether these counts are addressed to Hearst Communications, Inc., or Hearst Corporation.  Each of Counts Two, Three, and Four is asserted by "Plaintiff Nicklen against Defendants Hearst and Sinclair."  (SAC pp. 77, 79, 80.)  The syntax implies that a single Hearst Defendant is at issue.  For example, "Hearst's affiliates have infringed" (SAC ¶ 291) and "Hearst and Sinclair are liable" (SAC ¶ 292).  The claims refer to each of Hearst and Sinclair as a "parent," using the singular.  (SAC ¶¶ 303.)  Discerning the meaning of "Hearst" is impossible, because the SAC assigns each of two different parties the shortened name "Hearst."  (SAC ¶ 119 ("Defendant Hearst Communications Inc. ('Hearst') is a Delaware corporation . . . ."); *id.* ¶ 121 ("Defendant Hearst Corporation ('Hearst') is a Delaware corporation . . . .").)  Given this vagueness alone, the SAC fails to put each Hearst Defendant on notice of the claims against it, thereby falling short of even Rule 8(a)(2)'s permissive standard.

> **B.**      **Counts Two, Three, and Four rely on corporate parenthood as the entire reason for liability, without any basis to pierce the corporate veil.**

Whichever party the SAC intends to name in these counts, the counts say only that it is liable for being a parent corporation.  "Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight."  *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (1988).  In the copyright context, "to prevail against a parent corporation on the theory of vicarious copyright infringement, the plaintiff must present evidence that the

23

parent has done more in relation to the infringing activity than simply be the parent." *Banff Ltd.*

*v. Limited, Inc.*, 869 F. Supp. 1103, 1110 (S.D.N.Y. 1994).

Here, the factual allegations say nothing about Hearst Corporation other than where it is a

citizen (SAC ¶ 121) and nothing about Hearst Communications, Inc. other than where it is a

citizen and that it "may" own other companies (SAC ¶¶ 119, 276).  And the counts themselves

do not add any facts.  To the contrary, they fixate on ownership without alleging any reason to

disregard the corporate form: "Hearst's affiliates have infringed" (SAC ¶ 291); "Defendants

Hearst and Sinclair parent companies [sic] have infringed and are infringing" (SAC ¶ 302);

"Defendants Hearst and Sinclair parent [sic] are liable as contributory copyright infringers for

the infringing acts of their various named affiliates" (SAC ¶ 303).  This infatuation with

corporate parenthood does not substitute for allegations showing entitlement to relief.

Vague as to the defendant at issue and silent as to actual conduct at issue, these counts are

"the sort of 'shotgun pleading' that illustrates plaintiffs' utter disrespect for Rule 8."  *Coakley*, 49

F. Supp. 2d at 625 (citation omitted).

## VI.  To the extent Mittermeier asserts a claim against the Hearst Defendants, it should be dismissed.

The SAC asserts a copyright infringement claim by "all Plaintiffs against all

Defendants." (SAC p. 75.)  The SAC does not mention any Hearst Defendant in the context of

Mittermeier's work and thus alleges no element of copyright infringement.  *See Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).  It appears that Mittermeier does not intend to press a claim

against the Hearst Defendants: a recent notice of voluntary dismissal as to another defendant

implies that she has no more remaining claims in this action.  (ECF No. 73.)  Still, as a formal

matter, Mittermeier has asserted a claim against the Hearst Defendants and has declined to

voluntarily dismiss it.  (Greenfield Decl. ¶ 22.)  The Court should therefore dismiss the claim.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss all claims against the Hearst

Defendants under Rule 12(b)(6) and grant all other relief that it deems appropriate.  Considering

that the SAC is the third failed attempt to sufficiently plead claims against the Hearst

Defendants, the dismissal should be with prejudice.


Dated: March 8, 2021
       New York, New York

                                        By: */s/ Matthew Greenfield*
                                            Matthew Greenfield
                                            Ravi V. Sitwala
                                            THE HEARST CORPORATION
                                            Office of General Counsel
                                            300 West 57th Street, 40th Floor
                                            New York, New York 10019
                                            Matthew.Greenfield@hearst.com
                                            Tel.: (212) 649-2009

                                            *Counsel for Defendants Hearst
                                            Communications, Inc., Hearst Stations
                                            Inc., Hearst Television Inc., Jackson
                                            Hearst Television Inc., Ohio/Oklahoma
                                            Hearst Television Inc., WJCL Hearst
                                            Television LLC, WVTM Hearst
                                            Television Inc., Hearst Properties Inc.,
                                            and Hearst Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 8, 2021.

_/s/ Matthew Greenfield_____
Matthew Greenfield