**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
                                            :

PAUL NICKLEN, et al.,                   :    No. 1:20-cv-10300-JSR

                Plaintiffs,     :

                              :    ECF Case

             -against-        :

                              :

MASHABLE, INC., et al.,         :

                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X


## MEMORANDUM OF LAW IN SUPPORT OF THE SINCLAIR DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

Thomas B. Sullivan
Joseph Slaughter
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 850-6139
Fax: (212) 223-1942
sullivant@ballardspahr.com
slaughterj@ballardspahr.com

*Counsel for Sinclair Defendants*

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT FACTUAL ALLEGATIONS .................................................................. 3

ARGUMENT .............................................................................................................. 6

I.      STANDARD OF REVIEW ............................................................................. 6

II.     SINCLAIR'S EMBEDDING OF THE VIDEO DID NOT INFRINGE ANY
        OF NICKLEN'S EXCLUSIVE RIGHTS UNDER THE COPYRIGHT ACT .................. 6

III.    SINCLAIR'S USE OF THE VIDEO WAS A FAIR USE ................................. 11

        A.      The Purpose and Character of Sinclair's Use Favors a Finding of Fair
                Use ............................................................................................................ 12

        B.      The Nature of the Copyrighted Work Favors a Finding of Fair Use .................... 16

        C.      The Amount and Substantiality of the Portion Used Favors a Finding
                of Fair Use ............................................................................................... 18

        D.      The Effect of the Use Upon the Potential Market Favors a Finding of
                Fair Use ................................................................................................... 19

CONCLUSION ......................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                             **Page(s)**

*Arica Inst., Inc. v. Palmer*,
   970 F.2d 1067 (2d Cir. 1992)..................................................................................16

*Arista Records LLC v. USENET.com*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009)........................................................10, 11, 20

*Arrow Prods., Ltd. v. Weinstein Co.*,
   44 F. Supp. 3d 359 (S.D.N.Y. 2014)........................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................6

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014)......................................................................................18

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)..............................................................................12, 16

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*,
   297 F. Supp. 3d 339 (S.D.N.Y. 2017)....................................................................13

*Bechler v. MVP Grp. Int'l, Inc.*,
   No. 16-CV-8837 (LAP), 2021 U.S. Dist. LEXIS 41874 (S.D.N.Y. Mar. 5,
   2021) ................................................................................................................11, 20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................6

*Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*,
   386 F. Supp. 2d 324 (S.D.N.Y. 2005)........................................................16, 18, 19

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)..........................................................................12, 16, 18

*Boesen v. United Sports Publ'ns, Ltd.*,
   No. 20-CV-1552 (ARR) (SIL), 2020 U.S. Dist. LEXIS 203682 (E.D.N.Y.
   Nov. 2, 2020) ................................................................................................. *passim*

*Brown v. Netflix, Inc.*,
   462 F. Supp. 3d 453 (S.D.N.Y. 2020)....................................................................12

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
   196 F. Supp. 3d 395 (S.D.N.Y. 2016)....................................................................17

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..................................................................................................12, 13, 18

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018)................................................................................................19

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)........................................................................... *passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998).................................................................................11, 12, 21

*Clark v. Transp. Alts., Inc.*,
  18 Civ. 9985 (VM), 2019 U.S. Dist. LEXIS 46274 (S.D.N.Y. Mar. 18, 2019) ...............12, 20

*Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001).................................................................................................12

*Flava Works, Inc. v. Gunter*,
  689 F.3d 754 (7th Cir. 2012) .................................................................................................8

*Goldman v. Breitbart News Network, LLC*,
  302 F. Supp. 3d 585 (S.D.N.Y. 2018)................................................................................9, 10

*Grady v. Iacullo*,
  No. 13-CV-00624-RM-KMT, 2016 U.S. Dist. LEXIS 51584 (D. Colo. Apr.
  18, 2016) ...............................................................................................................................9

*Konangataa v. ABC*,
  Nos. 16-cv-7382, 16-cv-7383 & 16-cv-7472 (LAK), 2017 U.S. Dist. LEXIS
  95812 (S.D.N.Y. June 21, 2017)...........................................................................................15

*Leibovitz v. Paramount Pictures Corp.*,
  137 F.3d 109 (2d Cir. 1998).................................................................................................18

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*,
  No. 13 C 4664, 2014 U.S. Dist. LEXIS 92809 (N.D. Ill. July 8, 2014) ...................................9

*Live Face on Web, LLC v. Biblio Holdings LLC*,
  No. 15 Civ. 4848 (NRB), 2016 U.S. Dist. LEXIS 124198 (S.D.N.Y. Sept. 13,
  2016) .....................................................................................................................................8

*McGucken v. Newsweek LLC*,
  464 F. Supp. 3d 594 (S.D.N.Y. 2020)...................................................................................15

*MyPlayCity, Inc. v. Conduit Ltd.*,
  No. 10 Civ. 1615 (CM), 2012 U.S. Dist. LEXIS 47313 (S.D.N.Y. Mar. 30,
  2012) .................................................................................................................................8, 9

*N. Jersey Media Grp. Inc. v. Pirro*,
    74 F. Supp. 3d 605 (S.D.N.Y. 2015)..................................................................17, 18

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004).............................................................................15, 19

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................................7, 8, 10

*Peter v. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010)........................................................................................6

*R.F.M.A.S., Inc. v. So*,
    619 F. Supp. 2d 39 (S.D.N.Y. 2009).........................................................................7

*Samuels v. Air Transport Local 504*,
    992 F.2d 12 (2d Cir. 1993).......................................................................................6

