## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**PAUL NICKLEN,**

                                        **1:20-CV-10300-JSR-SN**

                *Plaintiff,*

**v.**                                    **ECF CASE**

**SINCLAIR BROADCAST GROUP INC., et. al.,**

                *Defendant.*

**PLAINTIFF'S MEMORANDUM OF LAW AND SUPPORTING AUTHORITIES IN OPPOSITION TO THE SINCLAIR DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)**

James Bartolomei, Esq.
DUNCAN FIRM, P.A.
809 W. 3rd Street
Little Rock, Arkansas 72201
501-228-7600 phone
james@duncanfirm.com

Bryan Hoben, Esq.
HOBEN LAW
1112 Main Street
Peekskill, NY 10566
347-855-4008 phone
bryan@hobenlaw.com

Robert N. Kaplan, Esq.
KAPLAN, FOX, KILSHEIMER LLP
850 Third Street
New York, New York 10022
rkaplan@kaplanfox.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................................iii

PRELIMINARY STATEMENT...........................................................................................................1

STATEMENT OF FACTUAL ALLEGATIONS......................................................................................2

I. STANDARD OF REVIEW ..............................................................................................................3

II. EMBEDDING THE VIDEO INFRINGES ON THE EXCLUSIVE DISPLAY RIGHT ......................4

  A. The Facts of This Case are Closer to *Goldman* than *Perfect 10*. ........................................................5

  B. Physical Location or Possession of the Displayed Video Copy is Not Relevant to the Display Right Under the Copyright Act as Found by *Goldman*. ...................................................................................8

  C. *Perfect 10*'s Server Test is Inconsistent with the Supreme Court's Intervening Decision in *Aereo* which Downplayed the Technical Process Behind a Given Display. ....................................................11

  D. Sinclair References "Numerous Other Courts" Applying the Server Test, But None Are from the Second Circuit or This District and None Address the Display Right....................................................13

III. SINCLAIR'S FAIR USE DEFENSE FAILS AS A MATTER OF LAW ..........................................16

  A. The Character and Purpose of the Defendants' Uses Strongly Favor Plaintiff..................................17

    i. Repackaging Plaintiff's Display of his Video with a Passing Mention of the Video's "Viral" Status Is Insufficiently Transformative.....................................................................................................17

    ii. The Sinclair Defendants' Uses are Indisputably Commercial. .......................................................20

    iii. The Sinclair Defendants' Uses were Undertaken in Bad Faith. ....................................................20

  B. The Expressive and Creative Nature of Plaintiff's Video Favors Plaintiff.......................................21

  C. Each Defendant Used the Entire Video Which Strongly Disfavors a Fair Use Finding ....................22

  D. Each Defendant's Use Negatively Affected the Markets for the Video, which Strongly Disfavors a Fair Use Finding ...........................................................................................................................................23

CONCLUSION..................................................................................................................................25

CERTIFICATE OF SERVICE ................................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) ………......……5, 9, 11, 12, 13, 14 14, 15

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir.2010) …………...………………...……3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ……………………….……...…………….…………3

*Authors Guild v. Google, Inc*., 804 F.3d 202 (2d Cir. 2015) …………..……...……..……….23-24

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 207 F. Supp. 3d 339 (S.D.N.Y. 2017) …..19, 22, 24, 25

*Boesen v. United Sports Publications, Ltd.*, No. 20CV1552ARRSIL, 2020 WL 6393010 (E.D.N.Y. Nov. 2, 2020) …………………………………...……………………19, 20, 23, 24

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499 (S.D.N.Y. 2015) ...16, 21-22

*Byrne v. British Broadcasting Corp.*, 132 F. Supp. 2d 229 (S.D.N.Y. 2001) …………..…..……18

*Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 114 S.Ct. 1164 L.Ed.2d 500 (1994)...16, 17, 21, 23

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013), aff'd, 910 F.3d 649 (2d Cir. 2018)……………………………………………………………………...……..4

*Carell v. Case Shubert*, 104 F. Supp. 2d 236 (S.D.N.Y. 2000) (aff'd, 23 F.3d 398 (2d Cir. 1994)…….…………………………………………………………………...……..3

*Clark v. Transportation Alternatives, Inc.*, No. 18 CIV. 9985 (VM), 2019 WL 1448448 (S.D.N.Y. Mar. 18, 2019)………………………………………………………………..24

*Corley v. United States,* 556 U.S. 303 (2009)……………………………….……..……….10

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007)……………………………………………….……8

*Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515 (S.D.N.Y. 2018)…………….…..…….18

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)……………………….......…14, 15

*Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169 (2d Cir. 2018)……………….……....17

*Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162 (N.D. Cal. 2019)………………….5

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018)…1, 5, 6, 7, 8, 9, 11

*Grady v. Iacullo*, No. 13-CV-00624-RM-KMT, 2016 WL 1559134 (D. Colo. Apr. 18, 2016)…14

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ………...16, 20, 21

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) ………………………………….…..…………..3

*Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994) ...…3

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC,* No. 13 C 4664, 2014 WL 3368893 (N.D. Ill. July 8, 2014) …………………………………...…………………...………..…15

*Live Face on Web LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016) ……………………………...…………………………………14

*MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012) ………………………...……………………………………………….…………14

*N.Y. Times Co. v. Tasini*, 533 U.S. 483 (2001) …………….....………..……………..8, 9, 10, 11, 14

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004) …………...………………………17, 21

*Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736 (2017) ……………………….17, 22

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006), aff'd in relevant part sub nom., *Perfect 10*, 508 F.3d 1146 (9th Cir. 2007) …………….……………………………….…..6

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) …5, 6, 7, 10, 11, 12, 13, 14, 15

*Rogers v. Koons*, 960 F.2d 301 (2d Cir.1992) …………………………………...16, 17, 18

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) …………………16, 24

*Wainwright Securities, Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91 (2d Cir.1977) ………….20

*Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570 (S.D.N.Y. 2020) ………....…22, 23, 24

*Warren v. John Wiley & Sons, Inc.*, 952 F.Supp.2d 610 (S.D.N.Y.2013) ………….……………4

