**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
PAUL NICKLEN, et al., : No. 1:20-cv-10300-JSR
:
              Plaintiffs, :
: ECF Case
:
        -against- :
:
:
MASHABLE INC., et al., :
:
             Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE SINCLAIR
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Thomas B. Sullivan
Joseph Slaughter
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 850-6139
Fax: (212) 223-1942
sullivant@ballardspahr.com
slaughterj@ballardspahr.com

*Counsel for Sinclair Defendants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

I.  Under the Server Test, Sinclair's Embedding of the Video Cannot Support a
    Claim of Copyright Infringement ..........................................................................................1

    A.  The Server Test Should Apply Because Sinclair Neither Had a Copy
        of Nor Transmitted the Video As Required by the Copyright Act ..........................1

    B.  The Supreme Court's Decision in *Aereo* Is Inapposite, and in Any
        Event Supports Sinclair, Not Plaintiff .....................................................................3

    C.  Plaintiff's Attempts to Analogize this Case to *Goldman* Are
        Misplaced..................................................................................................................4

    D.  The Server Test Does Not Create a "Free Buffet" of Content.................................6

II. Sinclair's Use of the Video Was A Fair Use ........................................................................6

    A.  Because Sinclair's Use was Transformative, the First Fair Use Factor
        Favors a Finding of Fair Use ....................................................................................7

    B.  Because the Video Was Published and Factual, the Second Fair Use
        Factor Favors a Finding of Fair Use .........................................................................9

    C.  Because Sinclair Used No More of the Video Than Necessary, the
        Third Fair Use Factor Favors a Finding of Fair Use................................................9

    D.  Because Sinclair's Use Did Not Usurp the Market for the Video, the
        Fourth Fair Use Factor Favors a Finding of Fair Use ............................................10

CONCLUSION..............................................................................................................................10

# **TABLE OF AUTHORITIES**

**Cases** Page(s)

*ABC v. Aereo, Inc.*,
  573 U.S. 431 (2014) ............................................................................................................ 3, 4

*Ace Arts, LLC v. Sony/ATV Publ'g, LLC*,
  56 F. Supp. 3d 436 (S.D.N.Y. 2014) ....................................................................................... 5

*Boesen v. United Sports Publ'ns, Ltd.*,
  2020 U.S. Dist. LEXIS 203682 (E.D.N.Y. Nov. 2, 2020) .................................................... 7, 8

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
  196 F. Supp. 3d 395 (S.D.N.Y. 2016) ....................................................................................... 9

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018) ................................................................................................... 10

*CVS Pharmacy, Inc. v. Press Am., Inc.*,
  377 F. Supp. 3d 359 (S.D.N.Y. 2019) ....................................................................................... 6

*Flava Works, Inc. v. Gunter*,
  689 F.3d 754 (7th Cir. 2012) .................................................................................................... 2

*Free Speech Sys., LLC v. Menzel*,
  390 F. Supp. 3d 1162 (N.D. Cal. 2019) .................................................................................... 5

*Goldman v. Breitbart News Network, LLC*,
  302 F. Supp. 3d 585 (S.D.N.Y. 2018) ........................................................................... 3, 4, 5, 6

*Grady v. Iacullo*,
  2016 U.S. Dist. LEXIS 51584 (D. Colo. Apr. 18, 2016) ...................................................... 3, 5

*Harbus v. Manhattan Inst. for Policy Rsch.*,
  2020 U.S. Dist. LEXIS 74568 (S.D.N.Y. Apr. 27, 2020) ..................................................... 8, 9

*Kanongataa v. ABC*, No. 16 Civ. 7382 (LAK) (S.D.N.Y. Feb. 15, 2017), Dkt. No.
  34 (Hearing Tr.) ....................................................................................................................... 6

*Live Face on Web, LLC v. Biblio Holdings LLC*,
  2016 U.S. Dist. LEXIS 124198 (S.D.N.Y. Sept. 13, 2016) ................................................. 3, 5

*Maxtone-Graham v. Burtchaell*,
  803 F.2d 1253 (2d Cir. 1986) .................................................................................................... 7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ........................................................................................ *passim*

