**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**PAUL NICKLEN,**

                *Plaintiff*,

**v.**

| | |
|---|---|
| **SINCLAIR BROADCAST GROUP, INC.,** | **Case 1:20-cv-10300-JSR** |
| **SINCLAIR TELEVISION MEDIA, INC.,** | |
| **ACC LICENSEE, LLC,** | **DEMAND FOR JURY** |
| **ANDERSON (WFBC-TV) LICENSEE, INC.,** | **TRIAL** |

**BALTIMORE (WNUV-TV) LICENSEE, LLC**
**CHESAPEAKE MEDIA I, LLC,**
**CHESAPEAKE TELEVISION LICENSEE, LLC,**
**COLUMBUS (WTTE-TV) LICENSEE, INC.,**
**DEERFIELD MEDIA (CINCINNATI) LICENSEE, LLC,**
**DEERFIELD MEDIA (MOBILE) LICENSEE, LLC,**
**DEERFIELD MEDIA (PORT ARTHUR) LICENSEE, LLC,**
**DEERFIELD MEDIA (ROCHESTER) LICENSEE, LLC,**
**DEERFIELD MEDIA (SAN ANTONIO) LICENSEE, LLC,**
**FLINT (WBSF-TV) LICENSEE, INC.,**
**GOCOM MEDIA OF ILLINOIS, LLC,**
**HARRISBURG LICENSEE, LLC,**
**HARRISBURG TELEVISION, INC.,**
**HSH FLINT (WEYI) LICENSEE, LLC,**
**KABB LICENSEE, LLC,**
**KATV LICENSEE, LLC,**
**KATV, LLC,**
**KBSI LICENSEE L.P.,**
**KDBC LICENSEE, LLC,**
**KDNL LICENSEE, LLC,**
**KDSM LICENSEE, LLC,**
**KDSM, LLC,**
**KENV, LLC,**
**KEYE LICENSEE, LLC,**
**KFDM LICENSEE, LLC,**
**KFOX LICENSEE, LLC,**
**KGAN LICENSEE, LLC,**
**KGBT LICENSEE, LLC,**
**KHGI LICENSEE, LLC,**

**KHQA LICENSEE, LLC,**
**KJZZ LICENSEE, LLC,**
**KLGT LICENSEE, LLC,**
**KMPH LICENSEE, LLC,**
**KMTR TELEVISION, LLC,**
**KOCB LICENSEE, LLC,**
**KOKH LICENSEE, LLC,**
**KOKH, LLC,**
**KPTM LICENSEE, LLC,**
**KRCG LICENSEE, LLC,**
**KRNV, LLC,**
**KRXI LICENSEE, LLC,**
**KRXI, LLC,**
**KSAS LICENSEE, LLC,**
**KTUL LICENSEE, LLC,**
**KTUL, LLC,**
**KTVL LICENSEE, LLC,**
**KTVO LICENSEE, LLC,**
**KUPN LICENSEE, LLC,**
**KUQI LICENSEE, LLC,**
**KUTV LICENSEE, LLC,**
**KVCW, LLC,**
**KVII LICENSEE, LLC,**
**MANHAN MEDIA, INC.,**
**MERCURY BROADCASTING COMPANY, INC.,**
**MILWAUKEE TELEVISION, LLC,**
**MITTS TELECASTING COMPANY, LLC,**
**MPS MEDIA OF TENNESSEE LICENSE, LLC,**
**NASHVILLE LICENSE HOLDINGS, L.L.C.,**
**NEW AGE MEDIA OF GAINESVILLE LICENSE, LLC.,**
**NEW AGE MEDIA OF PENNSYLVANIA LICENSE, LLC,**
**NEW YORK TELEVISION, INC.,**
**PORTLAND (WPFO-TV) LICENSEE, INC.,**
**RALEIGH (WRDC-TV) LICENSEE, INC.,**
**RENO (KENV-TV) LICENSEE, INC.,**
**RENO (KRNV-TV) LICENSEE, INC.,**
**SAN ANTONIO TELEVISION, LLC,**
**SECOND GENERATION OF IOWA, LTD.,**
**SINCLAIR BAKERSFIELD LICENSEE, LLC,**
**SINCLAIR BOISE LICENSEE, LLC,**

**SINCLAIR COMMUNICATIONS, LLC,**
**SINCLAIR EUGENE LICENSEE, LLC,**
**SINCLAIR LEWISTON LICENSEE, LLC,**
**SINCLAIR MEDIA III, INC.,**
**SINCLAIR MEDIA LICENSEE, LLC,**
**SINCLAIR MEDIA OF BOISE, LLC,**
**SINCLAIR MEDIA OF SEATTLE, LLC,**
**SINCLAIR MEDIA OF WASHINGTON, LLC,**
**SINCLAIR PORTLAND LICENSEE, LLC,**
**SINCLAIR PROPERTIES, LLC,**
**SINCLAIR SEATTLE LICENSEE, LLC,**
**SINCLAIR TELEVISION OF ABILENE, LLC,**
**SINCLAIR TELEVISION OF BAKERSFIELD, LLC,**
**SINCLAIR TELEVISION OF BRISTOL, LLC,**
**SINCLAIR TELEVISION OF CALIFORNIA, LLC,**
**SINCLAIR TELEVISION OF EL PASO, LLC,**
**SINCLAIR TELEVISION OF FRESNO, LLC,**
**SINCLAIR TELEVISION OF ILLINOIS, LLC,**
**SINCLAIR TELEVISION OF MONTANA, LLC,**
**SINCLAIR TELEVISION OF NEW BERN, LLC,**
**SINCLAIR TELEVISION OF OMAHA, LLC.,**
**SINCLAIR TELEVISION OF OREGON, LLC,**
**SINCLAIR TELEVISION OF PORTLAND, LLC,**
**SINCLAIR TELEVISION OF WASHINGTON INC.,**
**SINCLAIR TELEVISION STATIONS, LLC,**
**SINCLAIR YAKIMA LICENSEE, LLC,**
**SOUTH WEST OREGON TV BROADCASTING CORP.,**
**THE TENNIS CHANNEL, INC.,**
**WACH LICENSEE, LLC,**
**WAITT BROADCASTING, INC.,**
**WBMA LICENSEE, LLC,**
**WCHS LICENSEE, LLC,**
**WCTI LICENSEE, LLC,**
**WCWB LICENSEE, LLC,**
**WCWF LICENSEE, LLC,**
**WCWN LICENSEE, LLC,**
**WCWN, LLC,**
**WDKA LICENSEE, LLC,**
**WDKY LICENSEE, LLC,**
**WEAR LICENSEE, LLC,**

**WFGX LICENSEE, LLC,**
**WFXL LICENSEE, LLC,**
**WGME LICENSEE, LLC,**
**WGME, INC.,**
**WGXA LICENSEE, LLC,**
**WICS LICENSEE, LLC,**
**WJAC LICENSEE, LLC,**
**WJAR LICENSEE LLC,**
**WKEF LICENSEE L.P.,**
**WKRC LICENSEE, LLC,**
**WLFL LICENSEE, LLC,**
**WLOS LICENSEE, LLC,**
**WLUK LICENSEE LLC,**
**WMBA LICENSEE, LLC,**
**WMMP LICENSEE L.P.,**
**WMSN LICENSEE, LLC,**
**WNAB LICENSEE, LLC,**
**WNWO LICENSEE, LLC,**
**WOAI LICENSEE, LLC,**
**WOIA LICENSEE, LLC,**
**WOLF LICENSEE, LLC,**
**WPBN LICENSEE, LLC,**
**WPDE LICENSEE, LLC,**
**WPEC LICENSEE, LLC,**
**WPGH LICENSEE, LLC,**
**WRDC, LLC,**
**WRGB LICENSEE, LLC,**
**WRLH LICENSEE, LLC,**
**WSBT LICENSEE, LLC,**
**WSET LICENSEE, LLC,**
**WSMH LICENSEE, LLC,**
**WSMH, INC.,**
**WSTQ LICENSEE, LLC,**
**WSYX LICENSEE, LLC,**
**WTGS LICENSEE, LLC,**
**WTOV LICENSEE, LLC,**
**WTTO LICENSEE, LLC,**
**WTVC LICENSEE, LLC,**
**WTVX LICENSEE, LLC,**
**WTVZ LICENSEE, LLC,**

WTWC LICENSEE, LLC,
WUCW, LLC,
WUHF LICENSEE, LLC,
WUPN LICENSEE, LLC,
WUTV LICENSEE, LLC,
WUXP LICENSEE, LLC,
WVAH LICENSEE, LLC,
WVTV LICENSEE, INC.,
WWHO LICENSEE, LLC,
WWMT LICENSEE, LLC,
WXLV LICENSEE, LLC,
WZTV LICENSEE, LLC,

*Defendants,*

## THIRD AMENDED COMPLAINT

On August 18, 2021, the Court granted Plaintiff's motion for leave to file this Third Amended Complaint by August 25, 2021, pursuant to Fed. R. Civ. P. 15(a)(2). Plaintiff respectfully alleges his third amended complaint and states as follows:

### I.  INTRODUCTION

1.      This case is about willful and reckless copyright infringement claims against 149 for-profit websites[1] generally owned and/or operated or controlled by affiliated subsidiaries (each an "Affiliate Website" or referred to a "Sinclair Affiliate Defendant(s)" unless specifically noted) of Defendant Sinclair Broadcast Group, Inc. ("Sinclair" unless otherwise noted). Each of the 149 Affiliate Websites operated or owned by various Sinclair Affiliate Defendants separately

---

[1] Attached is Exhibit "A," a stipulation by the parties as certain uncontested facts and representations made by Sinclair Broadcast Group Inc. related to the alleged 149 infringements, including the website domain address of each alleged infringement, the bates number of the screenshot of the alleged infringement and entity names that may have operated each website as represented by Sinclair Broadcast Group Inc. Plaintiff alleges that each Affiliate Website is more likely than not liable for the content on its site.

displayed Plaintiff Paul Nicklen's ("Plaintiff" or "Nicklen") starving polar bear video (the "Video") in an attempt to cash in on the Video's "lightning-in-a-bottle" viral moment without authorization, and caused damages to Plaintiff.[2] At its core, this case is about makers and takers.

2.      What this case is not about is Plaintiff seeking to hold a parent company, Sinclair Broadcast Group, Inc., liable for infringing Plaintiff's Video on various affiliates of Sinclair. Rather, Plaintiff alleges that the evidence shows each Affiliate (by and through its operating entity and/or TV station licensee, as the case may be determined by the fact finder) is separately and independently liable for infringing Nicklen's Video, and not Sinclair the parent.