*Schwartzwald v. Oath Inc.*,
    No. 19-CV-9938 (RA), 2020 U.S. Dist. LEXIS 165641 (S.D.N.Y. Sep. 10,
    2020) ...................................................................................................................12, 17

*Sing for Serv., LLC v. United Serv. Contract Grp., LLC*,
    No. 20-cv-8458 (JSR), 2021 U.S. Dist. LEXIS 2999 (S.D.N.Y. Jan. 7, 2021) .......6

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)................................................................................12, 15

*TCA Television Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016)..............................................................................11, 12

*Walsh v. Townsquare Media, Inc.*,
    464 F. Supp. 3d 570 (S.D.N.Y. 2020)............................................................ *passim*

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991)....................................................................................15

**Statutes**

17 U.S.C. § 101 ..............................................................................................................7

17 U.S.C. § 107...............................................................................................11, 15, 18

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6) ...................................................1, 6, 11

2 Howard B. Abrams, *The Law of Copyright* § 15:52 (2006) ......................................16

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)...........................13

Defendants Sinclair Broadcast Group, Inc. ("Sinclair Parent"), and various of its corporate subsidiaries (the "Sinclair Affiliates" and, together with Sinclair Parent, "Sinclair" or the "Sinclair Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

On February 24, 2021, Plaintiff Paul Nicklen ("Nicklen" or "Plaintiff") filed an 84-page, 321-paragraph, Second Amended Complaint ("SAC") (ECF No. 72) against Sinclair Parent, a company that owns local television stations throughout the country, and the Sinclair Affiliates— 118 corporate entities purportedly associated with Sinclair Parent and involved in the operation of or holding the FCC licenses for certain of its stations.[1]  The core allegations in the lawsuit

---

[1] The Sinclair Affiliates are: WCWN Licensee, LLC, WCWN, LLC, KDSM, LLC, KDSM Licensee, LLC, Chesapeake Media I, LLC, KRNV, LLC, KRXI, LLC, KVCW, LLC, KVMY, LLC, KATV, LLC, KATV Licensee, LLC, KTUL, LLC, KTUL Licensee, LLC, WLUK Licensee LLC, WJAR Licensee LLC, WCWF Licensee LLC, WBMA Licensee, LLC, WSET Licensee, LLC, WVTV Licensee, LLC, Raleigh (WRDC-TV) Licensee, LLC, Birmingham (WBAM-TV) Licensee, Inc., WICS Licensee, LLC, KOKH LLC, KOKH Licensee, LLC, Milwaukee Television, LLC, WCGV Licensee, LLC, Sinclair Media III, Inc., WCHS Licensee, LLC, WVAH Licensee, LLC, Sinclair Properties, LLC, WDKA Licensee, LLC, WMMP Licensee, L.P. (incorrectly sued as WMMP Licensee, LLC), Sinclair Television of El Paso, LLC, KDBC Licensee, LLC, WGME, Inc., WGME Licensee, LLC, WSMH, Inc., WSMH Licensee, LLC, WUCW Licensee, LLC, KABB Licensee, LLC, KDNL Licensee, LLC, KEYE Licensee, LLC, KFDM Licensee, LLC, KFOX Licensee, LLC, KGAN Licensee, LLC, KHGI Licensee, LLC, KHQA Licensee, LLC, KOCB Licensee, LLC, KPTH Licensee, LLC, KRCG Licensee, LLC, KSAS Licensee, LLC, KTVL Licensee, LLC, KTVO Licensee, LLC, KUTV Licensee, LLC, KVII Licensee, LLC, WACH Licensee, LLC, WEAR Licensee, LLC, WFGX Licensee, LLC, WFXL Licensee, LLC, WGFL Licensee, LLC, WGXA Licensee, LLC, WKRC Licensee, LLC, WLFL Licensee, LLC, WLOS Licensee, LLC, WMSN Licensee, LLC, WNAB Licensee, LLC, WNWO Licensee, LLC, WOAI Licensee, LLC, WOLF Licensee, LLC, WPBN Licensee, LLC, WPDE Licensee, LLC, WPEC Licensee, LLC, WPGH Licensee, LLC, WRGB Licensee, LLC, WRLH Licensee, LLC, WSYX Licensee, LLC (incorrectly sued as WYSX, LLC), WTGS Licensee, LLC, WTOV Licensee, LLC, WTTO Licensee, LLC, WTVC Licensee, LLC, WTVX Licensee, LLC (incorrectly sued as WVTX Licensee, LLC), WTVZ Licensee, LLC, WUHF Licensee, LLC, WUTV Licensee, LLC, WUXP Licensee, LLC, WWHO Licensee, LLC, WWMT Licensee, LLC, WXLV Licensee, LLC, WZTV Licensee, LLC, Sinclair Television of

concern supposed copyright infringement based on the embedding of Nicklen's own public social media posts in an article (the "Article") about those very posts. The Article, entitled "Starving polar bear goes viral in heartbreaking video," reports on the rapid, "viral" dissemination of Nicklen's social media posts containing video of an emaciated polar bear he encountered in the Canadian Arctic (the "Video"), as well as Nicklen's own written commentary on the Video and his belief that climate change contributed to the bear's plight. In so reporting, the Article embedded the allegedly copyrighted Video. According to Plaintiff, the Article was published on the web sites of each of the 118 Sinclair Affiliates named in the SAC.