**STATUTES**

17 U.S.C § 101……………………………………….…………………………………..…10

17 U.S.C § 106…………………………………………………..……………….…3, 4, 7, 17
17 U.S.C § 106(1) ……………………………………………………....…….…..10
17 U.S.C § 106(3) ………………………………………………………….…....10
17 U.S.C § 106(5) ……………………………………………………………....10
17 U.S.C § 201(d)(2) …………………………………………………….…....10
17 U.S.C § 504………………………………………………………....…...….4
17 U.S.C. § 107………………………………………………………………….17
17 U.S.C. § 107(3) ………………………………………………….….…….22
17 U.S.C. § 107(4) ………………………………………....………….23
Fed. R. Civ. P. 12(b)(6) ……………………………….……….....….2, 18

**SECONDARY SOURCES**

H.R. Rep. No. 90-83 (1967) ………………………………………………….….…………….9
H.R. Rep. No. 94-1476 (1976) ……………………………………………………….......9,10
2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.20[A] (2017)………...…….10
The Gingerbread Man, St. Nicholas Magazine, May 1875…………………………………...4

Plaintiff Paul Nicklen respectfully submits this memorandum of law and authorities in support of his opposition to the Sinclair Defendants' ("Sinclair" or "Sinclair Defendants" or "Defendants")[1] Motion to Dismiss the Second Amended Complaint ("SAC") [ECF No. 72], referred to as the "Motion." [ECF No. 85]. Because each independent alleged act of infringement of Plaintiff's polar bear video (the "Video"[2]) by each Sinclair Defendant is typical and common using the same text and embedding the Video the same way, Plaintiff applies the same analysis for all named Sinclair Defendants and all Sinclair Affiliates that infringed the Video but are not yet named or could be included in the Sinclair Class (SAC¶¶ 12-118). Plaintiff refers to each Defendant's post that embedded the Video as separate, distinct posts, separate uses and separate damages claims rather than Sinclair's self-serving factual reframing of the hundreds of uses of the Video as a single use in one "Article." Motion at 2.

First, the "server test" does not apply as found recently in *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 586 (S.D.N.Y. 2018)(Embedding a copyrighted work from Twitter infringes on exclusive display right under Copyright Act). Each Defendant displayed Plaintiff's Video in a Sinclair Affiliate operated website post (the "Posts") by embedding the Video from Facebook without obtaining a license in violation of Plaintiff's exclusive display right under the Copyright Act. Each Sinclair Defendant embedded the Video from Plaintiff's

---

[1] Plaintiff alleges as many 294 Sinclair Broadcast Group Inc. stations, each owned and operated through more than 100 separate Sinclair Affiliates (See Ex. 2 of the SAC, SAC at ¶¶11, 170 and 171.) each committed a separate act of copyright infringement. After review of Sinclair's Rule 7.1 corporate disclosure [ECF No. 83], Plaintiff seeks to amend the SAC to name the real parties in interest as the disclosures were filed after the SAC and the same day as the Motion.

[2] The Video was timely registered with the US Copyright office within 3 months of publication, making statutory damages, attorneys' fees and costs a component of Plaintiff's claims. SAC at ¶¶159 and 169.

Facebook account and caused the Video to be displayed on each of the 294 unique, individual, independently operated Sinclair Defendant station websites. Id. at ¶170. Each separate act of embedding the Video was done willfully or recklessly. Id. at 167, 286, 319. The so-called "server test" has never been applied in the Second Circuit or outside the context of search engines (i.e., Google). Therefore, embedding a copyrighted Video from Facebook is no defense to copyright infringement. Second, Sinclair is not favored in one fair use. Even is analyzed, each factor requires a robust factual inquiry; therefore, the Motion is premature and should be denied.

## STATEMENT OF FACTUAL ALLEGATIONS

The SAC sets forth in detail the alleged facts as applied to each cause of action. There is no need to repeat the same allegations here, except for a brief summary and to clarify, refute or point out glaring omissions in the Motion. Each Sinclair Defendant infringed a copyrighted Video owned by Plaintiff Nicklen that shows the entire one minute of footage of a starving polar bear. See, generally, SAC. Each Defendant displayed the Video by embedding from Plaintiff's Facebook account for non-transformative purposes. SAC at ¶156 and Ex. 3 and 5 to SAC.

Sinclair omits acknowledging that there is no evidence that any Sinclair Defendant ever licensed the Video for use and display in any Sinclair Defendant website Post despite a clear written directive in the caption of Plaintiff's Facebook post instructing prospective licensees to contact the Plaintiff's licensing agent, Caters News Agency, for a license. SAC at ¶¶ 5, 151, 158, 294. The Sinclair Defendants willfully and/or recklessly disregarded and ignored the explicit written notice, embedding and causing to be displayed the Video in over 100 separate alleged uses of the work. Id. at ¶¶ 5, 137 151, 158, 294, 296, 305.

Each Defendant displayed the Video by using the embed tool on Facebook. See SAC at ¶¶ 158 to 161. Whereas, Sinclair references its own ipse dixit, uncited definition. Motion 3-4.

Sinclair also alleges, without evidence, that some Sinclair Defendant entities are "simply holders of FCC licenses" and "do not actually control the operation of the stations or websites" which is disputed. Motion at FN 3 and 4. As noted below, each of the Sinclair Defendants' Posts describes the Video as "a photo," but this case is about Nicklen's Video. See SAC, Ex. 5.

## I. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Id*. See *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (Accepting all allegations in a complaint as true and drawing all reasonable inferences in plaintiff's favor.)

To make a *prima facie* showing of copyright infringement, a complaint must allege: "(1) which original works are the subject of the copyright claim; (2) that plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) 'by what acts during what time' the defendant infringed the copyright." *Carell v. Case Shubert*, 104 F. Supp. 2d 236, 250 (S.D.N.Y. 2000) (quoting *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994)). Here, Plaintiff has established prima facie copyright infringement based on his ownership of a valid, timely copyright registered Video and each Defendant's unauthorized display of his Video. See SAC generally. The Second Circuit has found that the "the owner of a copyright has the exclusive right to—or to license others to—reproduce, perform publicly, *display* publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir.2010) (citing 17 U.S.C. § 106). "A party who violates the exclusive rights of the copyright

owner is an infringer, liable for damages pursuant to 17 U.S.C. § 504." *Warren v. John Wiley & Sons, Inc.*, 952 F.Supp.2d 610, 616 (S.D.N.Y.2013). Plaintiff satisfies all these elements and submits that neither the server test nor fair use apply. Therefore, the Motion should be denied.