*Rudkowski v. Mic Network, Inc.*,
    2018 U.S. Dist. LEXIS 49975 (S.D.N.Y. Mar. 23, 2018) .................................................... 5, 6

*Sands v. What's Trending, Inc.*,
    2020 U.S. Dist. LEXIS 236019 (S.D.N.Y. Dec. 14, 2020) ....................................................... 8

*The Andy Warhol Foundation for The Visual Arts, Inc. v. Goldsmith*,
    2021 U.S. App. LEXIS 8806 (2d Cir. Mar. 26, 2021) ............................................................ 10

*Walsh v. Townsquare Media, Inc.*,
    464 F. Supp. 3d 570 (S.D.N.Y. 2020) ............................................................................ 7, 8, 10

**Statutes & Other Authorities**

17 U.S.C. § 101 ................................................................................................................... 1, 2, 4, 5

The Sinclair Defendants[1], respectfully submit this reply in further support of their motion to dismiss the Second Amended Complaint.  As discussed in Sinclair's opening memorandum, its embedding of a social media post containing the Video in an Article published by its various affiliates does not violate Nicklen's exclusive display right.  Moreover, because the embedded Video is placed in an Article includes the post as part of its reporting about the viral spread of that post, to the extent Sinclair can be said to have used the Video at all, it was fair use and therefore inactionable. For these reasons, Plaintiff's claims should be dismissed.

**I.     Under the Server Test, Sinclair's Embedding of the Video Cannot Support a Claim of Copyright Infringement**

Plaintiff does not contest that, if this Court adopts the "server test" articulated by the Ninth Circuit in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), his claim fails.  *See* Opposition ("Opp."), Dkt. No. 88, at 15-16.  Instead, he argues only that the server test should not govern here for a variety of reasons, each of which is unavailing.

**A.  The Server Test Should Apply Because Sinclair Neither Had a Copy of Nor Transmitted the Video As Required by the Copyright Act**

Plaintiff's main substantive argument against the server test is that it improperly made the "physical location" of the allegedly infringed work the primary factor in determining liability for copyright infringement in the context of embedded content on the internet.  Opp. at 8-11.  This is an overly simplistic reading of what the Ninth Circuit actually held in *Perfect 10*.  The court, relying on the plain language of the Copyright Act, found that a "computer owner that *stores* an image as electronic information *and serves* that electronic information directly to the user . . . is displaying the electronic information in violation of a copyright holder's exclusive display right."

---

[1] All capitalized terms have the same definitions as those in the Sinclair Defendants' opening memorandum, Dkt. No. 85 ("Mem.").

508 F.3d at 1159 (emphases added) (citations omitted).  An embedder fails this test in two separate ways.  First, its computers "do not store the photographic images" and thus it "does not have a copy of the images for purposes of the Copyright Act." *Id.* at 1160.  Second, it does not show or transmit the copy to a user at all – it provides "HTML instructions [which] are lines of text, not a photographic image." *Id.* at 1161.  Those instructions "give[] the address of the image to the user's browser" and the "bowser then interacts with the computer that stores the infringing image." *Id.*; *see also Flava Works, Inc. v. Gunter*, 689 F.3d 754, 761 (7th Cir. 2012) (providing HTML instructions to a browser regarding where to access a copyrighted work is not tantamount to "transmitting or communicating" that work).  These distinctions are critical because, under the plain language of the Copyright Act, an entity can only violate the public display right when it possesses a "copy" of the work and "shows" or "transmits" that copy. *See* 17 U.S.C. § 101 (defining "display" to require "show[ing] a copy" and "publicly" to require "transmi[ssion] or other[] communicat[ion].")  Sinclair therefore cannot have violated the display right here because it both never made a copy of the Video and never transmitted a copy of it.  It only provided lines of text pointing a user's computer in the correct direction.