3.      The analogy, often used in antitrust disputes where the target is the parent corporation, is one of a wheel with a hub (the parent) and spokes (the subsidiaries) that flow from the hub to create the liability wheel. In this instance, Sinclair may be the hub, but none of the 149 separate spokes (the Affiliate Websites or Sinclair Affiliate Defendants), are connected to each another and are in fact detached from the parent for liability purposes based on Sinclair's. This is because of Sinclair's own admissions and documents as alleged below that show Sinclair's terms and conditions of each Affiliate Website make only that Affiliate liable for the content on that site and no other entity is responsible. To complete this analogy of no spokes being connected to another spoke, no Affiliate Website has any hyperlinks to articles or posts on any other Affiliate Website. In other words, the viewer of that website is kept on that website as Sinclair had intended.

4.      Under oath, Sinclair admits that it is "wrong to steal a copyright holder's video without authorization" and it is "wrong for a company to embed a person's copyrighted video

---

[2] See the Video at: https://www.facebook.com/paulnicklen/videos/10155204590778364/.

from Facebook onto [149] websites without authorization from the copyright holder."  See Dep.

of David Bochenek, 30(b)(6) corporate representative of Sinclair, p 6-7, August 5, 2021.

5.       Sinclair also admits that its policies read that displaying a "viral" video without

permission from the copyright holder is not transformative and would break not only Sinclair's

own daily operating policies for third party copyrighted videos, but also violate the Copyright

Act. See Exhibit E (Photo and Video Use Guide, 11/2/2017).

6.       In the summer of 2017, Plaintiff captured the rare footage for his Video moments

before the starving bear passed away near the Artic Circle in northern Canada.

7.       Nicklen is a renowned Canadian photographer, filmmaker and marine biologist.

8.       Nicklen has one of the largest social media followings in the world on Instagram

and Facebook for a photographer with close to 7.5 million followers.  See

https://www.instagram.com/paulnicklen/ and https://www.facebook.com/paulnicklen.

9.       Nicklen's videos and photos are regularly featured in *National Geographic*

*Magazine*, the *New York Times*, and many other publications with a global reach.

10.      Plaintiff has received numerous international awards for his work including six

(6) with World Press Photo, three (3) with Pictures of the Year International, ten (10) in the BBC

Wildlife Photographer of the Year competition, and in 2012, Nicklen received the inaugural

Biogems Visionary Award from the National Resources Defense Counsel.

11.      Nicklen is also a National Geographic Fellow and the co-founder of the

environmental conservation group, SeaLegacy.  See https://www.sealegacy.org/.

12.      Nicklen regularly donates licensing fees earned from his work to SeaLegacy,

including the Video here, but also retains licensing fees to support the budget of his business,

Paul Nicklen Photography, Inc., which requires more than $1 million per year to operate.

13.     In addition to being one of the world's most acclaimed nature photographers, Nicklen is a sought-after speaker, including being a featured TED Talk lecturer, and author.

14.     In the past two decades, Nicklen has collaborated with scientists, filmmakers, conservationists and explorers to create awareness and inspire action for global issues such as climate change.

15.     Since 2003, Nicklen has maintained a public web site that solicits inquiries for licensing, speaking, film and photography projects at https://paulnicklen.com/, as well using licensing agents at National Geographic. He now handles his own licensing inquiries.

16.     A summary of factual allegations common to each infringement of the Video on the 149 websites include:

   a.   On December 5, 2017, Plaintiff Nicklen posted his copyrighted Video depicting a starving polar bear in the Canadian Arctic to his public Instagram and Facebook accounts. In both posts, the video's caption included an explicit written notice directing prospective licensees to contact Caters News Agency, Plaintiff Nicklen's designated agent to secure licensing fees for the Video;[3] The caption's licensing directive included a Caters email address and both its U.S. and U.K. phone numbers.

   b.   On December 7, 2017, *National Geographic*, with permission from Nicklen, published a newly edited version of the Video in an article on its website that explored Plaintiff Nicklen's experience making the Video and featured quotes

---

[3] Plaintiff granted Facebook and Instagram a non-exclusive license to display the Video on his Facebook and Instagram accounts by virtue of the terms of use of the platforms.

from Plaintiff regarding the plight of the world's polar bears in the face of climate change.[4]

c.  On December 11, 2017, 149 Sinclair Affiliate Websites, websites owned and/or operated by various subsidiaries of Defendant Sinclair Broadcast Group, Inc., displayed the Video using an embed code from Facebook.[5]

d.  Each Sinclair Affiliate Website is subject to the same Terms and Conditions which essentially state that each Sinclair Affiliate website is operated by its corresponding local affiliate television station and creates a liability wall between an Affiliate website and Sinclair or any other Affiliate website for content posted to the Affiliate website.[6]

e.  The headline of each of the 149 Affiliate Websites posts announced that Plaintiff's Video was going "viral," but the posts did not discuss how or why the post went viral, or even what constitutes *going* viral. The supposedly transformative "reporting" on the Video's viralness was limited to an introductory sentence wrongly stating that "a *photograph* of a starving polar bear [had been] grabbing attention" (emphasis added) and a brief final sentence noting that the Video had racked up "over a million views" – hardly

---

[4] Available at: https://www.nationalgeographic.com/news/2017/12/polar-bear-starving-arctic-sea-ice-melt-climate-change-spd/ (See also Exhibit C).
[5] The Sinclair Affiliate Defendants, subsidiaries of Sinclair Broadcast Group, each either own, operate, control, manage or provide services to TV station that each operate the Affiliate Websites.  As represented by Sinclair in Exhibit "A," some TV stations are operated by an unrelated license holder in arrangements known in the broadcasting industry as joint service agreements, shared services agreements, or local marketing agreements, depending on the details of the services provided and the relationship between the parties.
[6]  See Exhibit F for the terms and conditions that apply to each Affiliate Website per the stipulation that constitutes Exhibit A.

new insight given that Instagram displays a video's view count to the public just below its caption.[7]

f.   The rest of each of the 149 Affiliate Websites posts was little more than a "cut and paste job" comprised almost entirely of nearly verbatim portions of the original captions accompanying Plaintiff's own display of the Video on his Facebook and Instagram accounts and the text of the *National Geographic* article.[8]

g.   The lack of transformative value evident in the Sinclair Affiliate Defendants' posts displaying the Video is especially noteworthy given the fact that all Sinclair Affiliate Defendants' are subject to a corporate Photo and Video Use policy plainly stating that that "viral videos" should never be published without written authorization from the copyright owner unless a management-level employee signs off on a fair use assessment, but explicitly notes that merely commenting on a video's viral status is not sufficiently transformative for this purpose.[9]

h.   The same Photo and Video Usage policy goes on to warn Sinclair employees that the Sinclair Affiliates have "recently received copyright infringement claims for TENS OF THOUSANDS OF DOLLARS related to viral videos used by our news stations just in the past three months." Id. at 3 (Emphasis original.)

---

[7] See Exhibit D as example of a Sinclair Affiliate Defendant's display (Screenshot of one of 149 infringements).
[8] Exhibits: December 5, 2017 Facebook post by Nicklen *(*Exhibit B) *NatGeo* article (Exhibit C); Example Post (Exhibit D).
[9] Exhibit E (Photo and Video Use Guide for 2017 and 2016)

      i.    Despite the explicit and clear licensing directive in Plaintiff's Facebook and Instagram captions putting Defendants on actual notice that licensing was required, the Sinclair Affiliate Defendants displayed the Video on their websites in its entirety in posts offering no original content beyond an observation about the Video's popularity, in an apparently routine violation of their own official corporate policies.

      j.    Each Sinclair Affiliate Defendants' display of Plaintiff's Video was a separate and unique violation of his exclusive display right in the Video under 17 U.S.C. § 106(5).

17.    The Sinclair Affiliate Defendants admit that none obtained a license for the Video.[10]

18.    On July 30, 2021, the Court held that Plaintiff Nicklen second amended complaint [ECF. No. 72] "plausibly alleged that by embedding the Video without authorization, the Sinclair Defendants violated the display right."  See Opinion and Order [ECF No. 102].

19.    This third amended complaint arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 et. seq. (the "Copyright Act").

---

[10] *See* Answer to Second Amended Complaint at ₽ 158 [ECF No. 104]. Additionally, Facebook, Inc., through its counsel, admitted in open court on December 1, 2020 in a discovery conference in *Stephanie Sinclair v. Mashable, Inc.* that Instagram (both of which the substantially similar embedding tool to cause content to be displayed on third party websites), wholly owned by Facebook, has never once authorized or given a third-party publisher a license to embed a photo or video from another user's Instagram account: "Facebook is free to, under its policies as Judge Wood noted, to grant such sublicenses [to videos or photos on Instagram or Facebook], but they did not do that. And they did not do that for anybody and the anybody would, of course, then include Mashable in this situation."  *See Sinclair v. Mashable*, (18-cv-790), Tr. 8:24 to 9:14 (Dec. 1, 2020).  This "anybody" also includes all Sinclair Defendants in this case and every embedder publisher that has ever used the Instagram or Facebook embed tool to cause photos or videos to be displayed in their third party, for profit websites.

20.     Plaintiff separately alleges that each Sinclair Defendant is independently (not jointly and severally) liable for direct and willful copyright infringement of Plaintiff's respective works in violation of 17 U.S.C. §§ 106 and 501.

## II. <u>PARTIES</u>

21.     Plaintiff Paul Nicklen is a resident of and domiciled in Canada.

22.     Defendant Sinclair Broadcast Group, Inc. ("Sinclair"), is a Maryland corporation located at 10706 Beaver Dam Road, Hunt Valley, MD 21020. It is a public company with a current market cap of $2.4 billion, has more than 8,000 employees through its various affiliates, and claims to own more than 600 channels. Sinclair is being sued <u>not</u> because it is liable for the content any of the 149 Sinclair Defendants' Sites, but instead because its involvement in this action is necessary to bind the various Sinclair Affiliate Defendants.

23.     Sinclair represents that it may have an ownership interest in each TV station affiliate based on its Rule 7.2 corporate disclosure filing and that each TV stations owns and/or operates the 149 Affiliate Websites as identified in Exhibit "A." Each Affiliate Website, through its terms and conditions, admit that only the operator of the TV station that also operates the Site is liable for the content on that site. Exhibit "A" contains certain representations made by Sinclair as to the operators of the various Affiliate Websites.  However, Plaintiff alleges that Sinclair's pattern and practice well is documented with the FCC as to its history of lack of candor and misrepresentations regarding ownership interests in broadcast licenses/real party in interests (the very same TV stations that hold the licenses that also operate the Affiliate Websites). Sinclair has also admitted to violations of sponsorship rules (pay-to-play of political programming disguised as real news).