The SAC should be dismissed against *all* of the Sinclair Defendants for two independent reasons. <u>First</u>, because the Article does not actually display the allegedly copyrighted material, there has been no infringement. As courts in this District and across the country have found, simply "embedding" on one website a social media post that is publicly available on another website does not constitute copyright infringement as a matter of law. <u>Second</u>, the SAC should be dismissed as against the Sinclair Defendants because the alleged infringement was a fair use. Plaintiff's theory of the case is that Sinclair Parent and the Sinclair Affiliates infringed Nicklen's copyright merely by reproducing his own social media posts in an Article reporting on those very posts. The law, however, says otherwise. In a series of recent cases, Courts in this Circuit have

---

Abilene, LLC, Sinclair Television of Bristol, LLC, Sinclair Television of Montana, LLC, WCTI Licensee, LLC, Sinclair Television of Fresno, LLC, KMPH Licensee, LLC, WJAC Licensee, LLC, Sinclair Television of Omaha, LLC, KPTM Licensee, LLC, Sinclair Television of Bakersfield, LLC, Sinclair Television of Portland, LLC, Sinclair Television of Washington, Inc. (inadvertently named twice in the SAC), Sinclair Kennewick Licensee, LLC, Sinclair Seattle Licensee, LLC, Sinclair Boise Licensee, LLC, Sinclair Yakima Licensee, LLC, Sinclair Lewiston Licensee, LLC, Sinclair Eugene Licensee, LLC, KAME, LLC, WICD Licensee, LLC, KFXA Licensee LLC, KUPN Licensee LLC, KUQI Licensee, LLC, WSTQ Licensee, LLC, WUPN Licensee, LLC, Sinclair Television of California, LLC, Sinclair Television of Seattle, Inc., Sinclair Television of Oregon, LLC, and Sinclair La Grande Licensee, LLC.

consistently found that, where a publication reports on a social media post itself that happens to contain copyrighted material, the reproduction of that post is protected by the doctrine of fair use. That is exactly the case here, and the SAC should therefore be dismissed against Sinclair.

## **RELEVANT FACTUAL ALLEGATIONS**[2]

Despite its length, the core factual allegations in Plaintiff's Second Amended Complaint are simple. Plaintiff is a professional nature photographer and conservationist who, in a July 2017 expedition to the Canadian Arctic, took a video (the "Video") of a starving polar bear. SAC ¶¶ 5(a), 150. On December 5, 2017, Plaintiff posted the Video to his public Instagram and Facebook accounts, along with text describing the circumstances in which he took the footage, its emotional impact on him, and his views on the links between the bear's plight and climate change. *Id*. ¶ 151. According to the SAC, these posts went "viral," and between December 7 and 13, 2017, "hundreds or perhaps thousands" of online publishers began displaying the Video without Plaintiff's permission. *Id*. ¶¶ 5(c), 156.

Plaintiff alleges that each of the defendants in this case, including the Sinclair Defendants, only made use of the Video by embedding it in their sites. *See id*. ¶ 166 ("Defendants stole Nicklen's Video . . . by using the Instagram or Facebook API tool to 'embed' each in certain posts on Defendants' respective websites"); *id*. ¶ 283 ("Each Defendant, without the permission, license or consent from Plaintiffs, embedded . . . Nicklen's single copyrighted Video . . . as alleged above onto Defendants' websites using the Instagram or Facebook API, causing Nicklen's Video . . . to be displayed on the Defendant's website and distributing and displaying the Video . . . to the public."). Embedding, also known as in-line linking, is the use of

---

[2] For this motion only, Sinclair accepts as true the well-pleaded allegations of the Amended Complaint.

computer code to direct a user's browser to call up a social media post, photograph or video from the site where it is stored and cause is it to appear in the context of a separate publisher's site. When a social media post is embedded, the underlying video file it contains remains stored on the social media company's server. *Id.* ¶ 160; *see also Boesen v. United Sports Publ'ns, Ltd.*, No. 20-CV-1552 (ARR) (SIL), 2020 U.S. Dist. LEXIS 203682, at *3 n.1 (E.D.N.Y. Nov. 2, 2020) ("To embed an image, a coder or web designer adds an 'embed code' to the HTML instructions; this code directs the browser to the third-party server to retrieve the image. The image appears on the new page, but links to and remains hosted on the third-party server or website." (internal marks and citations omitted)).

As specifically relevant to the instant motion, the SAC names 118 corporate entities that are allegedly affiliated with Sinclair Parent. SAC ¶¶ 11, 172.[3]  The SAC further alleges that each of these Sinclair Affiliates is the owner of a local Sinclair television station website that embedded the Video at issue in this case. *Id.* ¶ 173.[4]  According to the SAC, each of the Sinclair Affiliates used the Video on their specific TV station website as a part of the same Article. *Id.*

---

[3] In addition to the 118 named Sinclair Affiliates and Sinclair Parent, Plaintiff purports to bring a putative "defendant" class action against all Sinclair-affiliated entities that embedded the Video in the Article, whether or not named in the SAC. *See* SAC ¶¶ 135-149. Regardless of whether Plaintiffs can in fact succeed in have a "Sinclair" class certified (Sinclair does not believe that they can), if the named Sinclair Defendants succeed in either their "embedding" or fair use arguments for dismissal, that ruling would be equally applicable to any Sinclair-affiliated entities that are not named in the Amended Complaint, but that are purportedly part of the Sinclair defendant class. In other words, if this motion is granted, all Sinclair entities, not just those named in the caption, should be dismissed from the case.

[4] In reality, many of the entities sued are simply the holders of FCC licenses, and do not actually control the operation of the stations or websites.