## II. EMBEDDING THE VIDEO INFRINGES ON THE EXCLUSIVE DISPLAY RIGHT

Section 106 of the Copyright Act (the "Act") grants copyright owners the exclusive public display right and control of the economic value of their work. "Public display includes 'show[ing] a copy of [a work], either directly or by means of a film, slide, television image, or *any other device or process*.' Id. § 101." *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 652 (S.D.N.Y. 2013), aff'd, 910 F.3d 649 (2d Cir. 2018). Here, Plaintiff published his Video on his Facebook account. SAC ¶¶159-161. A few days later, each Defendant accessed Plaintiff's Facebook post, copied the unique Facebook "embed" code assigned to the Video, then applied that code to each of their websites to cause the Video to be displayed. Id. When a viewer's browser loaded the Post, a still frame image of the Video was simultaneously displayed from Facebook. See SAC Ex. 7. When a viewer clicked on the Video, it played. Thus, the Video was viewable on a Defendant's websites alongside income-generating ads specific to that site. Id.

In asking this Court to endorse the "server test," Sinclair seeks a categorical, per se rule that divests copyright holders of their exclusive display right each time a website publisher embeds a copyrighted video in their website, making it appear to the viewer as if the Video were hosted there like any other content, when, in fact, the Video was physically hosted on a third-party server.[3] Sinclair's offensive proposal of requiring physical possession of a copyrighted work a necessary condition for infringement would, if adopted, midwife a radical new publishing

---

[3] The Server Test is the modern-day version of the "Gingerbread Man:" "Run, run as fast as you can! You can't catch me. I'm the Gingerbread Man!" *The Gingerbread Man*, St. Nicholas Magazine, May 1875.

4

industry that, beneath the smoke and mirrors, was predicated on the exploitation of legitimate displays of copyrighted content. Simply put, the Act does not permit such a result.

**A. The Facts of This Case are Closer to *Goldman* than *Perfect 10*.**

In support of their extreme view that the server tests be applied for all embedded works, Defendants heavily rely on the Ninth Circuit's flawed decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), misleadingly claiming that the decision is followed by numerous other courts. Motion at 8. Sinclair attempts to distinguish *Goldman v. Breitbart*'s holding as if it were a footnote, rather than have this court follow its sound, logical reasoning. *Goldman* directly addressed the embed question in a copyright holder's favor by holding, "when defendants caused the embedded Tweets to appear on their websites, their actions violated plaintiff's exclusive [copyright] display right; the fact that the image was hosted on a server owned and operated by an unrelated third party (Twitter) does not shield them from this result." *Goldman* at 586.

Critically, the server test has never even been applied in the Second Circuit, is inconsistent with *Goldman*, injects language into the plain text of the Act and ignores binding recent Supreme Court authority. Sinclair also cites a smattering of unpublished or out-of-circuit cases to misleadingly bolster *Perfect 10* while diminishing *Goldman*. In fact, a recent Ninth Circuit district court embraced *Goldman* and found there was "no case applying the *Perfect 10* server test" outside the context of search engines such as Google and alleged infringements. See *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019).

Even if this Court were to find *Perfect 10* to have persuasiveness--notwithstanding the Supreme Court's intervening decision in *Aereo* noted below (the "behind-the-scenes way" that content is delivered is not relevant)—the Ninth Circuit's reasoning in *Perfect 10* was highly fact-

driven and not applicable here. In *Perfect 10*, the technology at issue was a search engine, the express purpose of which the court described as facilitating access and directing users to other locations on the Internet. Because the search function operated "[m]erely to index the web so that users can more readily find the information they seek," it "should not constitute direct infringement." *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 844 (C.D. Cal. 2006), aff'd in relevant part sub nom., *Perfect 10*, 508 F.3d 1146; see also *Perfect 10*, 508 F.3d at 1154 (involving "efforts to stop an Internet search engine from facilitating access to infringing images"). Application of a "server test" in that context would "maintain[], however uneasily, the delicate balance for which copyright law strives–i.e., between encouraging the creation of creative works and encouraging the dissemination of information." *Perfect 10*, 416 F. Supp. 2d at 844. *Perfect 10* conceded that its endorsement of the "server test" was a policy judgment based on the specific facts before it, and <u>not</u> appropriate for every case, expressly acknowledging its application in other settings was "susceptible to extreme or dubious results." *Id.* at 839.

In this case, Defendants do not operate search engines. To the contrary, they embedded the Video via Facebook into their websites precisely to enhance their own websites that are filled with their paid ads–without acquiring a license–in order to make their websites the destinations where the Video was displayed, and users could play and view it. Thus, based on the detailed analysis below, *Goldman* is applicable here and not decidedly distinguishable for the reasons Sinclair offers. *Goldman* confirmed that the practice of embedding copyrighted works such as a single still image via social media such as Twitter may violate the display right. Using Facebook to embed video results in the same: infringement of the display right.

Sinclair embraces *Perfect 10* by arguing that *Goldman* was wrong regarding the display right and that Sinclair never controlled the Video (with no support for its basis) and, is

distinguishable based on some volitional act the user must take to play the Video. Motion at 9-10. *Perfect 10* served up pornographic images that Google search engine users were actively searching for and clicked on "thumbnail" versions of to retrieve the full-size version of the image, both files of which were stored on third party servers. Sinclair's chopped up, truncated cite obliterates *Goldman*'s greater point regarding a user's volitional acts, that it was one factor for the server test to apply, not *the* only factor[4]:

> Google's search engine provided a service whereby the user navigated from webpage to webpage, with Google's assistance. This is manifestly not the same as opening up a favorite blog or website to find a full color image awaiting the user, whether he or she asked for it, looked for it, clicked on it, or not. Both the nature of Google Search Engine, as compared to the defendant websites, and the volitional act taken by users of the services, provide a sharp contrast to the facts at hand.

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 596 (S.D.N.Y. 2018).

Here, unlike a Google search engine in *Perfect 10*, Defendants each made the volitional decision to control the Video, causing Plaintiff's polar bear Video to be displayed on their own websites by creating and serving up to its users a Post containing the Video. Put another way, it is a critical factual distinction that users were not actively searching for starving polar bear videos (unlike *Perfect 10* whose users were actively searching for porn images on Google). Instead users were shown the Video (perhaps on Defendants' websites homepage or through a direct link) by each Defendant's volitional acts which caused the Video to be displayed, like *Goldman*. Once a user arrived on the Post after clicking on a link to the headline, the Video appeared as a single still frame image, which also infringed the display right.[5] See SAC Ex. 5.