       Plaintiff criticizes this distinction as elevating the "internal mechanics of how the content is stored and retrieved" over the viewer's actual experience on Sinclair's websites.  Opp. at 8.  But embedding is not merely "internal mechanics" – it also directly impacts the actual display of a work in at least two ways. *First*, the entity on whose server the content resides controls completely how that content is presented when embedded.  Thus, in this case, the embedded Video displays not just the Video itself, but also the name of the user who posted it to Facebook, the number of views it has on Facebook, and Facebook's logo.  Second Am. Compl. ("SAC"), Dkt. 72 at Ex. 5.  Facebook, not Sinclair, decided that those elements would be part of the

2

embedded Video.  *Second*, the entity on whose server the content resides controls completely whether that content *is displayed at all anywhere*.  In this case, for example, if Facebook (or Plaintiff as a user of the Facebook site) decides for any reason to remove the Video from its server, it will no longer appear on any of Sinclair's websites.

### B. The Supreme Court's Decision in *Aereo* Is Inapposite, and in Any Event Supports Sinclair, Not Plaintiff

In seeking to undermine *Perfect 10*, Plaintiff argues that the Supreme Court's decision in *ABC v. Aereo, Inc.*, 573 U.S. 431 (2014) functionally overruled *Perfect 10* by establishing that "it is the practical, functional perspective, and not technicalities, that governs whether a particular mode of content delivery is infringing or not." Opp. at 13.  Therefore, according to Plaintiff, it is "ultimately the viewer's perception that matters" in making that determination.  *Id*.  Plaintiff's reading of *Aereo* is flawed.

As an initial matter, no court has ever suggested that *Aereo*, which involved entirely separate facts, actually or functionally overruled *Perfect 10*.  Indeed, even the *Goldman* case which Plaintiff primarily relies on acknowledged that, at the time it was decided more than four years after the Supreme Court decided *Aereo*, "the 'Server Test' is settled law" in the Ninth Circuit.  *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 590-91 (S.D.N.Y. 2018).  And courts in the Ninth Circuit and elsewhere have continued to acknowledge the validity of *Perfect 10* even after *Aereo*.  *See, e.g.*, *Live Face on Web, LLC v. Biblio Holdings LLC*, 2016 U.S. Dist. LEXIS 124198, at *12 (S.D.N.Y. Sept. 13, 2016); *Grady v. Iacullo*, 2016 U.S. Dist. LEXIS 51584, at *14-25 (D. Colo. Apr. 18, 2016).

Moreover, the legal issue before the Supreme Court in *Aereo* was entirely different than what is before the Court here.  In *Aereo*, the alleged infringement involved a system of thousands of miniature antennas that captured and stored broadcast TV signals containing copyrighted

3

content and allowed subscribers to view them over the internet. The content was saved "on Aereo's hard drive," not a third-party server, and Aereo itself transmitted these copies to its users. 573 U.S. at 436, 448. On those facts, the Court handed down a "limited holding" cabined to the specific technology at issue, and expressly disclaimed any application of the decision to "technologies not before [the Court]." *Id.* at 449-50.[2]

### C. Plaintiff's Attempts to Analogize this Case to *Goldman* Are Misplaced

Finally, Plaintiff's Opposition contends that the facts of the instant case more closely resemble *Goldman* than *Perfect 10*. Opp. at 5-8. Plaintiff attempts to do so in two ways: *first*, he argues that *Perfect 10* is inapplicable because the defendant in that case was a search engine—Google—rather than a news website; and *second*, he argues that the fact that a viewer of the Article had to click on the video to play it is irrelevant because "users were not actively searching for starving polar bear videos" when they viewed the Article and because "*the display right has already been infringed*" before the viewer ever clicked on the Video. *Id*. at 7, 8 (emphasis in original). Neither argument has any merit.

With respect to Plaintiff's "search engine" argument, he is correct that *Perfect 10* involved a search engine, but wrong to conclude that the Ninth Circuit's decision was based in any relevant part on that fact.[3] To the contrary, the Ninth Circuit *held Google could be liable* for infringing content that was in fact hosted on Google's servers, while it determined that Google

---

[2] Also, the holding in *Aereo* was largely premised on the Court's conclusion that the system at issue was functionally indistinguishable from cable television systems that Congress had expressly intended to bring within the ambit of the Copyright Act when it was revised in 1976. 473 U.S. at 443-44. Here, there is no allegation or suggestion that embedding is likewise the same as cable TV retransmission.