24.     In May 2020, Sinclair entered into a Consent Decree with the FCC, and is required to submit compliance reports every six months related to items in the Consent Decree. See https://www.fcc.gov/document/sinclair-pays-48-million-and-settles-all-pending-investigations and https://docs.fcc.gov/public/attachments/FCC-20-59A1.pdf. Sinclair also agreed to pay a $48 million fine for its conduct in mispresenting itself to the FCC and the public during the 2017, 2018 and 2019 time periods, all relevant to the when the alleged infringements occurred in December 2017. Based on Sinclair's pattern and practice of admittedly dishonest conduct with a federal government agency that resulted in the largest fine ever issues by the FCC (some FCC commissioners suggested that Sinclair also ought to lose its FCC licenses to operate), Sinclair indisputably has "unclean hands" and should be estopped from credibly challenging who the real parties of interest are liable for the 149 infringements, i.e., which entity(s) are the real owners or operators of any of the 149 Affiliate Websites, who the real operators are of the TV stations that hold an FCC license and also claim to operate the Affiliate Websites at issue as described in the terms and conditions of each Website. Of note, Plaintiff has also suffered from and continues to suffer unfair prejudice related to discovering and proving who the real parties in interest are as liability of and control of the 149 Sinclair Affiliate Websites, the same challenges as the FCC had with real party interest as to the FCC licenses.

25.     Defendant WCWN Licensee, LLC (d/b/a WCWN; d/b/a CW15 Albany) is an entity listed on Exhibit A and referred to a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit A. It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by broadcasting to cable television subscribers in Dutchess County.

26.     Defendant WCWN LLC ("WCWN") is a Delaware company that is an entity listed on Exhibit A and referred to as Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Ex. A. It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by broadcasting to cable television subscribers in Dutchess County.

27.     Defendant SINCLAIR TELEVISION MEDIA, INC. is a Washington entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

28.     Defendant ACC LICENSEE, LLC is Delaware is entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

29.     Defendant ANDERSON (WFBC-TV) LICENSEE, INC. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

30.     Defendant BALTIMORE (WNUV-TV) LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the

United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

31.     Defendant CHESAPEAKE MEDIA I, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

32.     Defendant CHESAPEAKE TELEVISION LICENSEE, LLC is a Maryland that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

33.     Defendant COLUMBUS (WTTE-TV) LICENSEE, INC. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

34.     Defendant DEERFIELD MEDIA (CINCINNATI) LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

35.     Defendant DEERFIELD MEDIA (MOBILE) LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant. Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

36.     Defendant DEERFIELD MEDIA (PORT ARTHUR) LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

37.     Defendant DEERFIELD MEDIA (ROCHESTER) LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

38.     Defendant DEERFIELD MEDIA (SAN ANTONIO) LICENSEE, LLC, is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

39.     Defendant FLINT (WBSF-TV) LICENSEE, INC. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States

District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

40.     Defendant GOCOM MEDIA OF ILLINOIS, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

41.     Defendant HARRISBURG LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

42.     Defendant HARRISBURG TELEVISION, INC. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

43.     Defendant HSH FLINT (WEYI) LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

44.     Defendant KABB LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

45.     Defendant KATV LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

46.     Defendant KATV, LLC, is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

47.     Defendant KBSI LICENSEE L.P. is a Virginia entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

48.     Defendant KDBC LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

49.     Defendant KDNL LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

50.     Defendant KDSM LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

51.     Defendant KDSM, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

52.     Defendant KENV, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

53.      Defendant KEYE LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

54.      Defendant KFDM LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

55.      Defendant KFOX LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

56.      Defendant KGAN LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

57.      Defendant KGBT LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

58.     Defendant KHGI LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

59.     Defendant KHQA LICENSEE LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

60.     Defendant KJZZ LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

61.     Defendant KLGT LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

62.     Defendant KMPH LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

63.     Defendant KMTR TELEVISION, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

64.     Defendant KOCB LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

65.     Defendant KOKH LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

66.     Defendant KOKH, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the

Southern District of New York by serving customers in the District or conducting business in the District.

67.     Defendant KPTM LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

68.     Defendant KRCG LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

69.     Defendant KRNV, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

70.     Defendant KRXI LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

71.     Defendant KRXI, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

72.     Defendant KSAS LICENSEE LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

73.     Defendant KTUL LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

74.     Defendant KTUL, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

75.     Defendant KTVL LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

76.     Defendant KTVO LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "1." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

77.     Defendant KUPN LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A."  It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

78.     Defendant KUQI LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

79.     Defendant KUTV LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

80.     Defendant KVCW, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

81.     Defendant KVII LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

82.     Defendant MANHAN MEDIA, INC. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

83.     Defendant MERCURY BROADCASTING COMPANY, INC., is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant. Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

84.     Defendant MILWAUKEE TELEVISION, LLC is a Wisconsin entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States

District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

85.     Defendant MITTS TELECASTING COMPANY, LLC is a California entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

86.     Defendant MPS MEDIA OF TENNESSEE LICENSE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

87.     Defendant NASHVILLE LICENSE HOLDINGS, L.L.C. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

88.     Defendant NEW AGE MEDIA OF GAINESVILLE LICENSE, LLC. is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

89.     Defendant NEW AGE MEDIA OF PENNSYLVANIA LICENSE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

90.     Defendant NEW YORK TELEVISION, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

91.     Defendant PORTLAND (WPFO-TV) LICENSEE, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

92.     Defendant RALEIGH (WRDC-TV) LICENSEE, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

93.     Defendant RENO (KENV-TV) LICENSEE, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States

District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

94.     Defendant RENO (KRNV-TV) LICENSEE, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

95.     Defendant SAN ANTONIO TELEVISION, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

96.     Defendant SECOND GENERATION OF IOWA, LTD. is an Ohio entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

97.     Defendant SINCLAIR BAKERSFIELD LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

98.     Defendant SINCLAIR BOISE LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

99.     Defendant SINCLAIR COMMUNICATIONS, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

100.     Defendant SINCLAIR EUGENE LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

101.     Defendant SINCLAIR LEWISTON LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

102.     Defendant SINCLAIR MEDIA III, INC., is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States

District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

103.    Defendant SINCLAIR MEDIA LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

104.    Defendant SINCLAIR MEDIA OF BOISE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

105.    Defendant SINCLAIR MEDIA OF SEATTLE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

106.    Defendant SINCLAIR MEDIA OF WASHINGTON, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

107.     Defendant SINCLAIR PORTLAND LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

108.     Defendant SINCLAIR PROPERTIES, LLC is a Virginia entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

109.     Defendant SINCLAIR SEATTLE LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

110.     Defendant SINCLAIR TELEVISION OF ABILENE, LLC is a Texas entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

111.     Defendant SINCLAIR TELEVISION OF BAKERSFIELD, LLC, is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction

of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

112.    Defendant SINCLAIR TELEVISION OF BRISTOL, LLC is a Virginia entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

113.    Defendant SINCLAIR TELEVISION OF CALIFORNIA, LLC is a California entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant. Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

114.    Defendant SINCLAIR TELEVISION OF EL PASO, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

115.    Defendant SINCLAIR TELEVISION OF FRESNO, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

116.    Defendant SINCLAIR TELEVISION OF ILLINOIS, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

117.    Defendant SINCLAIR TELEVISION OF MONTANA, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

118.    Defendant SINCLAIR TELEVISION OF NEW BERN, LLC is a North Carolina entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant. Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

119.    Defendant SINCLAIR TELEVISION OF OMAHA, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

120.    Defendant SINCLAIR TELEVISION OF OREGON, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the

United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

121.    Defendant SINCLAIR TELEVISION OF PORTLAND, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

122.    Defendant SINCLAIR TELEVISION OF WASHINGTON INC. is a Washington entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant. Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

123.    Defendant SINCLAIR TELEVISION STATIONS, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

124.    Defendant SINCLAIR YAKIMA LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

125.     Defendant SOUTH WEST OREGON TV BROADCASTING CORP. is a Washington entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

126.     Defendant THE TENNIS CHANNEL, INC., is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

127.     Defendant WACH LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

128.     Defendant WAITT BROADCASTING, INC. is a South Dakota entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

129.     Defendant WBMA LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

130.    Defendant WCHS LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

131.    Defendant WCTI LICENSEE, LLC is a Delaware entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

132.    Defendant WCWB LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

133.    Defendant WCWF LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

134.     Defendant WCWN LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

135.     Defendant WDKA LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

136.     Defendant WDKY LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

137.     Defendant WEAR LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

138.     Defendant WFGX LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

139.    Defendant WFXL LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

140.    Defendant WGME LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

141.    Defendant WGME, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

142.    Defendant WGXA LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

143.    Defendant WICS LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

144.    Defendant WJAC LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

145.    Defendant WJAR LICENSEE LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

146.    Defendant WKEF LICENSEE L.P. is a Virginia entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

147.    Defendant WKRC LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

148.    Defendant WLFL LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

149.    Defendant WLOS LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

150.    Defendant WLUK LICENSEE LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

151.    Defendant WMBA LICENSEE, LLC is an entity provided by Sinclair that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

152.     Defendant WMMP LICENSEE L.P. is a Virginia entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

153.     Defendant WMSN LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

154.     Defendant WNAB LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

155.     Defendant WNWO LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

156.     Defendant WOAI LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

157.    Defendant WOIA LICENSEE, LLC is an entity that Sinclair provided on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

158.    Defendant WOLF LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

159.    Defendant WPBN LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

160.    Defendant WPDE LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

161.     Defendant WPEC LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

162.     Defendant WPGH LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

163.     Defendant WRDC, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

164.     Defendant WRGB LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

165.     Defendant WRLH LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

166.    Defendant WSBT LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

167.    Defendant WSET LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

168.    Defendant WSMH LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

169.    Defendant WSMH, INC., is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

170.    Defendant WSTQ LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

171.    Defendant WSYX LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

172.    Defendant WTGS LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

173.    Defendant WTOV LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

174.    Defendant WTTO LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

175.    Defendant WTVC LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

176.    Defendant WTVX LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

177.    Defendant WTVZ LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

178.    Defendant WTWC LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

179.    Defendant WUCW, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

180.    Defendant WUHF LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

181.    Defendant WUPN LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

182.    Defendant WUTV LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

183.    Defendant WUXP LICENSEE, LLC is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court

for the Southern District of New York by serving customers in the District or conducting business in the District.