¶¶ 179-269.[5]  The short Article, an example of which is attached as an exhibit to the Second Amended Complaint (with highlighting added by Plaintiff), is entitled "Starving polar bear goes viral in heartbreaking video."  SAC, Ex. 5.  It reports on the viral dissemination of the Video, noting that it has been "grabbing attention" and that Plaintiff's Facebook post had garnered over 1 million views in just the few days between its posting on December 5 and the publication of the Article on December 11.  *Id.*  The Article also reports on Nicklen's posting of the Video and accompanying commentary on Facebook, as well as subsequent remarks he provided to National Geographic regarding the Video and the circumstances in which he took it.  *Id.*  Each Sinclair Affiliate is alleged only to have embedded Nicklen's original social media posts.  *Id.* ¶ 135 (proposing a class consisting of "Sinclair-affiliated entities" who "published, embedded, or caused to be displayed" Nicklen's Video "using the Instagram or Facebook-embedding tool"); ¶ 171 ("Defendant WCWN Licensee . . . embedded Nicklen's Video . . . in a post titled 'Starving Polar Bear Goes Viral in Heartbreaking Video,' published on December 11, 2017").[6]

On February 18, 2021, this Court held an initial pre-trial conference at which it granted Nicklen permission to file his Second Amended Complaint and set a briefing schedule on the defendants' anticipated dismissal motions, requiring them to be filed no later than March 8, 2021.  *See* Dkt. 70.  This timely motion followed.

---

[5] For the lion's share of the Sinclair Affiliates, the SAC includes the URLs where the allegedly infringing content was found.  For others, the SAC alleges that they had displayed the same Article and Video, but have since taken them down.  SAC ¶ 270.

[6] The SAC alleges that the conduct of Defendant WCWN Licensee, LLC is "typical for the rest of the Defendant Sinclair-affiliated class members," SAC ¶ 138; *see also id.* ¶ 171 (stating the other Sinclair Affiliates are "similarly situated" to WCWN).

## ARGUMENT

### I.   STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Sing for Serv., LLC v. United Serv. Contract Grp., LLC*, No. 20-cv-8458 (JSR), 2021 U.S. Dist.

LEXIS 2999, at *6 (S.D.N.Y. Jan. 7, 2021) ) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citation omitted)). The "[f]actual allegations must be enough to raise a right to relief

above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable

expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555-56 (2007).  "A pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  On a motion to dismiss, in addition to the

facts alleged in the pleadings, a court may consider "documents attached as exhibits or

incorporated by reference in the pleadings and matters of which judicial notice may be taken."

*Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).  "In copyright infringement

actions, the works themselves supersede and control contrary descriptions of them, including any

contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter*

*v. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal marks

and citations omitted).

### II.   SINCLAIR'S EMBEDDING OF THE VIDEO DID NOT INFRINGE ANY OF NICKLEN'S EXCLUSIVE RIGHTS UNDER THE COPYRIGHT ACT

The Sinclair Defendants cannot have committed copyright infringement because their only

alleged conduct – the embedding of the Video in the Article allegedly posted on their websites –

does not constitute infringement as a matter of law. "To be held liable for direct infringement under the Copyright Act, a party must be found to have violated one of the copyright owners' 'exclusive rights' . . . ." *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 66-67 (S.D.N.Y. 2009). Here, Nicklen alleges that each Sinclair Affiliate violated his exclusive right to display his Video. *See* SAC ¶ 173 ("The infringing acts described in this second amended complaint are each website's illicit display of Plaintiff's copyrighted Video."); *see also id.* ¶¶ 177, 179-270. But when a website embeds a third party's social media post, it does not actually publicly display any work that post contains, or violate any other exclusive right for that matter.  The website owner has instead only reproduced computer code telling a web browser to retrieve content that remains hosted on the original social media site.

The United States Court of Appeals for the Ninth Circuit articulated this rule – the so-called "server test" – in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).  In formulating the server test, the court began by looking at the text of the Copyright Act itself.  As the court explained, the word "display" in the Act "means 'to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process.'"  *Id.* at 1160 (quoting 17 U.S.C. § 101).  A copy is a "'material object[] . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.'"  *Id.* (quoting 17 U.S.C. § 101).  A work is "'fixed . . . when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.'"  *Id.* (quoting 17 U.S.C. § 101).

The Ninth Circuit determined that a work displayed by computer is "fixed" when it is stored on a computer server, and the version of the work "stored in the computer [server] is the 'copy' of the work for purposes of copyright law." *Id.* The work is displayed when the server's owner:

> uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer. In sum, based on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory.

*Id.* (internal citation omitted).

When a website embeds a work, it does not store that work on its own servers and therefore "does not have a copy of the images for purposes of the Copyright Act." *Id.* It instead merely "provides HTML instructions that direct a user's browser to a [separate] website publisher's computer that stores the [image or work]." *Id.* at 1161. The court noted that this is "not equivalent to showing a copy" because (1) the HTML instructions are merely "lines of text," not the work itself, and (2) the instructions merely "give[] the address of the [work] to the user's browser" which then interacts with another computer, causing that work "to appear on the user's computer screen." *Id.* While embedding "may cause some computer users to believe they are viewing a single . . . webpage," this misconception is simply not a cognizable injury to a copyright holder under the Copyright Act. *Id.*

Numerous other courts, including at least two in this District, have adopted *Perfect 10's* "server test" to conclude that embedding content does not constitute copyright infringement as a matter of law. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 756 (7th Cir. 2012); *Live Face on Web, LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016 U.S. Dist. LEXIS 124198, at *9-12 (S.D.N.Y. Sept. 13, 2016); *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615 (CM),

2012 U.S. Dist. LEXIS 47313, at *35-42 (S.D.N.Y. Mar. 30, 2012); *see also Grady v. Iacullo*,

No. 13-CV-00624-RM-KMT, 2016 U.S. Dist. LEXIS 51584, at *14-25 (D. Colo. Apr. 18, 2016);

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C 4664, 2014 U.S. Dist. LEXIS

92809, at *18 (N.D. Ill. July 8, 2014).