_____

[4] Moreover, 17 U.S.C. § 101 defines "copies" as "material objects … in which a work is fixed … and from which the work **can be** perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." "*Can be*" envisions potentiality, therefore the certainty of perception required by a volitional act is not relevant under the Act.

[5] Under 17 USCA § 101: A video is a work consisting of a series of related images shown in succession that impart an impression of motion, together with accompanying sounds, in any.

Plaintiff acknowledges that to play the Video, a user must click "play" (a white arrow) on the Video. But clicking "play" does not materially change the analysis under the plain text of the Act; *the display right has already been infringed*. Even when a user clicks play, the user's act does not cause the user to be transported off Defendant's website to Facebook. Instead, the Video is played and caused to be displayed (a public performance) within Defendant's website that Sinclair controlled as intended, technically committing a second infringing act of Plaintiff's display right. Technicalities aside, a user of a Defendant's website initially arrives at the website Post by volitionally clicking on a link to land on the Post, which displays the plagiarized content within the Post and a single still image of the Video. Without question, Sinclair intended for its users to play the Video and remain on the website for as long as possible, viewing all the ads a Defendant showed to generate revenue.

Finally, nowhere in the Copyright Act is the volitional act of a user's conduct a requirement of infringement of the display right to be triggered. It defies logic why the display right of a single image is afforded protection from infringement under *Goldman*, but that Sinclair suggests "clicking a Video," which consists of a series of related images, is not. Motion at 10. A blanket application of the server test where a user clicks on a video play button would yield "extreme or dubious results," and is inconsistent with the Act's overarching goal "to secure a fair return for an author's creative labor...." *Davis v. Blige,* 505 F.3d 90, 104 (2d Cir. 2007).

**B. Physical Location or Possession of the Displayed Video Copy is Not Relevant to the Display Right Under the Copyright Act as Found by *Goldman*.**

During the early days of the internet, the Supreme Court admonished that, under the Act, a court must "focus on the [work] as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). For the display right, then, it is the viewer's experience that matters, not the internal mechanics of how the content is stored or retrieved. Over a decade later,

the Supreme Court observed that the Act is not concerned with the "behind-the-scenes way" that content is delivered, "invisibl[y]" to the viewer, with such technical considerations "not adequate to place [the defendant's] activities outside the scope of the Act." *Am. Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2507-08 and 2511 (2014). Whether the displayed copy of the work resides on defendant's or a third party's server is <u>immaterial</u> to the display right; the only question is whether defendant caused the work to be viewed by the public, regardless of whether defendant did so "either directly or by means of … any … device or process." 17 U.S.C. § 101.

Clearly, the physical location of the Video displayed is not relevant to a infringement of the display right. The Act "does not make actual possession of a work a prerequisite for infringement." *Goldman* at 592**.** The legislative history of the display right confirms that the statute was intended to reach conduct like the use of embedded code regardless of the physical location of the copy being displayed or how a video is played (such as clicking a play button):

> Under the definitions of "perform," "display," "publicly," and "transmit" now in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public.

H.R. Rep. No. 90-83, at 27 (1967) (emphasis added); see also id. (stating that "any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance' or 'display' under the bill" (emphasis added)).

Critically, in passing the Act in its current form, Congress expressly intended a broad approach to include "[e]ach and every method by which the images … comprising a … display are picked up and conveyed," as long as the image "reaches the public." H.R. Rep. No. 94-1476, at 64, reprinted in 1976 U.S.C.C.A.N. at 5678. With specific regard to the transmission of videos on computers, the drafters noted that "[t]he display of a visual image of a copyrighted work would be an infringement if the image were transmitted by any method (by … for example … a

computer system) from one place to members of the public located elsewhere." Id. at 80.

Making storage of content a necessary condition to "display" the work, as the server test does, not only conflicts with the plain text of the display right in the Act, but it also conflicts with the very structure of the Act. The Act was intended to recast "copyright as a bundle of discrete 'exclusive rights,' each of which 'may be transferred … and owned separately.'" *Tasini*, 533 U.S. at 495-96 (quoting 17 U.S.C. §§ 106, 201(d)(2)) (citation and footnote omitted). It protects the exclusive rights of reproduction, distribution and display separately, each of which is intended to capture distinct conduct.[6] *Perfect 10*'s server test, however, requires that the accused infringer first have copied the work to its own server in order to "display" that work. This requirement *collapses* the display right and the reproduction right, effectively requiring an *antecedent* violation of the reproduction right before the display right can be violated. Such a result is at odds with basic interpretive canons. *Corley v. United States,* 556 U.S. 303, 314 (2009) (Interpreting statute must be construed so all provisions are in effect and no part be inoperative or superfluous, void or insignificant). *Perfect 10* assumption that a transmission can have only one actionable source, therefore, and that such source must only be the place where the physical copy of the work resides, was error and cannot be squared with the Act's structure and purpose.

By eliminating direct liability for the embedding of videos, the server test creates a "free buffet of content" that severely undermines the value of Plaintiff's copyright in his Video. Under the server test that Sinclair suggests applies for all embedded videos, there would be no incentive for Plaintiff to license any digital video for display beyond the very first such license or social media post. Application of the server test—which would effectively eliminate the ability of

---

[6] See 17 U.S.C. § 106(1), (3), (5); see also 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.20[A], at 8-636 to -637 (2017) ("important function[s] of the display right" is its application to electronic transmission of works that "does not implicate the reproduction right").

Plaintiff to control the public display of his work on Facebook and would result in a judicially-sanctioned exhaustion of copyright, bad public policy, and clearly not what Congress intended.

In relying on *Perfect 10* for its entire argument, Sinclair argues embedding granted them categorical immunity from copyright, which is divorced from the plain text of the Act and as adjudicated in seminal cases such as *Tasini* and *Aereo*. The server test is also not in Sinclair's own interest. The Sinclair Defendants are media publishers and presumably seek to maintain exclusive control over their copyrighted works, such as news articles, live sporting events, or videos. Adopting the server test would mean that Sinclair would be unable to stop anyone–even competitors–from embedding their content without authorization. Undoubtedly, this is not Sinclair's intended goal, but this will be the consequence if the Court adopts the server test here.