[3] Notably, this section of Plaintiff's Opposition quotes repeatedly from the District Court's opinion in *Perfect 10*, and virtually ignores the appellate opinion, while at the same time stating that the quotes represent "the Ninth Circuit's reasoning." Opp. at 5-6.

4

could not be liable for content hosted elsewhere. *Perfect 10*, 508 F.3d at 1160-61. Google's operation of a search engine had nothing to do with that conclusion—rather, as explained above, it was based on a careful determination of who, under the plain text of the Copyright Act and the undisputed facts regarding how embedding works, was actually responsible for "showing" or "transmitting" a "copy" of the content at issue. *Id*. at 1161.[4]

Plaintiff's various assertions regarding why and how viewers might come upon the Video—a supposedly "critical factual distinction" between this case and *Perfect 10*, Opp. at 7, is not only irrelevant, it is also pure speculation found nowhere in the Second Amended Complaint, raised for the first time in this brief, and therefore not properly before the Court. *See, e.g.*, *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 450-51 (S.D.N.Y. 2014). And Plaintiff's argument that viewers' "volitional act" of clicking on the Video is irrelevant to the analysis is also meritless. Opp. at 7-8. Plaintiff appears to be arguing that as soon as a viewer sees the very first frame of the Video as it appears embedded on a website, infringement has happened, regardless of whether the viewer actually watches any more of the Video. *Id*. But case law in this district is clear that the appearance of a single frame of a copyrighted video is a *de minimis* use and therefore non-actionable. *See, e.g.*, *Rudkowski v. Mic Network, Inc.*, 2018 U.S. Dist. LEXIS 49975, at *9-10 (S.D.N.Y. Mar. 23, 2018) (single screenshot from a video was

---

[4] Plaintiff claims that "a recent Ninth Circuit district court embraced *Goldman* and found there was 'no case applying the *Perfect 10* server test' outside the context of search engines[.]" Opp. at 5 (quoting *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019).) This is inaccurate. The *Menzel* court acknowledged the existence of *Goldman* but denied defendant's motion to dismiss because, unlike here, there was no record evidence of whether the defendant's servers had or had not hosted the allegedly infringing content. *Menzel* at 1172. The court did not say that there was "no case applying *Perfect 10* outside of the context of search engines," but rather that the defendant had "not provided" any such case. *Id*. In fact, courts *have* applied *Perfect 10* outside the context of search engines. *See, e.g.*, *Biblio Holdings*, 2016 U.S. Dist. LEXIS 124198, at *12 (acknowledging that *Perfect 10* could apply to a website operator); *Grady*, 2016 U.S. Dist. LEXIS 51584, at *14-16 (applying *Perfect 10* to individual defendant).

5

a *de minimis* use); *Kanongataa v. ABC*, No. 16 Civ. 7382 (LAK) (S.D.N.Y. Feb. 15, 2017), Dkt. No. 34 (Hearing Tr.) (same).

### D. The Server Test Does Not Create a "Free Buffet" of Content

Underlying many of Plaintiff's arguments seems to be the notion that, if this Court adopts the server test, copyright holders will be powerless to control their work on the Internet. *See, e.g.*, Opp. at 10 ("[T]he server test creates a 'free buffet of content.'"). In reality, it was Plaintiff himself who chose to post his Video on a public social media page, knowing full well that Facebook offered embedding tools. Indeed, Plaintiff did so *in 2017*—that is, prior to *Goldman*'s rejection of the server test, when Plaintiff would have had no reason to suspect that embedding was not fully protected under applicable law. Second Am. Compl. ¶ 5(a). To this day, Plaintiff retains the ability to remove the Video from Facebook—and by extension every website that has embedded it—with the click of a button. His repeated refrain about the supposedly dire consequences of the server test conveniently ignores these facts.[5]

### II. Sinclair's Use of the Video Was a Fair Use

Plaintiff's arguments against a finding of fair use fare no better than its arguments against application of the server test. Because, as explained in Sinclair's opening memorandum and further elucidated below, *all* of the fair use factors weigh in favor of fair use, there has been no infringement and the Second Amended Complaint should therefore be dismissed.