184.    Defendant WVAH LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

185.    Defendant WVTV LICENSEE, INC. is a Maryland entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

186.    Defendant WWHO LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

187.    Defendant WWMT LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

188.    Defendant WXLV LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

189.    Defendant WZTV LICENSEE, LLC is a Nevada entity that is an entity listed on Exhibit A and referred to as a Sinclair Affiliate Defendant.  Plaintiff incorporates by reference Exhibit "A." It purposefully submitted itself to the jurisdiction of the United States District Court for the Southern District of New York by serving customers in the District or conducting business in the District.

### III. JURISDICTION AND VENUE

190.    This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (copyrights).

191.    In its Answer to the second amended complaint, Defendant Sinclair Broadcast Group, Inc. and the Sinclair Affiliate Defendants did not contest the venue of this.  Therefore, all Defendants waived their right to challenge venue and accordingly venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391 because each Defendant availed themselves in this District. New York City is likely considered the media capital of the world and certainly the United States where discovery will show that all defendants in this case purposefully availed themselves to the District either through customers/subscribers, or financial/banking interests or both.

192.    In its Answer to the second amended complaint, Defendant Sinclair Broadcast Group, Inc. and all affiliates of Sinclair did not contest personal jurisdiction of this Court for this

action. Therefore, this Court has *in personam* jurisdiction over Defendants because Defendants each availed themselves of the privileges of conducting business in this district and the State of New York and incurred a benefit from the copyright infringements, thus it is reasonable for each Defendant to submit to the jurisdiction of this district court.

## IV. <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

193.    Throughout the time period relevant to this action, the Sinclair Affiliate Defendants, each independently operated of Sinclair Broadcast Group, Inc., affirmatively suppressed, concealed, and omitted from Plaintiff their acts and omissions violating Plaintiff's rights. Defendants willfully and knowingly kept Plaintiff ignorant of vital information essential to Plaintiff's rights and violations of Plaintiff's rights essential to pursuit of a claim against the Defendants, and as a result, Plaintiff could not have discovered the violation of rights, even upon reasonable exercise of due diligence.

194.    Defendants were aware that their actions were violating Plaintiff's rights, but continued to violate Plaintiff's rights, for their own financial gain, while suppressing, concealing and omitting this information from the Plaintiff.

195.    The exact number of Defendants affiliated with a Sinclair Broadcast Group, Inc. website that may liable is still unknown for entities that are independently (not jointly and severally) liable for infringing on Plaintiff's copyrighted Video on 149 separate, unique web sites which are found in dozens of states and other districts around the United States. Out of an abundance of caution, Plaintiff Nicklen has named all independently operated Sinclair Broadcast Group, Inc.-affiliated entities (including FCC licensees) for each of the 149 Sinclair Broadcast Group, Inc.-affiliated stations that that held an FCC license that operated the TV stations and also operated each of the Affiliate Websites that displayed the Video.

196.     Plaintiff Nicklen's claims arise from as many as 149 separate infringements pursuant to the Copyright Act, and while Plaintiff could have elected to file 149 separate actions, he elected to bring all actions in one case and submits that the Court has the discretion to maintain 149 separate infringement claims in one action, similar to a consolidated case or multi-district litigation. Filing 149 separate cases would have been burdensome for the courts, costly and unduly burdensome for the parties, and impractical.

197.     Common issues of law or fact for the Sinclair Affiliate Defendants include, but are not limited to:

a.   Each separate Defendant Affiliate Website displayed the Video embedded from Nicklen's Facebook without a license and without seeking authorization to display the Video

b.   Each separate Defendant Affiliate Website violated the Copyright Act by infringing any of Plaintiff Nicklen's exclusive rights in his copyrighted Video;

c.   Each separate Defendant Affiliate Website knew or acted in reckless disregard of the high probability that its actions infringed any of Plaintiff Nicklen's exclusive rights in his copyrighted Video given that notice of licensing requirements was clearly displayed besides the Video in the caption and the display clearly violated the Sinclair Affiliate Defendants' own official corporate policies, and

d.   Each Defendant Affiliate Website is likely liable for either actual or statutory damages for its violation of the Copyright Act.

///

///

## VI. GENERAL FACTUAL ALLEGATIONS

198.    In 2017, online media companies pivoted their publishing strategy focus from photo content to video content because videos generated greater viewer engagement and were therefore more valuable than static images.

199.    By this time, online media also recognized that the more "viral"[11] a video was, the more advertising a website or social media platform could generate. Over million views in the first few days could be considered viral.

200.    The Sinclair Affiliate Defendants are bound by admissions of Sinclair, that "The video could be considered viral if it had more than a million plays."  See Dep. of Elizabeth McKernan (30(b)(6) witness) at p. 65:10 to 65:11, July 7, 2021.

201.    On the other side of the equation, if the content creator, a.k.a., the copyright owner such as Plaintiff, could make a video that went viral, especially one that contained rare or unique footage such as a starving polar bear, the copyright holder would likely command higher than typical market value licensing fees for a video based on the rarity of the video.

202.    Similar to most for-profit online media companies, in 2017 Plaintiff Nicklen also pivoted from creating photos to videos for commercial use and licensing. Nicklen's goal in creating videos, such as the one at issue in this case, was to simultaneously gain exposure and engagement for his work (which focuses on wildlife conservation, generally) and to obtain licensing fees which helped to cover the $1 million-plus operating costs for his content creation business and to sometimes benefit SeaLegacy operating costs.

---

[11] "Definition of viral: quickly and widely spread or popularized especially by means of social media // a viral video."  See https://www.merriam-webster.com/dictionary/viral.

203.    In July of 2017, while on an expedition funded by a private group of wildlife enthusiasts in the remote Canadian Arctic, Plaintiff Nicklen kept an eye out for photography and video opportunities, eventually coming upon the starving polar bear in question.

204.    As a biologist with nearly 30 years of experience, Nicklen immediately understood the extreme rarity of witnessing a starving polar bear on the verge of death because, most often when approaching death, the creatures instinctually wander out onto pack ice and slip into the ocean without a witness or video evidence of their final journey.

205.    Nicklen believed this was a once-in-a-lifetime opportunity to capture photos and video content of a starving polar bear and share with the world what it would look like if global climate change caused the collapse of the arctic food chain and the disappearance of polar bear food sources.

206.    Nicklen swiftly contacted his partner Cristina Mittermeier, instructing her to assemble the SeaLegacy film/video production crew at the organization's home base on Vancouver Island, Canada, and do whatever it took to get to them to the location on Baffin Island near Resolute Bay from Vancouver Island almost 2,000 miles away.

207.    There was no guarantee that the bear would still be alive when Mittermeier and the SeaLegacy team arrived some three days after first contact, but, for Plaintiff, it was worth the gamble if he was to capture the rare event unfolding with this bear.

208.    In order to accomplish capturing this rare, one-of-a-kind moment in wildlife videography history, about $20,000 was spent on a charter plane bringing the SeaLegacy film crew from Vancouver to Resolute Bay.

209.    The wildlife enthusiasts for whom Nicklen had been acting as a guide subsequently departed and permitted Nicklen and his team to use the boat and its entire crew for

photo and filmmaking purposes in the region at no cost for an additional two weeks, a value of approximately $800,000.

210.    The film equipment delivered by Mittermeier, including the 8K video cameras, used to capture the Video, cost about $150,000.

211.    The film crew also needed to be compensated for their time.

212.    Plaintiff and his small crew utilized various resources of about $1 million to capture the Video.

213.    Expeditions such as the one involved in the Video are often used to create audiovisual content for the purpose of creating compelling conservation-oriented documentary films and still images which Plaintiff then is entitled to license for a variety of purposes as the copyright holder, be it to make a living off the licensing income or to divert it for the benefit of the nonprofit organization he founded, SeaLegacy.

214.    Once the SeaLegacy crew arrived to meet up with Nicklen to locate the bear, the crew trekked to Somerset Island, adjacent to the much larger Baffin Island, in the mostly rural Canadian territory of Nunavut where they were surprised to encounter one of the region's famed polar bears rummaging through garbage cans of a local village in a desperate attempt to find food. Plaintiff and his crew filmed and photographed the emaciated bear believing it to be an accurate representation of the fate that awaited the world's polar bear population given the toll that rise in global temperatures is taking on their natural habitat.

215.    While still on the boat and after returning to Vancouver, Canada, Nicklen oversaw the editing of his raw footage of the polar bear, eventually culling down one or two hours of raw footage from various camera angles down to about a one-minute clip, and appropriately layering in somber music to accompany the Video's subject matter.

216.    Plaintiff, along with the help of Mittermeier and members of the SeaLegacy team, strategized to publish the timing of the public release of the Video sometime after Thanksgiving 2017 to not only have maximum impact for exposure during the holiday season, but equally important also to reap what Plaintiff expected to be significant licensing fees for the display of the Video on various for-profit online media publishers' sites.

217.    On or about December 5, 2017, Plaintiff first posted the 60 second, edited version of the footage he had captured of the starving polar bear to his public Instagram and Facebook accounts.

218.    Nicklen's post was and is still located at:  https://www.instagram.com/p/BcU-6PsAoIp/ and https://www.facebook.com/paulnicklen/videos/10155204590778364/ (Attached as Exhibit B) with the following caption after the post's byline for both Facebook and Instagram:

> My entire @Sea_Legacy team was pushing through their tears and emotions while documenting this dying polar bear. It's a soul-crushing scene that still haunts me, but I know we need to share both the beautiful and the heartbreaking if we are going to break down the walls of apathy. This is what starvation looks like. The muscles atrophy. No energy. It's a slow, painful death. When scientists say polar bears will be extinct in the next 100 years, I think of the global population of 25,000 bears dying in this manner. There is no band aid solution. There was no saving this individual bear. People think that we can put platforms in the ocean or we can feed the odd starving bear. The simple truth is this—if the Earth continues to warm, we will lose bears and entire polar ecosystems. This large male bear was not old, and he certainly died within hours or days of this moment. But there are solutions. We must reduce our carbon footprint, eat the right food, stop cutting down our forests, and begin putting the Earth—our home—first. Please join us at @sea_legacy as we search for and implement solutions for the oceans and the animals that rely on them—including us humans. Thank you your support in keeping my @sea_legacy team in the field. With @CristinaMittermeier #turningthetide with @Sea_Legacy #bethechange #nature #naturelovers
>
> **This video is exclusively managed by Caters News. To license or use in a commercial player please contact info@catersnews.com or call +44 121 616 1100 / +1 646 380 1615" (emphasis added)**

**(Screenshot of the Video and a portion of the caption showing the license directive)**

219.    The text that accompanied the Video on Facebook and Instagram on the captions clearly put the world and the Sinclair Defendants on notice that Plaintiff was actively soliciting licenses for commercial displays of the Video.