Here, the SAC expressly alleges that each Sinclair Defendant infringed Nicklen's

copyright by embedding his Video in the Article. *See* SAC ¶ 135; 171.[7]  The SAC admits that

the Video remained on the social media company's server and not on any computer owned by

any Sinclair Defendant. *Id.* ¶ 160.  Thus, because each of the Sinclair Defendants allegedly only

included lines of code, not a copy of the Video itself, on their websites, they did not display the

Video and therefore did not commit copyright infringement.

The Sinclair Defendants acknowledge that a single decision in this District, *Goldman v.

Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018), reaches a different

conclusion.  In *Goldman*, Judge Forrest rejected the server test and found that "physical

possession of an image" was not "a necessary element to its display for purposes" of the

Copyright Act, *id.* at 594.  The Court's rationale was that embedding was a process that "resulted

in a transmission of the photos so that they could be visibly shown[,]" which it found sufficient

to constitute display of a fixed image.  *Id.*

The Sinclair Defendants respectfully suggest that *Goldman* was incorrectly decided and

that the Ninth Circuit's analysis of this issue more closely follows the text, intent, and purpose of

the Copyright Act.  The server test is not merely about, as the *Goldman* court would have it,

---

[7] While at times the Second Amended Complaint contends there may be other copies of the
Article and therefore additional Sinclair Defendants, Plaintiff concedes they are all similarly
situated.  *See* SAC ¶¶ 137-38.  Therefore, all claims against Sinclair, both those expressly
pleaded and those against the proposed Sinclair Class, should be dismissed.

"invisible technological details," *id.* at 594, but rather who has the right to control a work at all. By embedding the Video, Sinclair did not exercise control over Nicklen's copyrighted work, but simply provided a link back to a video that Nicklen himself chose to display publicly, and which anyone with an internet connection could view for free. SAC ¶ 5.

Moreover, *Goldman* is distinguishable from the instant case in at least one important respect: whereas *Goldman* involved a photograph, this case involves a video.  That distinction is crucial because even the *Goldman* Court acknowledged that whether the website user has an active role in viewing the allegedly infringing content is a "critical" factor in determining whether the server test should apply.  302 F. Supp. 3d at 596 (noting that "the volitional act taken by users of the services" at issue in *Perfect 10* "provide[s] a sharp contrast to the facts at hand.") On these facts, just as the user in *Perfect 10* had a "paramount" role because he or she had to click on the thumbnail to display a full-sized image and thereby "engaged in a direct connection with third-party websites," *see Goldman*, 302 F. Supp. 3d at 596 (citation omitted), a user of the Sinclair Affiliates' websites would have had to click on the Video within the social media post in order to play it.  Thus, even if *Goldman* was rightly decided on its particular facts, the facts of this case much more closely resemble *Perfect 10*, and the server test should therefore apply.

Because, under that test, Nicklen cannot maintain a claim for direct infringement against the Sinclair Defendants, he cannot also maintain claims for inducement of copyright infringement, contributory copyright infringement, or vicarious copyright infringement by which he contends that Sinclair Parent should be held liable for the infringing acts of its affiliates.  *See* SAC ¶¶ 292, 303, 312.  "For all three theories of secondary copyright infringement, there must be the direct infringement of a third party."  *Arista Records LLC v. USENET.com*, 633 F. Supp.

2d 124, 149 (S.D.N.Y. 2009); *accord Bechler v. MVP Grp. Int'l, Inc.*, No. 16-CV-8837 (LAP), 2021 U.S. Dist. LEXIS 41874, at *14 (S.D.N.Y. Mar. 5, 2021).

Therefore, due to the undisputed fact that Sinclair simply embedded the Video in question, the Complaint should be dismissed in full.

## III.    SINCLAIR'S USE OF THE VIDEO WAS A FAIR USE

Even if this Court determines that the server test is not applicable here, Plaintiff's infringement claims should be dismissed against all of the Sinclair Defendants because the use alleged against them was a non-infringing fair use of the Video.  *See* 17 U.S.C. § 107 ("the fair use of a copyrighted work . . . is not an infringement of copyright.").  The Copyright Act specifies four non-exclusive factors that must be considered to determine whether a particular use is fair: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use on the market for the original.  This is "an open-ended and context-sensitive inquiry." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (citations omitted).  The "ultimate test of fair use, therefore, is whether the copyright law's goal of promoting the Progress of Science and useful Arts . . . would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (internal marks and citations omitted).  For the reasons explained below, all four factors weigh in favor of a finding of fair use.

Importantly, courts in this Circuit have consistently affirmed that copyright infringement claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) where a comparison of the two works at issue is sufficient to decide the question of fair use.  *See, e.g.*, *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016) ("this court has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright

infringement claim"); *Brown v. Netflix, Inc.*, 462 F. Supp. 3d 453, 460-64 (S.D.N.Y. 2020)

(granting motion to dismiss based on fair use), *appeal filed*, No. 20-2007 (2d Cir. June 25, 2020);

*Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 574 (S.D.N.Y. 2020) (same);

*Schwartzwald v. Oath Inc.*, No. 19-CV-9938 (RA), 2020 U.S. Dist. LEXIS 165641, at *30

(S.D.N.Y. Sep. 10, 2020) (same), *appeal dismissed*, No. 20-3552, 2020 U.S. App LEXIS 41054

(2d Cir. Dec. 3, 2020); *Clark v. Transp. Alts., Inc.*, 18 Civ. 9985 (VM), 2019 U.S. Dist. LEXIS

46274, at *7-14 (S.D.N.Y. Mar. 18, 2019) (same).