As alleged in the SAC, each Defendant inserted a specific embed code into its website that caused the Video to be displayed to each website Post to visitors from where it was hosted on Facebook, without those visitors having to take additional action, except clicking the "play" button, to watch the Video. By any fair reading, Defendants, through a "device or process" of using embed code caused the Video to be displayed and playable on each Defendant website and, therefore, Defendants "displayed" the Video for purposes of the Act without ever having possession of the Video's file, consistent with the reasoning in *Goldman* and *Aereo* noted below.

**C. *Perfect 10*'s Server Test is Inconsistent with the Supreme Court's Intervening Decision in *Aereo* which Downplayed the Technical Process Behind a Given Display.**

Sinclair asks this Court to fashion a new rule based on the Ninth Circuit's decision in *Perfect 10*, and conclude that, because Defendants did not host the infringing work on their own servers, they did not "display" it within the meaning of the Copyright Act. Contrary to Sinclair's characterization, however, *Perfect 10*'s so-called "server test" is not settled law and has never been applied in this Circuit with respect to the display right. Moreover, it runs contrary to

subsequent authority of *Aereo* where the Supreme Court rejected the technical distinctions underpinning the "server test." This Court should decline to follow it here.

In *Perfect 10*, the Ninth Circuit considered a claim of direct infringement of the display right against Google based on the operation of Google Image Search. Google used "in-line linking" to display full-size, infringing copies of images in its search results that were drawn from third-party websites where the images were physically stored. *See Perfect 10* at 1155-56. Although Google did not store the images, the HTML code on Google's webpage directed the user's web browser to retrieve the images from the third-party sites and display those images in the user's browser window. *Id*. at 1156. From the viewer's perspective, the "window appear[ed] to be filled with a single integrated presentation"; however, the window displayed an image that was hosted on a third-party website, framed by content from Google's own website. *Id*. The Ninth Circuit concluded that Google did not display the images at issue because its servers "d[id] not store the photographic images" themselves. *Id*. at 1160. With little attempt to square its reasoning with the Act's plain language, the Ninth Circuit found that Google's use of HTML instructions to "direct a user's browser to a website publisher's computer that stores the full-size photographic image" was "not equivalent to showing a copy," even if the image appeared to the user as part of the Google website. *Id*. at 1161. Under a court-created "server test," whether a website publisher is directly liable for infringement of the display right turns entirely on the technical distinction of whether a video is hosted on the publisher's server or is instead embedded into the website's visual display from a third-party location.

The *Aereo* Court considered claims under the Act's public performance right, which is related to the display right,[7] where a web-based re-transmitter of over-the-air TV signals argued

---

[7] The Act's definitions of "display" and "perform" for display and performance rights are

that it did not "perform the copyrighted work publicly" because each transmission came from a miniature antenna assigned to each user and, therefore, was a "private" rather than "public" performance. *Aereo* at 2504, 2507-08. The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 2507. "Viewed in terms of Congress' regulatory objectives," the Court asked rhetorically, "**why should any of these technological differences matter**?" *Id.* at 2508. *Aereo* therefore educates that it is the practical, functional perspective, and not technicalities, that governs whether a particular mode of content delivery is infringing or not. The "server test" that Sinclair champions is contrary to the holding in *Aereo*. Where a website publisher purposely constructs its website to show a copyrighted video within that website– whether through embed code or "any other device or process" it controls–it is not only the publisher's action but ultimately the viewer's perception that matters, regardless of the physical location of the video displayed. Based on the Court's guidance in *Aereo*, the Ninth Circuit got *Perfect 10* wrong. This Court should decline Sinclair's invitation to similarly err.

### D. Sinclair References "Numerous Other Courts" Applying the Server Test, But None Are from the Second Circuit or This District and None Address the Display Right.

Sinclair boasts that numerous courts have adopted the server test while failing to mention the Supreme Court's majority decision in *Aereo* and *Tasini*. See § 102, copyright protection subsists in original works fixed in any medium "from which they can be **perceived**, reproduced,

---

materially identical. Compare 17 U.S.C. § 101 (defining "perform" as "to recite, render, play, dance, or act [a work], either directly or by means of any device or process…"), with id. (defining "display" as "to show a copy of [a work], either directly or by means of … any … device or process …").

or otherwise communicated." Instead, Sinclair impliedly seeks to artificially bolster the holding of *Perfect 10* as controlling by pointing to a few lower court decisions that, contrary to Sinclair's characterization of them, are inapposite here. First, Sinclair cites two unpublished cases from this district that involved the <u>distribution</u> and <u>reproduction</u> rights, not the "display right," and referenced that portion of the *Perfect 10* opinion that addressed only the distribution right, which the plaintiff in *Perfect 10* had raised separately. See *Live Face on Web LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016 WL 4766344, at *3-4 (S.D.N.Y. Sept. 13, 2016)(J. Buchwald); *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2012 WL 1107648, at *12 (S.D.N.Y. Mar. 30, 2012)(J. McMahon)(noting that the parties disagreed about whether the defendant infringed the plaintiff's "exclusive right to 'distribute'"). These cases do not endorse the server test in the context of the display right. In *Live Face*, the district court refused to resolve *Perfect 10*'s application even to the distribution claim, noting that, although authority supporting defendants' argument "may exist," defendants had failed to "provide legal authority for their argument" and did not cite *Perfect 10*, noting further that the question was "hardly briefed." *Live Face* at *4-5. Accordingly, these cases provide no support for *Perfect 10* as having been adopted in this District. Sinclair also misrepresents the holding in *Grady v. Iacullo*, No. 13-CV-00624-RM-KMT, 2016 WL 1559134, at *7 (D. Colo. Apr. 18, 2016)(Requiring discovery to determine whether defendant's conduct regarding copying needed further clarification).