---

[5] Plaintiff does not dispute that if his direct infringement claim fails, either because Sinclair only embedded the Video or because the use of the Video was a fair use, his claims for vicarious infringement, contributory infringement, and inducement of infringement must also fail. *See* Mem. at 20; *see also CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("[A] party may be deemed to have conceded an argument by failing to address it in its briefing.")

### A. Because Sinclair's Use was Transformative, the First Fair Use Factor Favors a Finding of Fair Use

Plaintiff offers three arguments as to why the character and purpose of the use weigh against a fining of fair use. *First*, he argues that, because the bulk of the Article's text consists of quotes from his Facebook page and his interview with National Geographic, it could not be transformative. Opp. at 17-20. *Second*, he asserts that, because Sinclair is a for-profit company, the purpose and character of the use weighs against fair use. *Id*. at 20. *Third*, he claims that Sinclair's purported "bad faith" in embedding the Video in the Article tips this factor against a finding of fair use. *Id*. at 20-21. All of these arguments are baseless.

Plaintiff begins by contending that, because the Article quotes from his own public statements accompanying his posting of the Video on Facebook, it cannot be transformative. He offers no legal support for this obviously incorrect proposition. In fact, the Article's inclusion of Plaintiff's quotes *supports* the conclusion that the Article made transformative use of the Video, because it demonstrates that the Article was reporting on the post itself. As Sinclair pointed out in its brief, multiple courts in this Circuit have concluded that reproduction of social media posts containing copyrighted material is transformative where the reproduction was in the context of reporting about the social media posts themselves. Mem. at 13-15 (citing *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570 (S.D.N.Y. 2020) and *Boesen v. United Sports Publ'ns, Ltd.*, 2020 U.S. Dist. LEXIS 203682 (E.D.N.Y. Nov. 2, 2020)). The same is true here.[6]

---

[6] Plaintiff also alleges that Sinclair "incorrectly and sloppily" refers the Video as a "photograph." Opp. at 18. While the "commission of errors in borrowing copyright material" can be considered in making a fair use determination, the Second Circuit has been clear that "[o]nly where the distortions were so deliberate, and so misrepresentative of the original work that no reasonable person could find them to be the product of mere carelessness would [it] incline toward rejecting a fair use claim." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1261 (2d Cir. 1986). An allegation of "sloppiness" does not meet this high bar.

Plaintiff acknowledges these cases, but attempts to distinguish them by arguing that they concerned "incidental" uses of the work in the articles at issue. Opp. at 19. He misunderstands the use of the word "incidental" in *Walsh* and *Boesen*. As the *Boesen* court explained, in each of those cases the "article did not use plaintiff's photograph 'as a generic image'" of the person who was being discussed. Instead, the photograph was published as part of an embedded social media post because the fact of the dissemination of the post "was the very thing the Article was reporting on." *Boesen*, 2020 U.S. Dist. LEXIS 203682, at *8-9 (citations omitted). Rather than provide any principled basis for distinguishing these cases, Plaintiff simply asserts that Sinclair's use was not "incidental" because showing the Video "was the point of Sinclair's use." Opp. at 19. But the Article itself, which self-evidently was reporting on a social media phenomenon just as the defendants were in *Walsh* and *Boesen*, belies Plaintiff's position.

Plaintiff next contends that the first factor weighs against fair use because Sinclair and its affiliates are for-profit entities. Opp. at 20. But Plaintiff once again does not even attempt to grapple with the well-established law, cited by Sinclair, that the fact that a publisher is a for-profit entity is largely irrelevant to the analysis of the first factor, particularly where the use at issue is transformative. Mem. at 15 n.11.

Finally, Plaintiff asserts that the first factor cuts in its favor because Sinclair acted in "bad faith." Opp. at 20-21. But the only "bad faith" Plaintiff identifies is Sinclair's failure to obtain a license for the Video. *Id*. Courts in this district have repeatedly rejected that exact argument, because a defendant has no obligation to obtain a license where a use is fair. *See, e.g.*, *Sands v. What's Trending, Inc.*, 2020 U.S. Dist. LEXIS 236019, at *11 (S.D.N.Y. Dec. 14, 2020); *Harbus v. Manhattan Inst. for Policy Rsch.*, 2020 U.S. Dist. LEXIS 74568, at *13 (S.D.N.Y. Apr. 27, 2020).