220.    The caption in the Facebook and Instagram posts did not state that "embedding" without authorization to an online media website was acceptable.

221.    Sensing the Video would elicit significant engagement from the public, Plaintiff entered into an agreement on December 5, 2017 for United Kingdom-based Caters News Agency to be his exclusive agent for seeking and securing licensing fees for uses of the video in exchange for a portion of the fees collected. As part of the agreement, Nicklen directed his portion of the licensing fees to be paid directly to SeaLegacy.

222.    Within days of its release, the Video was viewed by millions worldwide.

223.    Caters licensed Plaintiff's Video to almost two dozen entities both in the United States and throughout the world, including *The New York Times* and *The Washington Post*, for amounts ranging from "no fee" licenses (for certain uses determined by Nicklen, as the copyright holder, to be strategically beneficial to him and/or SeaLegacy) to $680 for CTV and $1,500 for Business Insider.[12]

224.    Eventually, Caters stopped acting as the licensing agent for the Video and Nicklen assumed sole licensing duties, but Caters currently has an ongoing obligation to refer all

---

[12] Dozens of other companies, however, displayed the Video without a license, authorization or valid legal defense, representing widespread usurpation of licensing opportunities by Plaintiff. Plaintiff, through his agent(s) and attorneys secured some licenses (post display) and confidential settlements for copyright infringement claims, leaving the 149 Sinclair Defendants' websites as alleged willful and/or reckless infringers.

licensing inquiries for the Video directly to Nicklen, whose licenses of the Video include one to Distrito Films ($1,000 for one (1) second of the minute-long video).

225.    While reputable news organizations generally seek and secure licenses prior to publication consistent with reasonable and acceptable industry practices, Nicklen has agreed to license his Video to entities after they had first published it without his consent. Examples of such post-publication licenses include, but are not limited to, International Business Times (a $6,000 licensing fee) and TEN Media Publishing LLC/A360 Inc. ($6,500).

226.    With few exceptions throughout his career, Nicklen has intentionally retained the copyright in his works, including videos and photos as part of his business model.

227.    Nicklen registered the copyright to the Video here as further alleged below.

228.    When Nicklen creates a video such as the Video at issue, he invests his time. Not simply the time invested in seeking out the subject matter, shooting vast amounts of footage, or editing that footage down to a quality film/video, but the time invested in gaining the knowledge and experience of a biologist and an acclaimed nature photographer/videographer.

229.    When Nicklen creates a video such as the one at issue here, he invests a great deal of knowledge, creativity and technical expertise.

230.    When Nicklen creates a video such as the Video at issue, he often invests funds from his company, Paul Nicklen Photography, Inc., or resources procured through SeaLegacy, to use against the costs of production.

231.    Despite all of Nicklen's investment of time, funds, knowledge, creativity and expertise, he does not expect to be fully compensated by every licensee who licenses usage of his videos, including its first licensee; in other words, Nicklen reserves and sometimes strategically

exercises the right to waive the license fees for his videos in instances of his choosing, which is his exclusive right as the videos' copyright holder.

232.    Like every other copyright holder under the Copyright Act, the "copyright life" of Plaintiff's copyright lasts the life of the copyright owner plus 70 years.

233.    In order for Plaintiff to recoup his overall investment in shooting his photos and videos, including the starving polar bear Video, and also operate a sustainable business, Plaintiff expects each photo and video will generate revenue throughout the copyright life of that photo or video.

234.    Plaintiff would be challenged to operate a sustainable content creation business if copyright law did not provide him with exclusive rights to control the use of his videos by third parties such as the Sinclair Affiliate Defendants.

235.    Upon Plaintiff's death, his copyrights pass to his heirs or successors or beneficiaries of his estate, and they in turn have the right to monetize the copyrighted videos throughout the life of the copyrights.

236.    When Plaintiff's videos are displayed or used without his authorization, such as the Video in this case with the Sinclair Affiliate Defendants, this more likely than not results in a loss of the license fee amount(s) that he would have charged had his permission been requested and granted.

237.    The unauthorized use of Plaintiff's Video can forever preclude him from earning revenue from licensing the Video for that same type of use, even on a non-exclusive basis.

238.    The damage caused by an unauthorized use of the Video is not limited to the fee that Plaintiff would have charged for that use, but also limits and sometimes prohibits his ability to monetize his copyrights throughout the copyright life of his work.

239.    When Plaintiff issues post-publication licenses to entities that initially displayed his photos or videos without his permission, he always charges the entity a significantly higher fee for the license than the entity would have paid had it negotiated a fee ahead of time.

240.    Plaintiff attempts to earn a living or to sustain his business by licensing his photos and videos for usages such as websites, newspapers, magazines, television programs, promotional videos, advertisements, etc. If companies such as Sinclair simultaneously offer licenses for his photos and videos to its affiliates for those same types of uses, or uses yet to be exploited by Plaintiff, without his authorization, the Sinclair and the Sinclair Affiliate Defendants were acting in direct competition with Plaintiff's own licensing efforts.

241.    The Video of the polar bear is rare and scarce because no other footage of its kind exists.

242.    In the photo and video licensing industry, a license for web usage is generally only permitted for usage on a single domain. In other words, licensing is generally limited to one website, as is the custom and practice for stock photo agencies such as www.GettyImages.com.

243.    It is common and accepted industry practice that a separate license fee is required for each domain and that the common license duration for each fee is one year.

244.    Most of Plaintiff's video licenses are issued for online use, such as with the Video in question; and though he does license his works for print use, this is generally not practical for a 60 second video.

245.    Online licensing usage is perhaps the single most important target market for licensing including usage on social media platforms such as Facebook and Instagram.

///

///

**A.  COMMON ALLEGATIONS EVIDENCING 149 SEPARATE INFRINGEMENTS ON 149 OF SINCLAIR AFFILIATE DEFENDANTS' AFFILIATE WEBSITES**

246.    Starting on December 11, 2017 and going through on or about February 9 and 10 2021[13] (for nearly all 149 Sinclair Affiliate Defendants' Affiliate Websites), Defendants displayed via Facebook embed Plaintiff Nicklen's Video without authorization, a license or protection by a "fair use" defense.

247.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair through its 30(b)(6) corporate representative, evidence willful and/or reckless infringement of Plaintiff's Video.

248.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that "Sinclair does not encourage stealing any content."  "Sinclair does not encourage our publishers to take content that is not appropriate for them to use." See Dep. of Elizabeth McKernan, p. 8:16-8:25, July 7, 2021.

249.    "It is not Sinclair's policy to use copyrighted material that we don't have permission to use."  Id. at 9:12-10:2.

250.    Jessie Karangu, a Sinclair employee in December 2017, had authority to publish the Video to the 149 Affiliate Websites.

251.    Jessie Karangu, a Sinclair employee in December 2017, was also trained that he "never got permission from a copyright owner to embed their video" from Facebook in any of

---

[13] After the amended complaint was filed, the various Sinclair Affiliate Defendants took steps to preserve evidence of the 149 infringements, which meant the Video was displayed for over three (3) years on almost all the Affiliate Websites.  See Exhibit. A, a stipulation showing the web domain address where the display occurred, the TV station call letter, the TV station licensee, and operators and/or owners of each TV station that may have operated the Sites.

the 149 Affiliate Websites, despite the policies in the Photo and Video Use Guide's explicit and mandatory instructions to always seek permission from the copyright owners.

252.    The Sinclair Affiliate Defendants were subject to a written corporate policy for photo and video use on their broadcast stations and their corresponding websites, the Photo and Video Use Guide,[14] which included instructions on using content from social media accounts such as Facebook; but contrary its official written policies, the Sinclair Affiliate Defendants simultaneously had a separate, secret, oral policy wherein it was an acceptable practice to embed copyrighted material without the owner's permission.

253.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that it is up to the individual stations to monitor and review copyrighted works on their individual websites to ensure that that website is complying with the rights that they have obtained to display a video. Dep. of Manny Fantis (30(b)(6) for Sinclair, at p. 126-128 in *Britney Gobble Photography Inc. v. Sinclair Broadcast Group Inc., vs. USA Entertainment News, Inc.*, 1:18-cv-03403-RDB August 5, 2019.

254.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that there are potentially a couple different people at each Affiliate Website (carrying titles such as: Digital Executive Producer, News Director or Digital Content Manager, etc.) that are charged with reviewing and monitoring the use of any copyrighted works on the Affiliate Website to ensure compliance with rights in which the TV station has been granted for that Site. Id.

255.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that at each Affiliate Website, there is a running audit or a daily audit and it's up to the digital executive

---

[14] See Exhibit E, Photo and Video Use Guide (11/2/2017)

producer or the news director at each affiliate website to know that they had the rights to publish the content on the site. Id.

256.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that it had a policy that when the national desk (someone such as Jessie Karangu) hit the "publish button" for a post to be published on 149 Affiliate Websites, it was a requirement that someone at the national desk was to send each of the Affiliate Websites an email or something in writing that gave Sinclair express written consent to use a video. Id.

257.    That email would be sent out Monday through Friday and a few times and a more limited capacity on the weekends. Dep. of McKernan at 20:18-21:15.

258.    Despite formal discovery requests, it is likely that Sinclair and the Sinclair Affiliate Defendants lost or destroyed the email or emails that were sent to the various contacts at the 149 Affiliate Websites that the polar bear Video was being displayed on each of the Affiliate Websites.

259.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that the terms and conditions of each of the separate 149 Affiliate Websites state that each Affiliate is "operated by Affiliates of Sinclair each of which also operates a local television station" and "notwithstanding anything to the contrary in this visitor [website] agreement, we [the Affiliate Website] will not be liable for the content of or any services provided by any Sinclair Affiliate Websites *other than this site*… (Attached as Exhibit F, the terms and conditions that apply to each Affiliate Website per the stipulation in Exhibit A).

260.    In other words, each local TV station that is operated by Affiliates of Sinclair and operates the website for that TV station is only liable for the content that is displayed on its specific, unique site and no other entity is liable. This contracting of liability in this written

document is circumstantial evidence that each Affiliate Website intended to only be liable for the content on its not and insulate itself from liability for claims of copyright infringement occurring on other sites. Simply put, factually each Affiliate Website is only liable for the content on its site and cannot factually be jointly and severally liable with any other of the 148 Affiliate Websites at issue here.

261.    Factually, the terms and conditions are also clear that the Affiliate Website never intended to specifically make Sinclair Broadcast Group Inc. liable for the content that is displayed or appeared on any one Affiliate Website.