A.   <u>The Purpose and Character of Sinclair's Use Favors a Finding of Fair Use</u>

The first statutory factor, the purpose and character of the use, is "[t]he heart of the fair

use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting *Davis v. The Gap,

Inc.*, 246 F.3d 152, 174 (2d Cir. 2001)).  The primary focus of the first fair use factor is "whether

and to what extent the new work is transformative," *Cariou*, 714 F.3d at 705-06 (quoting

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)), meaning whether the new use

"communicates something new and different from the original, or expands its utility." *Authors

Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015).  "If the secondary use adds value to the

original—if [the original] is used as raw material, transformed in the creation of new

information, new aesthetics, new insights and understandings—this is the very type of activity

that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock*, 150 F.3d

at 141 (internal marks and citation omitted).  In the case of news reporting, "[c]ourts often find

[transformation] by emphasizing the altered purpose or context of the work, as evidenced by

surrounding commentary or criticism." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756

F.3d 73, 84 (2d Cir. 2014).  "For a use to be fair, it 'must be productive and must employ the

quoted matter in a different manner or for a different purpose from the original.'" *Cariou*, 714

F.3d at 706 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105,

1111 (1990)).   As the *Campbell* Court observed, "transformative works . . . lie at the heart of the

fair use doctrine's guarantee of breathing space." 510 U.S. at 579.

Sinclair's use of the Video was transformative.   Nicklen is a conservationist who created

his Video because he believed the bear's experience was "an accurate representation of the fate

that awaited the world's polar bear population given the toll that global warming is taking on

their natural habitat."  SAC ¶ 150.   Sinclair used the Video for a very different purpose -- to

report on the viral phenomenon of Nicklen's social media posts.   Indeed, the title of the Article

makes plain that its subject is the dissemination of, rather than the content of, the video:

"Starving polar bear ***goes viral*** in heartbreaking video."   Similarly, both the first line of the

Article—which notes that "a photograph of a polar bear is grabbing attention"—and the last line

of the Article—which reports that the video "has already reached over 1 million views on

Facebook" in the five days since its posting—amply demonstrate that the primary subject of the

article was the dissemination of the social media posts and their subsequent virality.   As Judge

Furman noted in a recent case, "a news report about a video that has gone viral on the Internet

might fairly display a screenshot or clip from that video to illustrate what all the fuss is about."

*Barcroft Media, Ltd. v. Coed Media Grp.*, *LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017).   That

is exactly the case here—put simply, the posts are the story.   In the context of reporting on social

media itself, that is the paradigm of transformative fair use.[8]

---

[8] This conclusion is buttressed by the remainder of the Article, which is entirely devoted to
reporting on Plaintiff Nicklen's own commentary on the Video both on his own social media
posts and in his statements to National Geographic—that is, to the context and circumstances
relevant to the *posts*, not to merely the subject matter of the Video.

Two recent cases from this Circuit directly address fair use in the context of reporting on the content of social media posts.  In the first, *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570 (S.D.N.Y. 2020), the Court considered a copyright claim brought by a photographer against an online magazine that had published an article containing an embedded Instagram post made by well-known rapper and celebrity Cardi B.  The Instagram post itself contained the plaintiff's copyrighted photograph of Cardi B, and the plaintiff alleged that, because the article reproduced that Instagram post (including the copyrighted photograph) in total, the article had infringed his copyright.  *Id.* at 580.  The Court disagreed, holding instead that the reproduction of the Instagram post in the article was a fair use, and dismissing the complaint.  Crucially, in discussing the first fair use factor, the Court concluded that the article's use of the photograph was transformative "because the [Instagram] Post—or, put differently, the fact that Cardi B had disseminated the [Instagram] Post—was the very thing the Article was reporting on."  *Id.* at 582.

Similarly, in *Boesen v. United Sports Publ'ns, Ltd.*, No. 20-CV-1552, 2020 U.S. Dist. LEXIS 203682 (E.D.N.Y. Nov. 2, 2020), the Court considered a copyright claim based on an article that embedded an Instagram post made by professional tennis star Caroline Wozniacki, in which she used a copyrighted photograph to announce her retirement.  Largely agreeing with the reasoning in *Walsh*, the Court in *Boesen* found that the article's use of the Wozniacki Instagram post was a fair use because "it embedded the Instagram post announcing her retirement—which incidentally included the photograph—because the fact that [Wozniacki] had disseminated that post was the very thing the Article was reporting on."  *Id.* at *9 (internal marks and citation omitted).

*Walsh* and *Boesen* illustrate a clear legal principle—when online publishers reproduce social media content for the purpose of reporting about the dissemination of the social media

14

post itself, such reproduction is a transformative use for purposes of the fair use analysis.[9]  That is exactly the situation here.[10]

Finally, in addition to being transformative, the Article clearly "fits the description of uses described in § 107" of the Copyright Act, and therefore "there is a strong presumption that factor one favors the defendant."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991)).  Section 107 of the Copyright Act lists "criticism, comment, news reporting, teaching . . . , scholarship, or research" as favored uses for application of fair use.  17 U.S.C. § 107.  In this case, the Article was self-evidently a news item, displayed on the website of a local television station, commenting on a viral video phenomenon that by definition is of interest to many members of the public.  *See* SAC, Ex. 5.  Because the Article fits squarely into one of the identified uses in Section 107, a strong presumption that the first factor weighs in favor of fair use applies.[11]

---

[9] Judge Kaplan similarly granted a motion to dismiss from the bench in a case involving reporting on a viral video of the plaintiff's live-streaming the birth of his child, finding it was a fair use.  *See Konangataa v. ABC*, Nos. 16-cv-7382, 16-cv-7383 & 16-cv-7472 (LAK), 2017 U.S. Dist. LEXIS 95812, at *2-3 (S.D.N.Y. June 21, 2017).