Sinclair also cites out-of-circuit case, *Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)—but that decision also does not embrace the server test. In *Flava Works*, a video bookmarking website, myVidster.com, embedded infringing videos from third-party websites, allowing users to watch those videos through a frame (akin to a window within the user's web browser) on myVidster, even though the videos were transmitted directly from third-party

websites' servers. Id. at 756. To the extent Sinclair intended to imply that the Seventh Circuit resolved defendants' direct infringement in *FlavaWork*s, their statement is misleading. In fact, the court reviewed only the entry of a preliminary injunction concerning contributory infringement, as the court's opinion makes clear. See *Flava Works*, at 761, 763 ("Flava didn't make a claim for direct infringement a basis for its motion for preliminary relief."). The server test for direct infringement of the display right, was not at issue there, and was called into question by the lower court.[8] Finally, Sinclair cites *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, a subsequent, unpublished district court decision that relies on *Perfect 10*. Not only does that decision erroneously cite *Flava Works* as authority for a direct infringement claim, see No. 13 C 4664, 2014 WL 3368893, at *4 (N.D. Ill. July 8, 2014), but it was also decided mere days after the Supreme Court handed down its decision in *Aereo*. The district court's decision neither references nor distinguishes *Aereo*. Ultimately, these unpublished or inapposite cases are hardly "numerous courts" with widespread support for settled law. Motion at 8. In fact, the "server test" for direct infringement of the display right remains largely an anomaly of the Ninth Circuit in the context of search engines and has never been applied in this Circuit.

Copyright protection is intended to "secure a fair return for an author's creative labor" and "stimulate artistic creativity for the general public good." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984). The result of a broad application of the server test for the Sinclair Defendants' use of the Video via embedding from Facebook would divest and

---

[8] Although *Flava Works* did not involve a claim for direct infringement, the district court noted that, "[t]o the extent that *Perfect 10* can be read to stand for the proposition that inline linking can never cause a display of images or videos that would give rise to a claim of direct copyright infringement, we respectfully disagree. In our view, a website's servers need not actually store a copy of a work in order to 'display' it." *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 3876910, at *4 (N.D. Ill. Sept. 1, 2011), *rev'd on other grounds*, 689 F.3d 754 (7th Cir. 2012).

deny Plaintiff of his exclusive display right and licensing fees and create a court-sanctioned defense that is contrary to the plain language of the Act. Accordingly, the Court should decline Sinclair's invitation to adopt–for the first time ever in this Circuit–the "server test."

## III. SINCLAIR'S FAIR USE DEFENSE FAILS AS A MATTER OF LAW

Sinclair requests that the Court ignore controlling precedent that a "fair use" defense is most frequently determined at summary judgment after fact discovery is completed. See, e.g., *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006). Successful motions to dismiss based on fair use are a rare exception. See *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015) ("dearth of cases granting such a motion"). Nevertheless, even assuming arguendo a full <u>factual</u> record, fair use is not applicable here. The Act provides an owner the exclusive right to control and authorize the reproduction, display and distribution of his copyrighted video under 17 U.S.C. § 106, giving him, among other things, the ability to profit from that video and an incentive to create more videos. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 557 (1985). Fair use balances the creator's rights in his work with society's interest in "promot[ing] the Progress of Science and useful Arts" by permitting uses of a video without the videographer's consent in certain, narrow circumstances. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164 L.Ed.2d 500 (1994). Four non-exclusive factors are considered: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the work as a whole; and (4) the effect of the use upon the potential market for, or value of, the copyrighted work. 17 U.S.C. § 107; *see also Campbell* at 577-78. No single factor is dispositive; instead, a full analysis must be conducted on a "case-by-case" basis with the factors considered not "in isolation from one another … [but with] the results weighed together, in light of the purposes of copyright." *Id.*

### A. The Character and Purpose of the Defendants' Uses Strongly Favor Plaintiff

Analyzing the first fair use factor requires an evaluation of whether the infringing work is commercial in nature, as opposed to nonprofit or educational, and whether the work is transformative such that it supplants the original work, adding something new. *Campbell* at 578-9. This Circuit also recognizes a third sub-factor that considers whether the defendant acted in bad faith. See *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004).

### i. Repackaging Plaintiff's Display of his Video with a Passing Mention of the Video's "Viral" Status Is Insufficiently Transformative.

Whether the purpose is news reporting as noted by Section 107 of the Act, a secondary use must add "further purpose or different character, altering the first with new expression, meaning or message," in order to constitute a *transformative* use that favors a defendant. *Campbell* at 579. If the use is not sufficiently "productive," adding "new insights and understandings for the enrichment of society," it will not be considered transformative. *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 750 (2017) (J. Rakoff) (internal quotations omitted). *See, e.g., Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018) ("use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a [transformative] fair use"); *see also Rogers v. Koons*, 960 F.2d 301, 311 (2d Cir.1992) ("[i]t is not fair use when more of the original is copied than necessary"). In the context of a "news reporting" fair use defense, even if the underlying work contains material of possible public importance, "[i]f the purpose of the [defendant's] use was to entertain, rather than inform … or if equally informative non-infringing alternatives were available ... then the first fair use factor tips in favor of the plaintiff" *Byrne v. British Broadcasting Corp.*, 132 F. Supp. 2d 229, 234-236 (S.D.N.Y. 2001). Moreover, where the possibility exists that a reasonable jury could find the contested use to be "wholly unnecessary" to convey the report's subject matter, or its use

was merely to "make the story more entertaining for viewers," then transformativeness becomes a fact question for the jury, unsuitable for a 12(b)(6) motion. *Id*. at 235. *See e.g., Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 542 (S.D.N.Y. 2018).

Here, the Motion offers no compelling argument as to how Defendants' repackaging of the Video enriched society by transforming it with new insights and understandings. Plaintiff is a National Geographic explorer who captures some of the world's most renowned animal footage and he licenses this footage in a variety of contexts for a variety of purposes, including as part of his means of making a living. SAC ¶¶1-3. As illustrated by Ex. 5 to the SAC, the text common to each Post is an almost entirely plagiarized, paraphrased amalgam of the text accompanying two legal displays of the Video, one on Plaintiff's own social media (Ex 7 of SAC) and the other in a *National Geographic* article, for which Plaintiff was interviewed (Ex 6 of SAC). Of the mere two sentences in the Posts that are not cribbed directly from the two legal uses, the first briefly describes the Video's contents and that it is "grabbing attention," while the second states that it's received over a million Facebook views. Ex. 5 to the SAC. These token nods are the extent of "news" reporting on the "viral phenomenon" of the Video. Motion at 13. Additionally, the Posts are factually inaccurate. Exs. 5-7 of SAC. While the headline refers to the Video, text within the Posts' body incorrectly and sloppily refer to a "photograph" ("[a] photograph of a polar bear is grabbing attention," and "...Paul Nicklen, who took the photo, told National Geographic") (*See, e.g.*, Ex. 5 to the SAC). If Sinclair's intent was to report on the virality of the Video, it would have actually reported on the topic rather than passingly stating that the Video had "[gone] viral" amidst text pilfered from legitimate sources discussing the Video's contents and context. It also would have accurately reported on the most fundamental aspect of the story: that it was the Video that had gone viral. If, however, Defendants' purpose was the hasty repackaging of a

legitimate display of the Video to cash in on its lightning-in-a-bottle viral status, then these deficiencies become illustrative of the chasm between their contents and actual "news reporting."