### B. Because the Video Was Published and Factual, the Second Fair Use Factor Favors a Finding of Fair Use

With respect to the second fair use factor, Plaintiff argues that, because he is a well-known professional photographer who shot the Video "under challenging conditions" during one of his "celebrated but expensive" trips to the Arctic, this factor should weigh in favor of fair use. Opp. at 21. Plaintiff does not, however, offer any support for his contention that the "challenging" circumstances in which a video was obtained have any bearing on the analysis of this factor. Plaintiff concedes, moreover, that the Video functions as "visual evidence of issues which concern both him and the public," and that it indisputably contains "informational elements." *Id*. But he makes no attempt to acknowledge the numerous cases, cited by Sinclair, which hold that where a work conveys factual information for a non-artistic purpose, the second factor weighs in favor of fair use. Mem. at 17.

Plaintiff also ignores the undisputed fact that he published the Video on a social media account publicly available to anyone with a computer and an internet connection. Such publication cuts in favor of a finding of fair use. *See* Mem. at 16 (citing cases). Indeed, the one case Plaintiff does cite held that, where a published work contains both informational and creative elements, the second factor weighs in favor of fair use. *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 408-09 (S.D.N.Y. 2016).

### C. Because Sinclair Used No More of the Video Than Necessary, the Third Fair Use Factor Favors a Finding of Fair Use

Plaintiff asserts that the third fair use factor swings in its favor because Sinclair allegedly embedded the entire (1 minute) Video, rather than just a small portion of it. Opp. at 22-23. Plaintiff further argues that Sinclair has somehow made an "admission"—by quoting case law in an entirely different context—that it was only appropriate to use a small portion of the work. *Id*.

9

A portion of the Video would not have been a reasonable substitute because then Sinclair could not have accomplished its "journalistic objective of describing a social media story and providing readers with the relevant posts." *Walsh*, 464 F. Supp. 3d at 586. Sinclair used only as much of Nicklen's Video as was already included in his Facebook post; "in other words, no more was taken than necessary." *Id.* (internal marks and citations omitted).

### D. Because Sinclair's Use Did Not Usurp the Market for the Video, the Fourth Fair Use Factor Favors a Finding of Fair Use

Plaintiff argues that the fourth fair use factor weighs against a finding of fair use because the use of the Video in the Article supposedly "negatively affected the markets for the Video." Opp. at 23. Plaintiff's argument misunderstands the nature of the fourth factor, which asks "whether the copy brings to the marketplace a competing substitute for the original[.]" *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2760 (2019). In other words, the question is whether potential licensees of the Video will instead use Sinclair's Article. The answer to that question is obviously no. *See* Mem. at 19-20.[7]

### CONCLUSION

For the foregoing reasons, and the reasons set forth in its opening brief, Sinclair respectfully requests that this Court dismiss the Second Amended Complaint, with prejudice.

---

[7] At the end of last week, the Second Circuit handed down a new fair use opinion in *The Andy Warhol Foundation for The Visual Arts, Inc. v. Goldsmith*, 2021 U.S. App. LEXIS 8806 (2d Cir. Mar. 26, 2021). The opinion clarifies the line between transformative and derivative works in the context of primary and secondary works that "share the same overarching purpose (*i.e.*, to serve as works of visual art)." *Id.* at *21. As such, it has little if any application here, where the purpose of the Article—to report on the viral phenomenon of the Video—is fundamentally different from the purpose for which Plaintiff created the Video.

Dated: March 29, 2021

Respectfully submitted,

**BALLARD SPAHR LLP**

  */s/ Thomas B. Sullivan*
Thomas B. Sullivan
Joseph Slaughter
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6139
Facsimile: (212) 223-1942
sullivant@ballardspahr.com
slaughterj@ballardspahr.com

*Counsel for Sinclair Defendants*