262.    The Sinclair Affiliate Websites, owned and/or operated by various Sinclair Defendants, had a written policy to "always seek permission from copyright owners, regardless of whether video is used natively or embedded from Facebook."  See Exhibit E (Photo and Video Use Guide (November 2, 2017).  Exhibit E-1 is also attached as the 2016 version of the 2017 document.

263.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that none ever reached out to Plaintiff to license (or embed) his Video for display on any of the 149 Affiliate Websites.

264.    The Sinclair employee who hit the "publish" button for the Video on a program called Storyline was trained that the use of the embed code gave him the ability to publish the Video, and circumstantially, he was neither trained on licenses nor permission for the use of third party copyrighted content, which evidences willful and/or reckless disregard for Plaintiff's rights.

265.    The same Sinclair employee who hit the publish button testified that he does not "know anything about licenses except for drivers' licenses." Dep. of Jesse Karangu at 23:4 to 23:17, July 1, 2021.

266.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that "we must always seek written permission from copyright owners before using any content including videos and photos from social media, YouTube clips or other video content in stories." Dep. of McKernan at 35:01-35:16.

267.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that nowhere in its written official policies regarding displaying copyrighted content of third parties is "embedding" an exception to the policies, which were written by Sinclair in-house lawyers. Id. at 160: 14-18.  The Sinclair Defendants have maintained a defense that they had some oral, unwritten policy that embedding was an acceptable exception yet this contradicts at least two years (2016 and 2017) policies. See Exhibit E.

268.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit no one for an Affiliate Website performed a "fair use" analysis.  Dep. of McKernan at 44:18-45:22.

269.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admits that "before using any YouTube videos or social media content without permission from the owner you must meet the following [5] factors," and there is no exception mentioned that would excuse embedded content. Id. at 44:18-45:22.

270.    Under Fair Use Factor One (1) from Sinclair's own corporate polices that they used everyday, the Sinclair Defendants are not sure what editorial perspective the posts give to the Video. Id. 51:4-51:9.

271.    Under oath, the Sinclair Affiliate Defendants denied that there were "two different operations going on, the way the lawyers wanted things run and the way the [website] publishers did things on their own."  Id. at 47:08-47:15. Yet, the factual evidence shows that this is exactly what was happening. Sinclair's inhouse lawyers crafted daily operating policies that followed the Copyright Act (like an operating treatise), yet the various Affiliate Website operations had to feed their relentless appetite to publish and display quality content, especially "viral" content that could create traffic on their websites and generate ad revenue from that traffic.

272.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair and regarding a fair use defense, admit that the headline authored by a national desk employee at Sinclair references a video while the first sentence references a photograph (which is not accurate or consistent), admits that Sinclair didn't add any commentary "aside from mentioning that it had more than a million views on Facebook," and that there's nothing original or unique or editorial about noting a million views where anyone seeing the video can clearly see a video's view count. Id. at 56:10-56:25, 59:9-60:6, 61:2-61:13.

273.    The Sinclair Affiliate Defendants sought out viral or trending videos but recklessly failed to train their employees with the Photo and Video Use Guide which included **bold**, UPPERCASE instructions highlighted in green: "**VIRAL VIDEOS: THIS MEANS NO VIRAL VIDEOS WITHOUT WRITTEN AUTHORIZATION FROM THE COPYRIGHT OWNER.**"  *See* Exhibit E Photo and Video Use Guide at Section III 2) iii.

274.    Under a fair use defense, The Sinclair Defendants admit that its own policies state (in ALL CAPS) that "it is not transformative if a station shows a viral video, even if the anchor introduces the video, describes the video, and comments on the popularity of the video, is not transformative. THAT IS NOT TRANSFORMATIVE."  Id.

275.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that by embedding the Video, the entire 60 seconds in displayed. Id. at 76:5-76:12.

276.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that its own policies state "we must only use the shortest amount of the video as necessary for our story" and "60 seconds is a lot more than a few seconds."  Id. at 78:11-78:14, 79:04.

277.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that their own policies state in bold font: "**Assume all photos and videos are subject to copyright protection**!" and "there's no carve outs or exceptions under this rule." Id. 80:12-81:19 and 81:20-81:24.

278.     Sinclair violated its own policies when it failed to shoot the video clip off of a screen and show it in its full context from the social media page for the entire duration of the clip (Fourth Factor under Photo and Video Use Guide.) Id. at 85:15-86:13.

279.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that their own policies state that "If the station has followed all of the [fair use] steps and determines that the… …social media content is essential to the story, you must first present it to the station's news director or news director's designee for final sign-off and approval.  Id. 88:15-89:18. There is no evidence that this ever happened here.

280.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit its official corporate policy, the Photo and Video Use Guide, reads in all caps, underlined, bold font: "**<u>UNLESS ALL FIVE FACTORS ABOVE HAVE BEEN MET, YOU CANNOT USE THE CONTENT WITHOUT AN EXPLICIT WRITTEN LICENSE FROM THE COPYRIGHT OWNER."</u>** Under these policies, which appear to relate to fair use, there are no exceptions or

caveats under the policies for content such as Plaintiff's Video that was embedded from Facebook.

281.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that violated its own internal policies ("common errors") in the following ways:

a.  "The fact that a photo/video is available on the Internet **does NOT** mean that it is free to use or that you can use that photo/video without express permission from the content owner."

b.  The fact that an image/video is available on someone's YouTube or Facebook page **does NOT** mean that the image is free to use or that the Facebook user actually owns the image/video in the first place."

c.  "Just because other media companies use You Tube clips or social content in stories does **NOT** mean they are fair game."

282.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that because of the licensing language (directives to potential licensees) on the Facebook and Instagram captions written by Plaintiff, Sinclair knew or should have known Plaintiff was attempting to license his Video. Id. at 109:19-23.

283.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that each of the Affiliate Websites generate revenue from posts such as the 149 where the Video was displayed.

284.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that Facebook did not give Sinclair or Sinclair Affiliate permission to use Plaintiff Nicklen's video. Id. at 112:22.

285.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that there is no document in 2017 that authorizes the Sinclair Affiliate Websites to embed and display copyrighted videos without seeking permission from the copyright owner, other than the Photo and Video Use Guide which requires an affiliate to seek written permission unless it meets all five factors of its official corporate policy.  Id. at 113:12, 113:19-113:20.

286.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit no Affiliate Website had a license agreement as it pertains to embedding content onto [our] websites […] from platforms like Facebook or Twitter or Instagram or any others. Id. at 114-115.

287.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that the Video was displayed from December 11, 2017 until it was taken down in February 2021.

288.     The Sinclair Affiliate Defendants refuse to admit that Nicklen lost the opportunity to negotiate a licensing fee for each of the Affiliate Websites to display his Video.

289.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that that the polar bear video is not a work of fiction.

290.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit content creators (such as Nicklen) of documentaries tend to [produce their works] for monetary purposes.

291.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that no Affiliate Website did anything to change, shorten, or alter plaintiff's copyrighted Video when it was embedded. Id. at 134:4-6.

292.     The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that each Site each could have easily published a link to Nicklen's starving polar bear video without actually displaying (via embed) the video into its websites.  Id. at 134:20-23.

293.    The Sinclair Defendants avoid publishing pornography and explicit content on any Affiliate Website in native videos as well as embedded videos because the *display* of such content may offend viewers and FCC regulations as to prohibited content.

294.    Yet, the Sinclair Defendants testified over and over that when they displayed content stored on a third-party server such as Facebook, they were not violating the exclusive display right of a copyright holder such as Plaintiff.  At the same time, the Sinclair Affiliates acknowledge that content deemed morally offensive or illegal under the FCC rules (e.g., nudity or profanity) embedded from a social media account for display on an Affiliate Website would still be offensive and prohibitively again company policy even though the display did not originate from a Sinclair or Sinclair Affiliate Defendant server. This is evidence of contradictory legal positions in both instances for alleged wrongdoing and illustrates that the Sinclair Affiliate Defendants avoiding liability for offending its viewers in one instance, but taking the opposite position for non-offensive conduct to justify violating Plaintiff's copyright.

295.    Neither Sinclair or any of the Sinclair Affiliate Defendants could not produce or had any knowledge about a "written agreement between Sinclair Broadcast Group and each of the [149] affiliate websites to publish copyrighted content on those websites."  Id. at 142:7-14.

296.    Yet, Sinclair and Sinclair Affiliate Defendants cannot ascertain which entity owns any website (or the content on the site) because it's "too complicated" or too complex.

297.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that the digital managers at local TV stations would be in charge of making sure that the content that lives on their affiliate websites is indeed content that can be published;  it's a part of the responsibilities of people working in the local TV stations to know that what is on their website; each Affiliate station is responsible for what it is on their websites; digital managers (or whatever

their title is) at the local level have authority to remove content from their website that violates either a policy or the law. Id. at 146-149.

298.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that no Affiliate Website manager made any requests to remove the post where Video was displayed even though people working at the TV stations were charged with awareness and have actual knowledge of the content that is published on their Affiliate Website. Id.

299.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that all 149 affiliate stations would have more likely than not known that Plaintiff Nicklen's polar bear video was embedded on a post on their website and each websites manager is aware of the content that's published on their site because they can refresh it and see the new content and it's also designated as new, so it's fairly easy to see when new content is published on a website. Id.

300.    Even though the Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that there are checks and balances as to what content is displayed on each of the 149 Affiliate Websites, the undisputable facts show that each separate Affiliate Website is responsible and liable for the content on its own site as confirmed by each site's terms and conditions

301.    Each of the 149 Affiliate Websites not only violated the Affiliate Website's policies related to displaying copyrighted content, but also each site separately violated Plaintiff's exclusive display right in his Video.

302.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that there is neither a fixed budget nor was any money spent on licensing third party copyrighted content for the display on 149 Affiliate Websites.

303.    The Sinclair Defendants have no evidence and did not produce documents that show any licensing fees were ever paid to "stringers" or freelance photographers or videographers at any time. Rather, the Sinclair Affiliate Websites elected to recklessly display third party copyrighted content without bothering to seek to a license, confirm that a license or permission had been obtained.

304.    There is no more evident admission of the Sinclair Affiliate's conduct than in the Photo and Video Use Guide (See Exhibit E) wherein Sinclair's in-house lawyers remind the Affiliate Website managers that it was mandatory (not optional and not simply encouragement) to follow the Photo and Video Use Guide because "****We've recently received copyright infringement claims for TENS OF THOUSANDS OF DOLLARS related to viral videos used by our news stations just in the past three months."  This dire warning of following the official corporate policy is found the Photo and Video Use Guide in both 2016 and 2017 and is factual evidence that the Affiliate Websites have actual knowledge that using viral videos result in likely claims for copyright infringement.