[10] For this reason, this case is distinguishable from *McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594 (S.D.N.Y. 2020), a fair use case with some similar features decided around the same time as *Walsh* and *Boesen*.  In *McGucken*, the Court acknowledged the legal principle that reporting on a post itself was protected by fair use, but determined that, on the facts of that case, the article containing copyrighted content from Instagram had not been about the dissemination of a social media post itself, but rather that the defendant had used the copyrighted photograph "merely as an illustrative aid" in an article that had nothing to do with social media.  *Id.* at 606.  Here, by contrast, the headline and content of the Article make clear that its subject was Nicklen's post, not the underlying content of the Video, and therefore that the reasoning of *Walsh* and *Boesen*, not *McGucken*, should apply.

[11] It is well-established in the Second Circuit that a defendant's status as a for-profit enterprise is not a dispositive factor in evaluating the purpose and character of the defendant's use.  *See Swatch Grp.*, 756 F.3d at 83 ("purposes such as . . . news reporting" are set forth in the Copyright Act as prototypical examples of fair use, 17 U.S.C. § 107, and the Second Circuit has "recognized that '[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit'" (citation omitted)).  Thus, while Courts sometimes evaluate a

B.  <u>The Nature of the Copyrighted Work Favors a Finding of Fair Use</u>

The second factor in the fair use analysis is the nature of the copyrighted work.  Courts consider "(1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256 (quoting 2 Howard B. Abrams, *The Law of Copyright* § 15:52 (2006)).

Here, both aspects of the nature of the copyrighted work favor a finding of fair use.  With respect to publication, Nicklen admittedly published the work at issue on his public social media accounts.  SAC ¶ 151 & n.4.  This admission supports a finding of fair use.  *See, e.g.*, *Boesen*, 2020 U.S. Dist. LEXIS 203682, at *13 (noting that "the photograph does not incur the same protections as an unpublished work because plaintiff has published it on his own social media page and website."); *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (holding that second factor favored fair use because work was "a published work available to the general public"); *Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 330 (S.D.N.Y. 2005) ("This circuit has mitigated the importance of creativity in the second factor where a work is a published work available to the general public" (internal marks and citation omitted)), *aff'd*, 448 F.3d 605 (2d Cir. 2006).

---

defendant's status, the law is clear that this factor is largely irrelevant to the fair use analysis where a work was transformative. *See, e.g., Authors Guild*, 804 F.3d at 219 (commercial motivation deemed of little significance where there was a "highly convincing transformative purpose, together with the absence of significant substitutive competition."); *Blanch*, 467 F.3d at 254 (where the new work was substantially transformative, "[w]e therefore discount the secondary commercial nature of the use." (internal marks and citation omitted)); *Arrow Prods., Ltd. v. Weinstein Co.*, 44 F. Supp. 3d 359, 370 (S.D.N.Y. 2014) ("[T]he court does not place very much significance on this part of the first fair-use factor given the transformative nature of the work.").

Likewise, with respect to creativity, the primary function of the Video was to convey factual information about an event witnessed in real life—specifically, the existence of the emaciated polar bear.  This factor therefore weighs in favor of a finding of fair use, as courts in this and other circuits have consistently found that video or photographic depictions of real events are entitled to less protection under this factor—even where, as here, professional photographers made the images or recordings at issue.  *See, e.g.*, *Schwartzwald*, 2020 U.S. Dist. LEXIS 165641, at *23 (factor favored fair use where the subjects of a photograph were presented "'as they naturally appeared' without altering their poses or staging their surrounding environment" (citation omitted)); *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 408 (S.D.N.Y. 2016) (factor favored fair use where photographs were taken "to document their subjects rather than to serve as art pieces"); *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 619-20 (S.D.N.Y. 2015) (photograph of the attacks on the World Trade Center were "a non-fictional rendering" "created for news gathering or other non-artistic purposes" and therefore this factor weighed "in favor of fair use" notwithstanding that the photographer "exhibited great artistry" in capturing the moment); (because photo was "merely a candid shot in a public setting" factor weighed in favor of fair use).  Here, likewise, the "interest [in the works at issue] derives from their content, not their composition," and therefore the factual, documentary nature of the Video weighs in favor of fair use.  *BWP Media*, 196 F. Supp. 3d at 408.[12]

---

[12] At most, the Video "contains 'both informational and creative elements,'" which "renders the degree of creativity a relatively neutral consideration."  *Walsh*, 464 F. Supp. 3d at 585 (quoting *BWP Media*, 196 F. Supp. 3d at 408).  Even if the Video is construed as partially creative, the neutrality of its creative and information elements, combined with the undisputed fact of publication, tips the second factor in favor of fair use.  *Id.*

Finally, notwithstanding that this factor weighs in favor of a finding of fair use, the law is clear that "the second fair-use factor has limited weight" when the use is transformative. *Blanch*, 467 F.3d at 257; *see also Bill Graham Archives*, 448 F.3d at 612 ("the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose."). That is exactly the case here, for all of the reasons explained in Section III.A, above. Consequently, this factor should be afforded little weight in the overall analysis.