Further, Defendants chose to display the entire, unedited Video, which was unnecessary if the true purpose was to "report on the [Video's] viral phenomenon." Motion at 13. Even if the Posts had cleared the "news reporting" hurdle, Sinclair itself admits that the proper tact is to use "a screenshot or a clip from that video to illustrate what all the fuss was about" when "report[ing] about a video that has gone viral on the Internet." *Id*. quoting *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 207 F. Supp. 3d 339, 352 (S.D.N.Y. 2017). This disparity reveals a factual dispute regarding Defendants' dubious claim that the Posts were transformative news reporting.

Sinclair leans heavily on two recent Southern District cases that found transformativeness in a defendant's use of social media posts, but these are apples to the instant case's oranges. In *Walsh*, the court found transformativeness due to a photo being used "for an entirely different purpose than originally intended." *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 581 (S.D.N.Y. 2020). In *Boesen*, the court found defendant "transformed the function of the [original] work in a new context." *Boesen v. United Sports Publications, Ltd.*, No. 20CV1552ARRSIL, 2020 WL 6393010, at *5 (E.D.N.Y. Nov. 2, 2020)(internal quotations omitted). Critically, in both cases, the court found that the use of the copyrighted photo was **incidental** to the purportedly infringing use made by defendants, who were reporting on a nonparty's public announcement that happened to incorporate the photo as a visual aid. *Walsh* at *5, and *Boesn* at *4.

Here, the use of the Video was anything but incidental. Showing the Video in its entirety as Plaintiff had posted it was the point of Sinclair's use, fig leaf of reporting on its viral nature aside. That it did so alongside scant and erroneous original content belies the fact that the true

purpose of the use was merely an attempt to entertain (*look at this viral video!*) users of Defendants' websites. Nothing new was added regarding insights for the enrichment of society. Meanwhile, non-infringing alternatives were readily available, such as using a screenshot or short clip of the video, or better yet, getting a license as its caption explicitly directs (SAC Ex.7). Ultimately, Defendants' uses were "not legitimate coverage of a news event; [they were] chiseling for personal profit." *Wainwright Securities, Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 95 (2d Cir.1977). Therefore, this subfactor favors Plaintiff. Moreover, because a reasonable jury could find use of the full Video wholly unnecessary to Defendants' supposedly transformative purpose and the true purpose of the uses was to entertain viewers, the character and purpose of the uses are more properly a fact question for a jury.

### ii. The Sinclair Defendants' Uses are Indisputably Commercial.

The second subfactor in a character and purpose analysis looks at commerciality. *Harper & Row* at 562 (whether user stands to profit from exploitation of work without paying license fee and monetary gain is not sole motive). Defendants are for-profit media entities that operate distinct websites, generating profits from ads placed besides the Video without compensating Plaintiff. Id. ¶¶1, 287, 297, 314. Therefore, this subfactor favors Plaintiff.

### iii. The Sinclair Defendants' Uses were Undertaken in Bad Faith.

The third subfactor in a character and purpose analysis considers defendants' conduct, generally finding bad faith where the use "had not merely the incidental effect but the intended purpose of supplanting the copyright holder's commercially valuable right[s]." *Harper and Row* at 562. This Circuit considers a defendant's knowledge of the unauthorized nature of the use and the existing potential for the defendant to have properly acquired the copyrighted material. *See NXIVM* at 478 (bad faith based on defendant's awareness of document's unauthorized

procurement while possibility existed that same info in document could have been acquired legitimately by paying requisite fee).

Here, the Video's caption had clear instructions for potential licensees to contact Caters. SAC Ex. 7. Defendants ignored these instructions and displayed the Video without authorization, intentionally supplanting Plaintiff's rights. About two dozen other publishers followed the instructions and obtained a license; Defendants could have but chose not to. SAC at ¶¶1, 294-295. Accordingly, Defendants acted in bad faith by displaying the Video without a license when it could and should have obtained one. Therefore, this subfactor as well as all subfactors of the first factor of fair use (character and purpose) lean heavily in Plaintiffs' favor.

### B. The Expressive and Creative Nature of Plaintiff's Video Favors Plaintiff

The second fair use factor offers greater protection to work that possesses a high creative/expressive nature, as such work is "closer to the core of copyright protection than others." *Campbell* at 586. Nevertheless, the Second Circuit favors finding creative expression within documentary images because, "a photographer's efforts to create an aesthetically attractive, technically competent photograph […] have been held to be plainly creative expressions." *BWP Media* at 408.

Plaintiff is a renowned photographer, videographer, and biologist. His Video is selectively edited documentary footage and contains significant creative expression evidenced by Plaintiff's exercise of a high degree of technical skill and aesthetic judgment in capturing the video under challenging conditions during one of Plaintiff's celebrated but expensive and daunting expeditions to the Arctic to collect visual evidence of issues which concern both him and the public. SAC. Within the Video, strategy, artistry and empathy co-exist alongside informational elements, confirming that the Video is not the result of a random button push by

some kid with an iPhone. Because Sinclair used a Video that was imbued with significant creative expression, the second fair use factor favors Plaintiff.

**C. Each Defendant Used the Entire Video Which Strongly Disfavors a Fair Use Finding**

The third fair use factor considers whether "the amount and substantiality of the portion used [is reasonable] in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3). As this Court has noted, an amount and substantiality analysis regards "whether and to what extent defendants' copying was necessary to serve some transformative purpose – such as provide commentary or criticism." *Penguin Random House* at 752. Where the purpose of defendants' use is precisely the same as plaintiff's in licensing to third parties, "whether the amount used was reasonable in relation to the purpose of the copying must necessarily be answered in the negative." *BWP Media* at 409 (internal quotations omitted).