305.    The Sinclair Affiliate Defendants, bound by admissions of Sinclair, admit that "nowhere in the Photo and Video Use Guide written by Sinclair's in-house counsel does it mention a different policy for embedded content" and there is no written policy or written communication that maintains that is lawful to embed Facebook content without authorization from the copyright holder.  Id. at 160-164.

306.    Strikingly, Sinclair refused to acknowledge that the 149 Affiliate Websites violated nearly every policy found in the Photo and Use Guide but instead doubled down with reference and parroting of an unwritten, undocumented, oral-only policy created as a defense for this case.  There are no emails, no memo, no training materials, no handbooks, manuals,

operating procedures, policy or practice guide that any Sinclair Affiliate Defendant or any Affiliate Website have in its possession or control that allow the embedding of copyrighted content without permission or authorization or a license from the copyright holder, or any document that excuses not doing a full evaluation or analysis of the five (5) "fair use" factors identified in the Photo and Use Guide.

307.   Essentially, the Sinclair Defendants may have manufactured a defense by having the Sinclair corporate representative testify about an unwritten, orally communicated, "secret" policy for embedding from Facebook, which in turn caused Plaintiff to expend significant time, costs, energy and effort proving that the display right was violated, especially in light of the violations of the Photo and Video Use Guide.

308.   The display of the Video by the Sinclair Affiliate Defendants is not transformed by or through any commentary or criticism sufficient for fair use purposes.

309.   The 149 displays of the Video on 149 separate websites merely note the "viral" nature of the Video (which violates Sinclair Affiliate Defendants' own internal policies for fair use. The 149 displays also simply regurgitate Plaintiff Nicklen's caption to the Video from his Instagram and Facebook posts, the text of a December 7, 2017, article about the Video published by licensee, National Geographic.[15]

310.   Moreover, in all 149 posts by Defendants where the Video was used, each displayed or caused to be displayed the entire one-minute Video, far more than is reasonably required or necessary to comment or criticize the subject matter of the Video or Video itself.

311.   The display of the entire Video here is analogous to a writer that embeds an entire Hollywood blockbuster movie into his critique of the movie, then asserts "fair use" as a defense

---

[15] See: https://www.nationalgeographic.com/news/2017/12/polar-bear-starving-arctic-sea-ice-melt-climate-change-spd/

to justify the full display. The use of the entire film in such a critique is no more justified than Defendants' 149 displays of the entire one-minute Video here.

312.     Additionally, because Plaintiff regularly licenses his videos as a part of his means to make a living, and did so with the Video, the Defendants' unauthorized, non-transformative display of the Video on their commercial websites was a bad faith usurpation of the market for Plaintiff to license Video. Thus, any fair use defense will fail on its face.

313.     Prior to the embedding and displaying of the Video by Defendants on 149 separate web sites, Plaintiff Nicklen's Video were first posted and displayed on his respective public Instagram and Facebook accounts on or about December 5, 2017.

314.     Plaintiff maintains the sole copyright interest in his Video.

315.     Plaintiff timely registered his Video with the US Copyright office, the certificate of which is attached as Exhibit as G.

316.     All Sinclair Affiliate Defendant Websites accomplished an unauthorized display of Nicklen's Video by displaying the Video from Nicklen's Facebook account, generally referred to as Facebook's application programming interface ("API") code, in 149 separate Defendants' websites causing the Video or Photo to simultaneously be displayed within the body of each of the 149 Defendants' web site without the need for a viewer of any Defendants' web site to take additional action or navigate their web browser away from the web site to the Facebook account of Nicklen. In other words, a viewer of the article on a website likely did not even know that the Video displayed in the body of the web site was "embedded" and the actual Video file was stored on Instagram's server.[16]

---

[16] Upon information and belief, Instagram's default format for images is JPEG (.jpg), meaning that any image that is uploaded in PNG (.png), BITMAP (.bmp) or MP4 of MOV files.

317.   The Court has previously noted that "no user intervention was required to display the Video's individual images nonsequentially. An individual still image from the Video awaits Sinclair readers whether they click the image to play the video or not." See Opinion and Order, Dkt. No. 102.

318.   To a viewer of the Post, content embedded from a Facebook account appears no differently than other content within the Post, be it Defendants' advertisements, clickable links, or Defendant's content. A viewer does not need to be a Facebook user or have a Facebook account to view the Video displayed via an embed within any of the 149 separate Defendants' posts.

319.   All Facebook user account holders, including Plaintiff, agree to Facebook's Terms of Use in order to initially open an account and maintain that account for use on the Instagram or Facebook platform.

320.   Pursuant to Facebook's Terms of Use, Facebook users, such as Plaintiff, retain ownership of his copyrighted photos and videos that are posted to his Facebook account.

321.   However, each user, such as Plaintiff here, agrees to grant Facebook, a nonexclusive license to the Video he posts to his Facebook account, including any copyrighted photos or videos. This granting of a license, in turn, provides Facebook permission to license, or sublicense, those copyrighted photos should Facebook elect to do so.[17]

322.   There is no evidence that Facebook granted any of the Sinclair Affiliate Defendant Websites in this case a license to the Video.

---

[17] See Facebook Terms of Use applicable in December 2017 to the February 2021 when most of the 149 posts by the Sinclair Affiliate Websites were displayed.

323.    In fact, Facebook's lawyers, represented in open court that Facebook has never granted or given a license to an online publisher (such any of the Sinclair Defendants) who use the embed tool.

324.    Facebook's has made it clear that all publishers have always needed to obtain a license or permission by either the copyright holder or Facebook, as required by law.

325.    Further, users, such as each of the Sinclair Defendants that used Facebook's embedding code, agrees to be bound by an additional set of rules contained within Facebook's Platform Policy ("Platform Policy").

326.    Notably, Facebook's Platform Policy contains no language (that can be reasonably interpreted or misconstrued) that provides embed users such as each of the Sinclair Defendants a license or sub-license to freely use, display, publish, or embed the Video of Plaintiff without first ensuring that each Defendant Affiliate Website received "all rights necessary to display the content of a Facebook user.

327.    Non-party Facebook Inc. publicly confirmed that Instagram (which uses the similar or substantially the same terms for embed users) does not automatically give API embed users a license or sub-license to use and display the content of a Facebook user:

**"While our terms allow us to grant a sub-license, we do not grant one for our embeds API. Our platform policies require third parties [such as Defendants] to have the necessary rights from applicable rights holders. This includes ensuring they have a license to share this content, if a license is required by law."[18]**

328.    The Sinclair Affiliate Defendants have admitted that none of the 149 Affiliate Websites obtained a license for the Video from Facebook or from Plaintiff.

---

[18] Timothy B. Lee, *Instagram just threw users of its embedding service under the bus*, Ars Technica, June 4, 2020. Available at: https://arstechnica.com/tech-policy/2020/06/instagram-just-threw-users-of-its-embedding-api-under-the-bus/.

329.    Instead, Defendants stole Nicklen's Video by using the Facebook embed tool in 149 separate website posts on Defendants' respective Affiliate Websites.  This is despite Facebook's public position regarding licensing and the use of the API embed tool, and at least two court rulings in the Southern District of New York in *McGucken v. Newsweek LLC et. al.*, No. 1:2019cv09617 - Doc. 35 (S.D.N.Y. June 1, 2020) and *Sinclair v. Mashable Inc*. No.: 1:18-cv-00790 (S.D.N.Y.).

330.    Due to the large number of Sinclair Affiliate Defendant infringers that involve a common set of facts, joinder of the Sinclair Affiliate Defendants for the independent liability of the 149 Affiliates Sites is likely the most appropriate procedural mechanism and vehicle to manage the 149 infringements, rather than as many as 149 separate matters as this benefits all parties and the court systems throughout the United States.

331.    In any event, none of the Sinclair Affiliate Defendants took the Video off from the 149 websites despite being on actual or constructive notice of Facebook's position about the API/no automatic license and two S.D.N.Y. court decisions.

332.    Each of the Sinclair Affiliate Defendants willfully or recklessly ignored this information, even though each of the Sinclair Defendants are considered sophisticated corporate digital publishing companies with lawyers or management to address licensing and video rights clearing for any such uses.

333.    None of the Sinclair Affiliate Defendants secured a license or permission from Plaintiff Nicklen to display, copy, reproduce or use his copyrighted Video in their respective website posts.

334.    Plaintiff Nicklen's Video is filed as Exhibit "H" (under separate cover) and the U.S. Copyright Office's registration for his video is attached as Exhibit "G" and bears Effective

Date of February 7, 2018 and Registration number PA 2-102-139, with a supplemental

registration with Registration number 2-290-646, and a corrected first publication date of

December 7, 2017, the day *NatGeo* published its article.

    335.    Defendant Sinclair Broadcast Group, Inc. ("Sinclair") owns as many 601

television channels in the United States. See Exhibit I.  Despite Plaintiff's best efforts to allege

and confirm which parties may be liable for the 149 separate displays, the following facts from

Sinclair's Terms and Conditions (Exhibit F) show contradictory, vague, and potential

misrepresentations as who are the real parties in interest for liability for content on an Affiliate

Website:

    a.   "Each website is operated by an Affiliate of Sinclair Television Group, Inc.

        ("Sinclair").

    b.    Each "site is one of a network of ad-supported sites operated by Affiliates of

        Sinclair [multiple Affiliates?] each of which [a single Affiliate?] also operates

        a local television station (each a "Sinclair Affiliate Website" and, collectively,

        the "Sinclair Network of Sites").

    c.    The Terms and Conditions define "Affiliate" to means "a company

        controlling, controlled by or under common control with another company, or

        a company which shares common management."  (Three separate definitional

        options which is likely written in an intentionally vague way).

    d.    "These Website terms and Conditions (sometimes called "Agreement") are a

        binding legal contract between you [the website user] and the [single,

        separate] Sinclair Affiliate that operates this website ("we," "us" or "our") and

        governs your

use of such website and **any content made available from or through such website, including any subdomains** thereof."  This shows that each Affiliate that operates the website and any submains are governed by the Terms and Conditions.

336.    Plaintiff sent Defendant Sinclair's registered agent a cease and desist to preserve and takedown all alleged infringements of the Video on December 9, 2020. However, no Sinclair Affiliate Website complied with the takedown notice and Plaintiff's Video remained displayed on about 149 web sites until the Affiliate Websites took the Video down on February 9 or 10, 2021.