## C.   The Amount and Substantiality of the Portion Used Favors a Finding of Fair Use

As to the third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107, a court should consider not just the quantity used, but "whether the quantity and value of the materials used[] are reasonable in relation to the purpose of the copying." *Cariou*, 714 F.3d at 710 (quoting *Blanch*, 467 F.3d at 257).  The secondary use "'must be [permitted] to 'conjure up' at least enough of the original' to fulfill its transformative purpose." *Id*. (quoting *Campbell*, 510 U.S. at 588); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998).  "As the Second Circuit has noted, . . . there are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Pirro*, 74 F. Supp. 3d at 620-21 (citing *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014)). "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87.  Indeed, for some purposes, it may be necessary to copy the entire copyrighted work, and even then the third factor would not weigh against a finding of fair use.  *HathiTrust*, 755 F.3d at 98; *see, e.g.*, *Bill Graham Archives*, 448 F.3d at 613.

Here, Sinclair merely embedded the content—Nicklen's social media posts—that comprise the subject of its story. That is the only way Sinclair "could have accomplished [its]

journalistic objective of describing a social media story and providing readers with the relevant posts." *Walsh*, 464 F. Supp. 3d at 586; *see also Boesen*, 2020 U.S. Dist. LEXIS 203682, at *14 (where defendant sought to report on the fact of a social media post itself, "[o]nly reproducing that post could achieve that aim.")  Sinclair's reproduction of the allegedly copyrighted work was reasonable in relation to its purpose, and the factor therefore weighs in favor of fair use.

    D.  <u>The Effect of the Use Upon the Potential Market Favors a Finding of Fair Use</u>

"Factor Four focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1760 (2019).  The Court's concern in evaluating the fourth factor, "is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." *Cariou*, 714 F.3d at 708.  A secondary use "usurps" the market "where the infringer's target audience and the nature of the infringing content is the same as the original." *Id*. at 709.  In other words, "the focus . . . is on whether defendants are offering a market substitute for the original." *NXIVM*, 364 F.3d at 481.  When conducting this analysis, "[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." *Cariou*, 714 F.3d at 709 (citation omitted); *Bill Graham Archives*, 448 F.3d at 614-5 (secondary use does not affect the market for the original where it is "transformatively different from their original expressive purpose").

Here, it is clear that the Article does not and cannot "usurp the market" for Nicklen's original work.  As an initial matter, the social media posts at issue that are embedded in the

Article contain not only the purportedly copyrighted work, but also Nicklen's commentary on them, as well as other ancillary aspects of the original posts such as the user's profile picture, the date, the number of views, and a box for adding comments. *See* SAC, Ex. 5. This alone makes the fourth factor weigh in favor of fair use, because the presence of this additional material means that no potential user or licensee of Nicklen's work could use the Article as a substitute for it. *See, e.g.*, *Walsh*, 464 F. Supp. 3d at 586 ("[B]ecause the [work] did not appear on its own, but as part of the [Instagram] Post . . . it is implausible that Defendant's use would compete with Plaintiff's business or affect the market or value of her work."); *Boesen*, 2020 U.S. Dist. LEXIS 203682, at *15 (same); *Clark*, 2019 U.S. Dist. LEXIS 46274, at *13 (fourth factor weighed in favor of fair use where a screenshot of a news article contained not only a copyrighted photograph, but also the article's "headline, author byline, and photographer credit.")

Moreover, as noted above, the law in this Circuit is clear that "[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." *Cariou*, 714 F.3d at 709 (citation omitted). The fact that, as explained above, the use at issue here is clearly transformative, therefore provides an additional reason to conclude that the Article does not usurp the market for Nicklen's Video. The fourth factor also weighs in favor of a finding of fair use.

Because any direct infringement claim against the Sinclair Defendants cannot be sustained on fair use grounds, again, Nicklen cannot bring any claims for inducement of copyright infringement, contributory copyright infringement, or vicarious copyright infringement against Sinclair Parent. *See Arista Records*, 633 F. Supp. 2d at 149; *Bechler*, 2021 U.S. Dist. LEXIS 41874, at *14.

Therefore, because Sinclair's use of the Video was fair, all claims against those defendants should be dismissed with prejudice.

## **CONCLUSION**

At bottom, this case seeks to hold at least 118 Sinclair entities and their parent liable for copyright infringement because they allegedly published an article discussing how a video plaintiff posted online was spreading virally, and included HTML code in that article allowing readers to view the video in the location plaintiff originally posted it. As a matter of law, that does not constitute copyright infringement.

Even if the allegations in the SAC could support a finding of infringement based on embedding, Sinclair's use was manifestly a fair use. The fair use inquiry asks a court to evaluate "whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' . . . would be better served by allowing the use than by preventing it." *Castle Rock*, 150 F.3d at 141. That question is readily answered here. As social media takes an ever-more central role in daily intercourse, the ability for news media and others to disseminate information about what occurs on social media becomes increasingly more important. The legal propositions underlying this case—that news organizations may make use of embedding tools to point readers to a work intended to be shared online, particularly in reporting on those posts themselves—is legally and logically sound, and entirely consistent with the purposes of the Copyright Act. For these reasons, and all of the reasons explained above, the Court should enter an order dismissing Plaintiffs' claims against the Sinclair Defendants in their entirety, with prejudice, along with any other relief that the Court finds just and proper.

Dated:  March 8, 2021

Respectfully submitted,

**BALLARD SPAHR LLP**

   */s/ Thomas B. Sullivan*   
Thomas B. Sullivan
Joseph Slaughter
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6139
Facsimile: (212) 223-1942
sullivant@ballardspahr.com
slaughterj@ballardspahr.com

*Counsel for Sinclair Defendants*