Here, each Post displayed the Video from Plaintiff's Facebook account in full. Sinclair protests that this was "the only way it 'could have accomplished its journalistic objective of describing a social media story and providing readers with the relevant posts.'" Motion at 18-19 quoting *Walsh* at 586. This conclusory statement <u>contradicts</u> Sinclair's admission that using "a screenshot or a clip" in a "news report" discussing a video that has gone viral could be sufficient to fulfill the use's transformative purpose. Motion at 13 quoting *Barcroft* at 352. Instead of explaining why full display of the Video was necessary, Sinclair merely restates its premise by misapplying *Boesen*'s holding that the only way Defendants could have reported on a social media post was by reproducing it. Motion at 19 citing *Boesen* at *14. These citations are misleading because both *Walsh* and *Boesen* concern fair use of a *photograph*, not a video; the distinction is paramount here. Where a photo is at issue, displaying the work in its entirety is generally the *only* way to accurately communicate "what all the fuss is about" because a

22

photograph is a single still image. But for a video, essentially a series of related images, displaying only a portion of the entire work is generally all that's reasonably necessary to get the point of the criticism or commentary across. Therefore, because Defendants could easily have achieved their alleged transformative purpose by displaying a screenshot or a brief clip of the Video, their display of the Video in its entirety was gratuitous, meaning Defendants displayed the Video for exactly the same purpose as Plaintiff and all licensees posted it: to show its contents. Thus, the third fair use factor of "amount and substantiality" favors Plaintiff.

### D. Each Defendant's Use Negatively Affected the Markets for the Video, which Strongly Disfavors a Fair Use Finding

The fourth fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." (17 U.S.C. § 107(4)), including whether "unrestricted and widespread conduct" by a defendant would negatively impact the market for the work. *Campbell* at 590 (citations omitted). Because copyright is "a commercial doctrine" that aims to "stimulate creativity among potential authors by enabling them to earn money from their creations," the inquiry "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues." *Authors Guild v. Google, Inc*., 804 F.3d 202, 223 (2d Cir. 2015). Where each Defendant's use is merely a non-transformative duplication of the original, courts are free to presume market harm because "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp.* at 450.

Here, each Defendant's use clearly usurped the markets in which Plaintiff had a reasonable expectation of earning licensing revenue. Plaintiff is a professional videographer who regularly licenses his works to earn a living (SAC ¶150), while Defendants are 294 television stations with separate websites, and regularly license videos for display. Defendants insist,

however, that the uses were not usurpative because the Video was embedded, which necessarily incorporated the "ancillary aspects" of a social media post (Plaintiff's profile picture, etc.). Motion at 19-20. Sinclair arrives at this non sequitur by again misapplying *Walsh* and *Boesen*, this time adding *Clark v. Transportation Alternatives, Inc.*, No. 18 CIV. 9985 (VM), 2019 WL 1448448, at *3 (S.D.N.Y. Mar. 18, 2019). In *Boesen*, defendant reproduced a social media post featuring plaintiff's photo made by a tennis star to announce her retirement. In Walsh, defendant reproduced a social media post featuring plaintiff's photo made by a music star to announce the launch of a cosmetics brand. In *Clark*, defendant reproduced a portion of a newspaper article featuring plaintiff's photo to excoriate the paper's politics. These uses were found to be fair because the defendants had reported on the nonparty's original material (retirement announcement, product launch, political critique), and the display of plaintiff's photo was merely *incidental* to this purpose. Each court correctly noted that defendants' uses were unlikely to usurp the market for the original photos because the focus of the unauthorized displays was information *extraneous to the photo itself*. *Walsh* at 586, *Boesen* at *6, *Clark* at *4. Despite Sinclair's inapposite argument, this is <u>not</u> the issue here. Defendants merely repackaged a Video Plaintiff posted to Facebook alongside his own commentary about the Video – commentary in which he also solicited licenses for its commercial display (*See* SAC Ex. 7). None of the "ancillary aspects" of Plaintiff's Facebook post that appear in Defendants' display of that post reflect extraneous information created by a nonparty; it is all related to Plaintiff and the Video, the display of which is not incidental, but the very point of Defendants' Posts. Moreover, Sinclair misstates the nature of the "ancillary aspects" that appeared in its uses; none show Plaintiff's profile picture, the date, or a comment box. Motion at 20.

Whether Defendants' Posts included a throwaway line about virality or not, Defendants'

unauthorized uses of the Video in its entirety targeted the same audience Plaintiff had intended to reach through issuing commercial licenses for the Video's display, and therefore, Defendants' uses unquestionably usurped the market for the Video. In the aggregate, should publishers like Defendants be permitted to engage in widespread embedding of videos from Facebook for free rather than paying the copyright holder a licensing fee, "the market for such [videos] would diminish correspondingly … and there would be little or no reason to pay for Plaintiff's works." *Barcroft* at *8. Thus, the fourth fair use factor heavily favors Plaintiff.

In sum, all four fair use factors analyzed separately and together, demonstrate that Defendants' fair use defense fails.

## CONCLUSION

Defendants' Motion fails to provide any credible support in fact or law to maintain that the server test applies to embedding Plaintiff's Video from Facebook or that a fair use defense favors Defendants in any factor. Plaintiff prays the Court deny the Motion in full. Alternatively, should the Court grant some or all of the Motion, Plaintiff seeks leave to amend the SAC.

Dated: March 22, 2021

 /s/James Bartolomei

DUNCAN FIRM, P.A.
809 W. 3rd Street
Little Rock, Arkansas 72201
501-228-7600 phone
james@duncanfirm.com

Bryan D. Hoben, Esq.
HOBEN LAW
1112 Main Street
Peekskill, NY 10566
347-855-4008
bryan@hobenlaw.com

Robert N. Kaplan, Esq.
KAPLAN, FOX, KILSHEIMER LLP
850 Third Street
New York, New York 10022
212-687-1980
rkaplan@kaplanfox.com

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 22nd day of March 2021, a true and correct copy of the foregoing was filed with the Court through the ECF-CM electronic filing system, which will automatically serve electronic notice of the same on the counsel of record and hard copies were delivered to the court under its rule.

<u>/s/ James Bartolomei</u>

James Bartolomei, Esq.