337.    As an example of one of the unauthorized displays of the Video (also referenced in Exhibit A), Defendant WCWN Licensee, LLC (d/b/a WCWN; d/b/a CW15 Albany), allegedly operated by Defendant Sinclair Communications, LLC displayed Nicklen's Video from his Facebook account in a post titled, "Starving Polar Bear Goes Viral in Heartbreaking Video," published on December 11, 2017.  Attached as Exhibit D.

338.    The example post (Exhibit D) essentially shows a cut and paste job from the *Nat Geo* article, Exhibit C. The *NatGeo* article shows in ==yellow highlights== the text in the post quoted from the *Nat Geo* article, and shows in ==yellow highlights== the source text used in the post. To evidence lack of any objective transformation, Exhibit B also shows in ==blue highlights== of the text that the post grabbed from Nicklen's ==Facebook Post==, which is attached as Exhibit B, and shows in ==blue highlights== the source text used in the post. The post cannot be objectively found as transformative in anyway by grabbing near identical language from the *Nat Geo* article and Nicklen's Facebook Post.

339.    Each Sinclair Affiliate Website is a separate infringer and not jointly and severally liable with any other Affiliate for their infringing display of Nicklen's video. Sinclair Broadcast Group Inc.'s employee may have hit the "publish" button, but the Terms and Conditions contract away or disclaim any liability except for liability on the Affiliate Website operated by the same entities that may operate the Affiliate TV station that holds the FCC license.  Therefore, Plaintiff is entitled to seek separate awards of statutory damages as to each infringing Sinclair Affiliate Website, which may be as many as 149 or a few as 38 entities.

340.    The general rule is that a parent such as Defendant Sinclair Broadcast Group Inc. is a "separate and distinct entity" in copyright infringement cases. *See, e.g*., *Sinclair v. Ziff Davis, LLC and Mashable, Inc.*, 454 F.Supp.3d 342, 347 (S.D.N.Y. 2020) (holding that Mashable is a separate entity from Ziff Davis, LLC, "corporations and their subsidiaries are legally distinct …." for copyright infringement purposes).

341.    A "parent" company such Sinclair Broadcast Group Inc. cannot in good faith "reverse" pierce its own corporate veil for any affiliate subsidiaries to avoid liability for those affiliates. *Big East Entertainment, Inc. v. Zomba Enterprises, Inc.,* 453 F.Supp.2d 788 (S.D. N.Y.). A parent corporation may not pierce the corporate veil for its own benefit in order to advance the claims of its subsidiary. This is akin to maintaining that each of the Sinclair Affiliate Defendants are simply just shells (perpetuating a fraud) on creditors and others who rely on the separate and distinct nature of the companies. So, Sinclair Broadcast Group cannot "pierce" its own corporate veil to avoid liability of the various affiliates as this would mean that there is no separation between all of its affiliated companies, i.e., it is a sham corporate structure for purposes of avoiding copyright liability (all one entity) but for purposes of FCC licenses and

operating TV stations that each have its own website or other statutory schemes such as antitrust, Sinclair purports to rely on having separate, distinct independent operating affiliates.

342.   In other words, Plaintiff Nicklen may seek a separate damages award against each separate Sinclair Affiliate Defendant that operates an Affiliate Website or alternatively, actual damages.

## VII. CAUSES OF ACTION

### COUNT 1: INFRINGEMENTS OF COPYRIGHTS (17 U.S.C. §§ 106, 501)

### (PLAINTIFF NICKLEN AGAINST ALL SINCLAIR AFFILIATE DEFENDANTS)

343.   Plaintiff Nicklen incorporates herein by this reference each and every allegation contained in each paragraph above.

344.   Plaintiff Nicklen is and was at all relevant times the sole copyright owner under United States copyright with respect to the copyrighted Video identified in Exhibit H and the registration in Exhibit G.

345.   Among the exclusive rights granted to Plaintiff under the Copyright Act are the exclusive rights to reproduce his copyrighted works, to distribute his copyrighted works to the public and the exclusive display right.

346.   Defendant Sinclair Broadcast Group Inc., without the permission, license, or consent from Plaintiff, caused 149 initial embeds of Nicklen's copyrighted Video which was separately displayed on 149 Affiliate Websites using the Facebook embed code. Based on the agreements in place between Defendant Sinclair Broadcast Group Inc and each of the separate Affiliate Websites liable for the content its separate Site, each Affiliate Website is separately liable for the display of Nicklen's Video that was distributed to the public.

347.    Each Affiliate Website through various the Sinclair Affiliate Defendants each separately violated Plaintiff's exclusive rights of display (17 U.S.C. § 106(5)), reproduction (17 U.S.C. § 106(1)), and/or distribution (17 U.S.C. § 106(3)) of Nicklen's Video as alleged above.

348.    Neither Defendant Sinclair Broadcast Group, Inc. nor any one of the 149 separate Affiliate Website operators of the Sinclair TV stations ever sought permission or secured a license for the right to display Plaintiff's copyrighted Video despite Plaintiff operating a publicly available website for the purpose of inviting offers from potential licensors and despite Plaintiff Nicklen providing explicit written public licensing information in the text of his Instagram and Facebook posts where the Video was first displayed and which Sinclair admits that it saw and read and each Sinclair Affiliate Defendant should have saw and read.

349.    Plaintiff is also informed and believe that each of the display right violations of the foregoing acts of infringements have been willful and intentional or reckless, in total disregard of and with indifference to the rights to Plaintiff's copyright and exclusive rights under copyright.

350.    Willfulness is supported by the Sinclair Defendants and their various Affiliates having admitted that prior to displaying Nicklen's Video, the affiliate TV stations received (and presumably resolved) numerous copyright infringement claims for TENS OF THOUSANDS OF DOLLARS, making this evidence of knowledge of serial copyright infringers likely admissible, which also creates a presumption of enhanced damages.   See Exhibit E, Photo and Video Use Guide.

351.    As a result of the Sinclair Affiliate Defendants' 149 separate violations and/or displays on unique web domains of Plaintiff's exclusive rights under copyright, Plaintiff is also

entitled to statutory damages pursuant to 17 U.S.C. § 504(c) for Defendants' infringements of the copyrighted Video.

352.    Alternatively, Plaintiff can elect to pursue actual damages pursuant to 17 U.S.C. § 504(b) based on a number of factors including but not limited to what  the various Sinclair Defendants earned from the websites via advertising, impressions, user traffic etc., and savings from the avoidance of paying a licensing fee that represents the fair value for the scarcity and rarity multipliers factored into the value of Plaintiff's Video, the duration of a license (generally one year is the industry standard), the value of the damaging Plaintiff's copyright (his life plus 70 years) and the number of web domains at issue (149) that a license could have been separately negotiated in good faith.

353.    Plaintiff is further entitled to attorney's fees and costs pursuant to 17 U.S.C. § 505.

354.    In the event that Nicklen's Video is still published, displayed or found to be with Defendants, the conduct of Defendants have caused, may still be causing, and will continue to cause Plaintiff irreparable injury that cannot fully be compensated or measured in money unless enjoined and restrained by this Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyright, and ordering Defendants to destroy all copies of images made or used in violation of Plaintiff's exclusive rights and to remove the Video from any website that Defendants control, operate, or own.

## VIII. <u>DAMAGES</u>

355.    Defendants' conduct caused actual damages and/or are each liable for up to 149 separate statutory damages of up to $30,000.00 for each separate infringement for each

Defendant entity that is liable for an infringement or alternatively up to $150,000.00 for each of the 149 instances of willful infringement pursuant to 17 U.S.C. § 504. Alternatively, Plaintiff may elect to seek actual damages and profits earned by Defendants related to the infringing conduct.

## IX. <u>JURY TRIAL DEMANDED</u>

356.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury of all the claims asserted in this Complaint so triable.

## X. <u>RELIEF REQUESTED</u>

357.     WHEREFORE, Plaintiff respectfully requests and prays that the Court enter judgment on his behalf adjudging and decreeing that:

    a.  For declaratory relief under the Federal Copyright Act and for an injunction
        providing: "the Sinclair Affiliate Defendants and all 149 Affiliate Websites
        shall be and hereby are enjoined from directly or indirectly infringing
        Plaintiff's rights under federal or state law in the Copyrighted Video, whether
        now in existence or later created, that is owned or controlled by Plaintiff,
        including without limitation by using the Internet, the Facebook or Instagram
        embedding API code, or any online media distribution system to reproduce
        (i.e. download) of Plaintiff Nicklen's Video, to distribute (i.e. cause to be
        displayed) any of Plaintiff's copyrighted works, or to make any of Plaintiff's
        works available for distribution to the public, except pursuant to a lawful
        license or with the express authority of Plaintiff. Defendants also shall destroy
        all copies of Plaintiff's videos that Defendants have downloaded onto any
        computer hard drive or server and remove the 'embed code' pointing to the

Copyrighted Video from the internet or Instagram that Defendants have control or ownership interest in."

b.  For Plaintiff to be awarded either: (i) Plaintiff's actual damages and Defendants' profits, gains, or advantages of any kind attributable to Defendants' infringement of Plaintiff's copyrighted works based on the rarity and uniqueness and scarcity of the Video that was displayed on 149 separate web domains; or (ii) alternatively, statutory damages of up to $30,000.00 per infringement or up to $150,000.00 for each instance up as many as 149 separate willful infringement of Plaintiff's Copyrighted works pursuant to 17 U.S.C. § 504.

c.  For Defendants to be required to account for all profits, income, receipts, or other benefits derived by Defendants as a result of their unlawful conduct.

d.  For Plaintiff's costs and expenses in this action, including all reasonable attorney's fees incurred herein, pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1201 et. seq.

e.  For Plaintiff to be awarded pre-judgment interest from the time of the infringements.

f.  For such other and further relief as the Court may deem just and proper.

Dated: This 25th day of August 2021.

Respectfully submitted,

By: /s/ James H. Bartolomei
James H. Bartolomei Esq.
**Duncan Firm, P.A.**
Of Counsel
809 W. 3rd Street
Little Rock, Arkansas 72201
501-228-7600 phone
james@duncanfirm.com

and

Bryan D. Hoben, Esq.
**Hoben Law**
1112 Main Street
Peekskill, New York 10566
347-855-4008
bryan@hobenlaw.com

and

Robert Kaplan, Esq.
**Kaplan, Fox, and Kilsheimer LLP**
850 Third Street
New York, New York 10022
rkaplan@kaplanfox.com

Attorneys for Plaintiff Paul Nicklen

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause via email at their respective business addresses via the Court's ECF system, on August 25, 2021, as well as a courtesy copy delivered to the Court. I declare under the penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

By: /s/ James H. Bartolomei